**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| Sylvia Bruni, Texas Democratic Party, DSCC, DCCC, and Jessica Tiedt, <br><br> Plaintiffs, <br><br> v. <br><br> RUTH HUGHS, in her official capacity as the Texas Secretary of State, <br><br> Defendant. | Civil Action No. 5:20-cv-35 |

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Sylvia Bruni, Texas Democratic Party, DSCC, DCCC, and Jessica Tiedt, by and through their undersigned counsel, file this First Amended Complaint for Declaratory and Injunctive Relief against Defendant RUTH HUGHS, in her official capacity as the Texas Secretary of State, and allege as follows:

### NATURE OF THE ACTION

1.      This lawsuit challenges Texas's effort to end straight-ticket voting, which will unjustifiably and discriminatorily burden Texans' fundamental right to vote. Following record growth in both voter turnout and use of straight-ticket voting in a State that consistently ranks at the bottom of the country for voter turnout, Texas decided voting had become too convenient for its citizens, and especially its minority citizens. In ending a century-old voting practice that Texans have relied on to exercise their most fundamental and sacred rights—the rights to political participation and association—Texas has recklessly created a recipe for disaster at the polls in 2020.

2.      In Texas, if a voter decides she wants to support the candidates running under the

banner of a party that voter supports, straight-ticket or one-punch voting ("STV") gives her the option of making an initial selection corresponding to that party, which automatically chooses the candidate in each race who runs as that party's candidate. The voter may then modify her choices for any individual office.

3.      STV plays a critical role in Texas's elections: during Texas's 2018 general election, approximately two-thirds of voters—*more than 5.6 million Texans*—cast their votes using STV. Voters and election administrators have come to rely on STV as an integral component of the voting process that reduces voting time and minimizes wait times at polling places. STV's efficiency is particularly important because Texas is larger than most states by size and population and its electoral ballots are among the longest in the country—in Texas's largest counties, voters are regularly asked to make decisions in as many as 80 races or referendum issues. Thus, for the past century, STV has allowed Texans to efficiently and deliberately vote for the candidates of their choice.

4.      STV also ensures that voters fully complete their ballots. Without the option of voting straight-ticket, the excessive length of Texas's ballots creates a significant risk that voters will fail to cast votes in every down-ballot race, an effect often referred to as "roll-off." A product of voter fatigue, roll-off is most likely in jurisdictions with longer ballots and among voters with less educational attainment.

5.      Even with the overwhelming use of STV in Texas and the significant amount of time it saves voters when casting a ballot, Texans often encounter unreasonably long polling-place lines. During the 2018 election, for example, Texas voters encountered hours-long waits both on Election Day and during the early-voting period. And with turnout in the upcoming November 2020 general election expected to be the highest in decades, if not a century, Texas's long polling-

place lines are poised to get much worse.

6.      Texas's longest polling-place lines exist in its most populous counties, whose populations are disproportionately African-American and Hispanic. As a result, even when STV is available, African-American and Hispanic voters in Texas must, on average, wait longer to exercise their fundamental right to vote than non-minority voters.

7.      Despite all of this, on September 1, 2020, Secretary of State Hughs will order the elimination of the STV option from all Texas ballots pursuant to House Bill 25 ("HB 25"). HB 25 was passed on a party line vote with almost every Democrat opposing the bill and almost every Republican supporting it. Nearly all minority members of the Texas Legislature opposed HB 25, which the Legislature passed over repeated and strenuous objections that it would disproportionately burden minority voters with longer lines and confusion at the polls.

8.      HB 25 will be a disaster for Texas's elections. If HB 25 takes effect, each of the more than 5.6 million Texans who relied on STV in the last election will take significantly more time to complete their ballots at their polling place. As a result, already lengthy polling-place lines will grow, forcing Texans who wish to exercise their fundamental right to vote to first endure unreasonably long wait times. Just this week, Texans across the state—especially those in areas with high minority populations—endured hours-long waits to cast their primary ballots. Texas itself has recognized that increases in polling-place lines harm voters and discourage them from exercising their right to vote. *See Cotham v. Garza*, 905 F. Supp. 389, 399 (S.D. Tex. 1995). Despite this, Texas has done nothing to prepare its election system to avoid the predictable longer lines that will result from the repeal of STV.

9.      The severe burdens of increased polling-place lines caused by HB 25 will uniquely and disparately impact minority voters. African-American and Hispanic Texans utilize STV at a

higher rate than white Texans, and they live in more densely populated areas of the state. The combination of a higher proportion of voters switching away from STV and heavily-populated areas will result in longer lines for these voters. Making matters worse, due to their bearing the socioeconomic effects of a pervasive history of discrimination, African-American and Hispanic Texans are more likely to live in poverty, work jobs that are less flexible and accommodating, have less access to transportation, and have less access to child care assistance. As a result, on average, African-American and Hispanic Texans have significantly less ability to wait in line at a polling place. Each of these factors compounds the other, making it even harder for minority voters to participate in Texas's elections.

10.     HB 25's elimination of STV will also cause significantly more Texans, particularly minority voters, to fail to complete their ballots. These same voters—who tend to live in Texas's most populous counties where ballots are the longest, and who, due to Texas's extensive history of racial and ethnic discrimination, on average have lower educational attainment—are at a heightened risk of roll-off.

11.     In addition to burdening all individual voters, HB 25's elimination of STV would also impose a significant and disparate burden on the Democratic Party and its supporters. Because more African-Americans and Hispanic Texans utilize STV than whites in Texas, and because African-American and Hispanic Texans overwhelmingly support the Democratic Party over the Republican Party, roll-off is significantly more likely to occur among Democratic voters. As a result, HB 25 will directly harm Texas Democrats' fundamental right to associate with one another and elect the candidates of their choice.

12.     None of these detriments are justified by a legitimate governmental interest. Though HB 25's proponents claimed it would lead to a more educated electorate, no evidence was

- 4 -

offered to support this claim; indeed, numerous legislators raised concerns that elimination of STV would not achieve this purported purpose at all. Republican proponents of the bill admitted they did not conduct any inquiry into whether HB 25 would actually achieve their purported goals and that they were unaware of any evidence from Texas or anywhere else that indicated that elimination of STV leads to a more informed electorate.

13.     Instead, Republican proponents of HB 25 ignored repeated warnings that HB 25 would cause reduced voter engagement, long lines at the polls, and a disparate impact on minority voters. These concerns were neither evaluated nor answered. In fact, Republican legislators admitted they had not conducted any inquiry into whether HB 25 would disparately impact minorities, especially African Americans and Hispanics, and claimed ignorance when repeatedly reminded that minority voters use STV at far higher rates than white voters.

14.     In light of these facts, HB 25 violates a bevy of constitutional and statutory rights. HB 25 violates the First and Fourteenth Amendments to the U.S. Constitution because it unduly burdens Texans' right to vote and the rights of voters who support the Democratic Party to associate and elect their candidates. HB 25 violates Section 2 of the Voting Rights Act because it disproportionately burdens minority voters. And HB 25 violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act because a substantial motivating factor behind its passage was an intent to depress electoral participation by racial and ethnic minorities.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution and the Voting Rights Act, 52 U.S.C. § 10301.

16.     This Court has original jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States, and involve the assertion of a deprivation, under color of state law, of a right under the Constitution of the United States and an Act of Congress providing for equal rights of citizens or of all persons within the United States.

17.     This Court has personal jurisdiction over the Defendant, the Texas Secretary of State, who is sued in her official capacity.

18.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Laredo Division of the U.S. District Court for the Southern District of Texas because a substantial part of the events that give rise to Plaintiffs' claims occurred here.

19.     This Court has authority to enter a declaratory judgment in this action under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

20.     Plaintiff Sylvia Bruni was elected to be the Chair of the Webb County Democratic Party, the countywide organization representing Democratic candidates and voters throughout Webb County, on March 3, 2020. Ms. Bruni's goal is to elect Democratic Party candidates to public office throughout Webb County and Texas. To accomplish this, Ms. Bruni supports Democratic Party candidates through fundraising and organizing work, including providing Get Out the Vote ("GOTV") assistance and actively supporting the development of programs benefiting Democratic Party candidates. Ms. Bruni plans to continue to engage in fundraising, GOTV assistance, and the development of programs to elect Democratic Party candidates in Webb County and Texas. If allowed to take effect, HB 25 will directly harm Ms. Bruni in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will directly harm Ms. Bruni by frustrating her goal of, and efforts in, turning out voters in Webb

County who support Democratic Party candidates. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm Ms. Bruni by frustrating her goal of, and efforts in, turning out voters who support Democratic Party candidates in Webb County. Ms. Bruni is aware of the effects that HB 25 will cause, and to combat these effects in the 2020 general election in Texas, she will divert and expend additional time and resources in voter education and turnout efforts in Webb County at the expense of her other efforts in Webb County.

21.     Plaintiff DSCC is the national senatorial committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party to the U.S. Senate across the country, including those running in Texas. DSCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Texas. In 2018, DSCC made millions of dollars in contributions and expenditures to persuade and mobilize voters to support Senate candidates who affiliate with the Democratic Party. In 2020, there will be a Senate election in Texas, and DSCC will work to elect the Democratic candidate for U.S. Senate. DSCC intends to and will make substantial contributions and expenditures to support the Democratic candidate for U.S. Senate in Texas in 2020. If allowed to take effect, HB 25 will directly harm DSCC in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will directly harm DSCC by frustrating its mission of, and efforts in, turning out Texas voters who support the Democratic candidate for U.S. Senate. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm DSCC by frustrating its mission of, and efforts in, turning out Texas voters who support the Democratic candidate. DSCC is aware of these effects that HB 25 will cause, and to combat the effects of HB 25 in the 2020 general election for U.S. Senate in Texas, DSCC will divert and expend additional funds and resources for voter education and turnout efforts in Texas

at the expense of its other efforts in Texas and in other states. Because HB 25 will also impose disproportionate burdens on voters who support Democratic candidates, it will directly prevent DSCC, its members, volunteers, and constituents from fully exercising their associational rights to band together and elect candidates of their choice. HB 25 will also directly harm DSCC by decreasing the electoral prospects of the candidates DSCC supports and represents.

22.     Plaintiff DCCC is the national congressional committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party to the U.S. House of Representatives from across the country, including those running in Texas's 36 congressional districts. DCCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Texas. In 2018, DCCC made millions of dollars in contributions and expenditures to persuade and mobilize voters to support congressional candidates who affiliate with the Democratic Party. For 2020, DCCC has identified multiple specific congressional districts in Texas as targeted races, in which it will expend significant resources to support the Democratic candidates. Overall, in 2020, DCCC expects to make contributions and expenditures in the millions of dollars to persuade and mobilize voters to support Democratic candidates in congressional elections around the country, including in Texas. If allowed to take effect, HB 25 will directly harm DCCC in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will directly harm DCCC by frustrating its mission of, and efforts in, turning out Texas voters who support Democratic candidates for Congress. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm DCCC by frustrating its mission of, and efforts in, turning out Texas voters who support Democratic candidates for Congress. DCCC is aware of these effects that HB 25 will cause, and to combat the effects of HB 25 in the 2020 general election

- 8 -

for Texas's congressional seats, DCCC will divert and expend additional funds and resources in voter education and turnout efforts in Texas at the expense of its other efforts in Texas and in other states. Because HB 25 will also impose disproportionate burdens on voters who support Democratic candidates, it will directly prevent DCCC, its members, volunteers, and constituents from fully exercising their associational rights to band together and elect candidates of their choice. HB 25 will also directly harm DCCC by decreasing the electoral prospects of the candidates DCCC supports and represents.

23.     Plaintiff Texas Democratic Party ("TDP") is the statewide organization representing Democratic candidates and voters throughout the State of Texas within the meaning of 52 U.S.C. § 30101(15). TDP's purpose is to elect Democratic Party candidates to public office throughout Texas. To accomplish its purpose, TDP engages in vitally important activities, including supporting Democratic Party candidates in national, state, and local elections through fundraising and organizing; protecting the legal rights of voters; and ensuring that all voters have a meaningful opportunity to cast ballots in Texas. TDP has millions of members and constituents from across the State, including Texans who regularly support candidates affiliated with the Democratic Party and Democratic Party candidates. TDP works to accomplish its mission by, among other things, working closely with Democratic candidates and assisting county parties by making expenditures on candidates' behalves, providing GOTV assistance, and actively supporting the development of programs benefiting Democratic Party candidates. TDP has previously engaged in, and plans to continue to engage in, expenditures on behalf of Democratic Party candidates, GOTV assistance, and the development of programs to elect Democratic Party candidates in Texas. If allowed to take effect, HB 25 will directly harm TDP in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will

directly harm TDP by frustrating its mission of, and efforts in, turning out Texas voters who support Democratic Party candidates in Texas. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm TDP by frustrating its mission of, and efforts in, turning out Texas voters who support Democratic Party candidates in Texas. TDP is aware of the effects that HB 25 will cause, and to combat these effects in the 2020 general election in Texas, TDP will divert and expend additional funds and resources in voter education and turnout efforts in Texas at the expense of its other efforts in Texas. Because HB 25 will also impose disproportionate burdens on voters who support Democratic candidates, it will directly prevent TDP, its members, volunteers, and constituents from fully exercising their associational rights to band together and elect candidates of their choice. HB 25 will also directly harm TDP by decreasing the electoral prospects of the candidates TDP supports and represents.

24.     Plaintiff Jessica Tiedt is a candidate for the Texas State House of Representatives for District 20. Ms. Tiedt's goal is to be elected to the Texas State House of Representatives and to elect Democratic Party candidates to public office throughout Texas. To accomplish this, Ms. Tiedt and her campaign will engage in fundraising and organizing work, including running GOTV programs and actively encouraging voters to support Ms. Tiedt and other Democratic Party candidates. If allowed to take effect, HB 25 will directly harm Ms. Tiedt in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will directly harm Ms. Tiedt by frustrating her goal of, and efforts in, turning out voters in District 20 who support her and other Democratic Party candidates. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm Ms. Tiedt by frustrating her goal of, and efforts in, turning out voters who support her and other Democratic Party candidates in District 20. The increase in the number of voters who do not make a selection

in every election down the ballot caused by HB 25 will also directly harm Ms. Tiedt, who is herself a down-ballot candidate, by frustrating her goal of, and efforts in, ensuring voters in District 20 who support her and other Democratic Party candidates complete their entire ballot. Ms. Tiedt is aware of the effects that HB 25 will cause, and to combat these effects in the 2020 general election in Texas, she will divert and expend additional time and resources in voter education and turnout efforts in District 20 at the expense of her other efforts in District 20.

25.    Defendant Ruth Hughs is the current Texas Secretary of State and is named as a Defendant in her official capacity. The Texas Secretary of State is Texas's chief elections officer and, as such, is responsible for the administration and implementation of election laws in Texas, including HB 25. *See* Tex. Elec. Code § 31.001(a). Among many other duties, the Secretary is specifically responsible for prescribing "the form of the ballot." *Id.* § 105.002(c). If HB 25 takes effect, the Secretary will act under color of state law to implement its provisions.

## FACTUAL ALLEGATIONS

## I.    Use of Straight-Ticket Voting in Texas

26.    Straight-ticket voting ("STV") or one-punch voting has been available to Texans since the turn of the twentieth century. Today, STV is utilized by a vast majority of Texans, and for good reason—Texas's elections involve some of the longest ballots in the country. In the State's most populous counties, voters are sometimes faced with the task of making decisions in over 80 races or referendum questions. STV provides an efficient way for voters to indicate their electoral preferences. As one Senator who opposed HB 25 observed, "straight-ticket voting saves valuable time, especially when the ballot is long." Tex. Senate Journal, 85th Legislature, Reg. Sess., Sen. Zaffirini Statement Regarding HB 25, p. 2086, (May 18, 2017) ("Sen. Zaffirini Statement"), https://journals.senate.texas.gov/sjrnl/85r/pdf/85RSJ05-18-F.PDF#page=12.

27.    In 2018 in the 48 most populous Texas counties—comprising 86 percent of the

State's population—over two-thirds of voters used STV to cast their votes. That is, more than *5.6 million* Texans utilized STV during the last election.

28.     STV in Texas is most popular among minority voters. The STV utilization rate among African-American and Hispanic voters is consistently higher than the average STV utilization rate in a given county. For example, in the 2018 election, 80 percent of voters in the five Harris County precincts with the largest percentage of African-American and Hispanic populations utilized STV, compared to about two-thirds of voters countywide.

29.     One crucial benefit of STV is that it prevents "roll-off" in partisan races. Roll-off occurs when a voter casts a ballot, but fails to make a selection in all entries on that ballot. Roll-off occurs most commonly among voters with lower levels of educational attainment. One of the most significant causes of roll-off is voter fatigue, which often occurs when voters must complete lengthy ballots. The availability of the STV option reduces the risk of voter fatigue and roll-off by reducing the number of separate races in which a voter must select a candidate. Without the STV option, voters must take significantly more time to complete their ballots, which increases the risk of voter fatigue and roll-off. Given the long length of Texas's ballots, there is a significant risk of roll-off in Texas elections, particularly in partisan races further down the ballot and especially among voters with lower levels of educational attainment.

## II.     Long Lines During Elections in Texas

30.     Texans consistently report long lines at polling places. Waiting in line to vote is costly, and often prevents eligible voters from participating in elections. Most Texans, and especially those with lower socioeconomic status, inflexible job schedules, less access to transportation, and less access to child care, simply cannot afford to wait hours in line at their polling place. A nationwide study following the 2008 election estimated that approximately 11 percent of Americans who chose not to vote did so because of long lines. Indeed, Texas itself has

recognized that increases in how long it takes a voter to mark a ballot will discourage others from exercising their right to vote. *Cotham*, 905 F. Supp. at 399.

31.     Recognizing the cost long polling-place lines produce, the Obama administration established the Presidential Commission on Election Administration to study the problem of long polling-place lines and other election administration issues. In its final report, the Commission concluded that, "*as a general rule, no voter should have to wait more than half an hour in order to have an opportunity to vote*." The American Voter Experience: Report and Recommendations of the Presidential Commission on Election Administration 14 (Jan. 2014), http://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf, (emphasis in original).

32.     But Texans routinely wait longer than thirty minutes to cast their ballot. For example, on Election Day for the 2018 general election, Travis County residents reported waiting hours to vote. Katie Hall & Kelsey Bradshaw, *Record Midterm Turnout Brings Long Waits at Travis, Williamson Ballots*, Statesman (Nov. 7, 2018), https://www.statesman.com/news/201811 06/record-midterm-turnout-brings-long-waits-at-travis-williamson-ballots. A voter at the Austin City Hall precinct reported seeing at least a dozen voters "give up on their plans to cast a ballot and go back to work." *Id.* In Houston, voters faced hours-long lines, forcing many to give up their fundamental right to vote—a result that prompted a federal judge to order nine polling locations to remain open after the official closing time. Tess Owen, *Some Texans Had to Wait So Long to Vote That They Gave Up. A Lawsuit Is Giving Them a Second Chance*, Vice News (Nov. 6, 2018), https://www.vice.com/en_us/article/nepwng/some-texans-had-to-wait-so-long-to-vote-they-gave-up-a-lawsuit-is-trying-to-give-them-a-second-chance.

33.     Long lines at the polls in Texas are not limited to Election Day. During early voting

for the 2016 general election, Texans reported waiting hours to cast a vote. Jim Malewitz, *In Some Counties, Early Voting Means Long Lines*, Texas Tribune (Oct. 24, 2016), https://www.texastribune.org/2016/10/24/some-texas-counties-long-lines-complicate-early-vo/. And during early voting for the 2018 general election, Travis County residents reported waiting up to 2 hours to vote. Sarah Navoy, *Travis County Fixes "Glitch" in Online Wait Times Tool Ahead of Election Day*, CBS Austin (Nov. 5, 2018), https://cbsaustin.com/news/local/travis-county-fixes-glitch-in-online-wait-times-tool-ahead-of-election-day.

34.     And on March 3, 2020, Texans across the State stood in line for hours to cast their primary ballots, forcing many to forego their right to vote. By 10:30 p.m.—over three hours after the polls were supposed to close—nearly half of polling places in Harris County, one of Texas's most diverse counties, remained open due to long lines. Garrett Haake (@GarrettHaake), Twitter (Mar. 3, 2020, 10:22 PM), https://twitter.com/GarrettHaake/status/ 1235057980086898688. At 11:15 p.m., more than 100 people were still waiting in line to vote at a polling place at Texas Southern University, a historically black college in Houston. Jen Rice (@jen_rice_), Twitter (Mar. 4, 2020, 11:15 PM), https://twitter.com/jen_rice_/status/123507133 6860413952. The last two voters to cast their ballots there finished voting after 1:00 a.m., after waiting over six hours to vote. Jen Rice (@jen_rice_), Twitter (Mar. 4, 2020 1:30 AM), https://twitter.com/jen_rice_/status/1235106957381349377. Throughout the State, African-American and Latino voters unable to endure these lines left the polls without voting. Nicole Narea, *Black and Latino voters were hit hardest by long lines in the Texas Democratic Primary*, Vox (Mar. 3, 2020), https://www.vox.com/2020/3/3/21164014/long-lines-wait-texas-primary-democratic-harris. Similar long lines were reported in other parts of Houston, as well as Dallas, Austin, and other parts of the State. *E.g.,* Alexa Ura, *Texas voting lines last hours after polls close*

- 14 -

*on Super Tuesday*, Texas Tribune (Mar. 3, 2020), https://www.texastribune.org/2020/03/03/texas-voting-lines-extend-hours-past-polls-closing-super-tuesday/; Julia Craven, *Black and Latino Texas Voters Get Stuck in Long Super Tuesday Lines*, Slate (Mar. 4, 2020), https://slate.com/news-and-politics/2020/03/three-hour-waits-extend-texas-super-tuesday-voting-past-poll-closing-time.html.

35.     A significant contributor to long lines is that Texas prohibits voters from casting absentee (or "mail-in") ballots unless they fall within one of four extremely limited circumstances: (1) the voter will be absent from her county during Election Day or the early voting period, (2) the voter is disabled in such a way that "prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health," (3) the voter is over 65 years of age, or (4) the voter is confined in jail but otherwise eligible to vote. Tex. Elec. Code §§ 82.001–82.004. As a result, the vast majority of Texans must cast a ballot in person at a polling place to exercise their fundamental right to vote.

36.     The burdens imposed by Texas's long polling-place lines are disproportionately large for African-American and Hispanic voters. Lines are longest in the most populous areas of the State, where African-American and Hispanic voters disproportionately live. Moreover, given the long and pervasive history of discrimination against these groups in Texas, African-American and Hispanic voters are more likely to, among other things, (1) live in poverty, (2) have less flexible job schedules, (3) lack access to transportation, and (4) lack access to child care assistance. Such realities cause these voters to leave polling-place lines more quickly or to be more likely to be dissuaded from attempting to vote in the first place.

**III.    Passage of HB 25**

37.     Despite Texans' widespread reliance on STV and Texas's existing problem of long polling-place lines, the Texas Legislature passed HB 25 largely along party lines, with only three

Democrats supporting its passage. Almost every minority legislator voted against HB 25.

38.    Even though HB 25 will upend a century of voting practices in Texas, the Legislature held just two public hearings on the bill. The Senate hearing was held before the Business & Commerce Committee, instead of the State Affairs Committee, which ordinarily hears election-related bills.

39.    Prior to HB 25's passage, numerous legislators expressed grave concerns that repealing STV was unconstitutional, violated the Voting Rights Act, and disproportionately burdened Texans of color. Proponents of HB 25 turned a blind eye every time such concerns were raised, leaving them unanswered and unrefuted. For example, four opponents of HB 25 stated "[they] believe that this sudden and unprovoked elimination of a voter's right to vote straight ticket would be unconstitutional." Tex. House Journal, 85th Legislature, Reg. Sess., Statement regarding HB 25, at 2842 (May 6, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY65FINAL .PDF#page=78. Many other legislators raised concerns that HB 25 violated the Voting Rights Act. Nevertheless, the Legislature, without any reasoning, rejected a proposed amendment to have the United States Department of Justice evaluate whether HB 25 violated the Voting Rights Act prior to its implementation. House Amendment 1, 85th Legislature, Reg. Sess. (May 6, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY64FINAL.PDF#page=94.    A    similar amendment for review of HB 25's constitutionality was also rejected. House Amendment 2, 85th Legislature, Reg. Sess. (May 6, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY64 FINAL.PDF#page=94. What is more, in rejecting these and all other proposed amendments, the Legislature deviated from its usual process. Normally, the author of a bill takes a position on any proposed amendment and explains her reasoning for doing so prior to a vote on that amendment. But Rep. Ron Simmons, R-Carrollton, HB 25's drafter and chief proponent, only followed this

process on one of a dozen proposed amendments, and only after other legislators commented on the irregularity of Rep. Simmons' silence. Tex. House of Reps., Floor Debate on HB 25, 85th Legislature, Reg. Sess. (May 5, 2017) ("House Debate 1"), https://tlchouse.granicus.com/Media Player.php?view_id=39&clip_id=13915.

40.     Other opponents of HB 25 accurately protested that minority voters rely on STV at much higher rates than white voters. *Id.* Rep. Simmons repeatedly ignored such concerns. When asked to respond to this issue of disproportionate use of STV, Rep. Simmons claimed he was unaware of that fact. *Id.* Rep. Simmons also refused to provide an answer when asked if he would have offered the bill if he had been aware that it would disenfranchise African Americans and Hispanic voters. *Id.* In response to concerns that legislators had not considered whether HB 25 would violate the Voting Rights Act, Rep. Simmons first claimed that HB 25 "has nothing to do with race." *Id.* However, he ultimately admitted that neither he nor anyone else had actually examined whether repealing STV would disparately impact minorities, and that no disparate impact analysis or *any other study* on the bill had been conducted, despite widespread concern over the lack of analysis of HB 25's effects. *Id.*; Tex. House of Reps. Floor Debate on HB 25, 85th Legislature, Reg. Sess. (May 6, 2017) ("House Debate 2"), https://tlchouse.granicus.com/Media Player.php?view_id=39&clip_id=13915; Tex. Senate Bus. & Comm. Committee Hearing, 85th Legislature, Reg. Sess. (May 11, 2017) ("Senate Public Hearing"), https://tlcsenate.granicus.com/ MediaPlayer.php?view_id=42&clip_id=12472. And when asked about the fact that in just the three months preceding that House debate, federal courts had issued three separate, well-publicized rulings finding Texas had intentionally discriminated against African-American and Hispanic voters, Rep. Simmons replied that he was unaware of those rulings because he had "been busy down here." House Debate 1.

41.     Despite HB 25's impact on minority voters in Texas, neither the author of the bill nor its proponents consulted any minority leaders while drafting or considering the bill. None of the following groups or their leaders were briefed or contacted about HB 25: the Mexican-American Legislative Caucus, the Black Legislative Caucus, NAACP, MALDEF, LULAC, the Urban League, Southwest Voter, and Mi Familia Vota. House Debate 1; Tex. Senate, Floor Debate on HB 25, 85th Legislature, Reg. Sess. (May 17, 2017) ("Senate Debate"), https://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=12549.     At     a     public hearing, the NAACP opposed the bill. Senate Public Hearing.

42.     Numerous legislators also raised concerns that HB 25 would increase lines at the polls. One legislator observed that

> [l]ong waits at polling places already are huge problems in some parts of Texas, especially in urban areas where many voters line-up to vote for many races on the ballot. On the first day of early voting for the November, 2016, election, for example, long waits—sometimes hours—were reported in Bexar, Harris, Nueces, and Denton counties . . . . Lines and ballot fatigue can exhaust voters' patience, and eliminating the straight-party option would only make things worse and cause many either to skip down-ballot races altogether or not go to the polls at all. The effect would be to suppress voting and voter turnout.

Sen. Zaffirini Statement, p. 2086. HB 25's proponents offered no response. In fact, they admitted that they had not reviewed any studies regarding the potential for increased voting times, longer lines, and decreased voter turnout as a result of the repeal of STV.

43.     Legislators also ignored concerns raised by election officials, including the Chairman of Harris County's Republican Party, who testified that STV's elimination will cause longer polling-place lines and require higher budgets for additional voting stations, and would hit largest counties the hardest. House Committee on Elections Hearing, 85th Legislature, Reg. Sess. (Mar. 13, 2017) ("House Public Hearing"), https://tlchouse.granicus.com/MediaPlayer.php?view _id=40&clip_id=12966. Ignoring the realities of the increased costs to large, urban, and minority-

heavy counties like Harris, the Legislature rejected a proposed amendment making elimination of STV contingent on counties determining that sufficient funding would be allotted to ensuring no increase in wait times at polls. House Amendment 5, 85th Legislature, Reg. Sess. (May 5, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY64FINAL.PDF#page=94.  Similarly,  the Legislature rejected a proposed amendment that would have allowed for STV in counties where there are 25 or more total offices and measures on the ballot. House Amendment 2, 85th Legislature, Reg. Sess. (May 5, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY64 FINAL.PDF#page=94.

44.     Proponents of HB 25 also failed to consider Texas's uniquely lengthy ballots. When asked whether he was aware that Dallas and Harris Counties have anywhere from 65 to 100 offices on the ballot in each election, respectively, Rep. Simmons responded that he was not. Floor Debate 1. When confronted with the reality that voters in these types of counties would have to work through 100 different races to fully exercise their right to vote, Rep. Simmons implied that he was comfortable with voters not completing their ballots: "if that's how many places are on the ballot, they would, assuming they wanted to vote in every race . . . that's what they would do. Of course, it's obviously their choice as to how they want to handle that." *Id.*

45.     HB 25 likewise failed to include *any* measures that would address HB 25's increased burdens on elections administrators, counties, and voters of color who will be forced to cope with long lines at the polls. For example, the Legislature could have (but did not) split large precincts, required additional voting machines, or provided more election funding. In fact, when asked who would cover increased costs of election administration resulting from HB 25, Rep. Simmons responded that he "was not advised as to what [those costs] would be or wouldn't be, so [he] d[id]n't know one way or the other." House Debate 1. He likewise had no response when

- 19 -

presented with evidence that costs in Dallas County alone would go up by nearly $1 million as a result of HB 25. *Id.*

46.     These concerns have now become reality. Election officials who requested funding to cope with the longer lines HB 25 will cause have been told they are out of luck. For example, Hunt County Elections Administrator Mina Cook was informed that the State has no money for additional voting machines needed to handle anticipated increased lines as a result of the elimination of STV. John Austin, *Changes Coming for Straight-Ticket Ballots,* Cleburne Times-Review (Oct. 7, 2018), https://www.cleburnetimesreview.com/news/changes-coming-for-straight-ticket-ballots/article_808e9396-c8e1-11e8-bf55-cbc94eaab3d2.html.

47.     After hearing the dire warnings regarding HB 25's impact on minority voters, the Legislature's silence, intentional ignorance, and utter refusal to take any measures to lessen the disproportionate impact upon African-American and Hispanic voters—even when given the opportunity to do so—demonstrates that a substantial motivation behind HB 25's passage was the intent to depress minority turnout in Texas's elections.

48.     Aside from HB 25's impact on minorities, the Legislature also supported HB 25 due to the disproportionate harms it will impose on voters who support Democratic candidates, and particularly the detriments it will cause to Democratic candidates in down-ballot races.

49.     Texas Republicans chose to pass HB 25 following consistent growth in Democratic use of STV and consistent decline in Republican use of STV, which resulted in electoral gains for Democratic candidates. During floor debates on the bill, Democratic legislators observed that HB 25 was proposed only after a Democratic "sweep" in Harris County. House Debate 1.

50.     Between 2004 and 2016 in every one of Texas's seven largest counties, which account for about 50 percent of Texas's current population, straight-ticket votes for the Democratic

Party increased, while straight-ticket votes for the Republican Party fell. For example, in 2004, of all votes cast in Harris County, 34 percent were Republican straight-ticket votes and 29.9 percent were Democratic straight-ticket votes. By 2016, these numbers had flipped—30 percent of ballots cast were Republican straight-ticket and 35.3 percent were Democratic straight-ticket. The shifts in Dallas County were even more drastic. In 2004, 31.2 percent of ballots cast were Republican straight-ticket and 33.1 percent were Democratic straight-ticket. In 2016, Republican straight-ticket ballots fell to 23.8 percent and Democratic straight-ticket ballots grew to 41.3 percent of all ballots cast in Dallas County. The same happened in Bexar County. In 2004, 28.7 percent of ballots cast were Republican straight-ticket and 26.8 percent were Democratic straight-ticket. In 2016, Republican straight-ticket votes dropped to 23 percent and Democratic straight-ticket votes rose to 32.6 percent. Similar trends occurred in Texas's other largest counties, including Tarrant, Travis, Collin, and Denton.

51.     Proponents of HB 25 publicly testified that it would benefit Republicans by counteracting STV's pro-Democratic effect in the State's larger counties, where Democratic and minority voters are concentrated. One proponent of HB 25 from Bexar County explained that she supported the bill because "Republican judges in [] large population areas [] get swept out of office because of the straight party Democrat voting." House Public Hearing. A former Harris County Republican judge claimed that STV was "why [she's] no longer a judge" and "the only reason we all lost" in 2016. *Id.*

52.     Following his defeat in the race for Harris County Judge, a longtime Republican elected official tweeted "[k]eeping the straight ticket option for 1 more election cycle turned out to be a disaster for all Republicans." Ed Emmett (@EdEmmett), Twitter (Nov. 6, 2018, 1:10 PM), https://twitter.com/EdEmmett/status/1060233047646367745.   Harris   County   GOP   Chairman

echoed these sentiments and lamented the fact that Republicans had failed to repeal STV sooner: "I've been warning about it for years. . . At the last minute, [lawmakers] put [STV] back in for 2018, and I told some legislators then, '2018 will not be the same as 2014.'" Emma Platoff, *Straight-Ticket Voting Ends in 2020. For Some Down-Ballot Republicans, That Wasn't Soon Enough*, Tex. Tribune (Nov. 16, 2018), https://www.texastribune.org/2018/11/16/straight-ticket-voting-ed-emmett-harris-county-texas/. The Communications Director for the Harris County Republican Party, Vlad Davidiuk, chimed in:

> I am mad. . . [m]ad at the avoidable losses wreaked across Texas by the Beto Wave of straight-ticket votes. That straight-ticket wave turned Fort Bend County Democrat, defeated Republicans on appellate courts across Texas, elected Democrats across the state to Congress and the Legislature, and swept every countywide vote in Harris County . . . . [T]o the detriment of Republicans across Texas, straight-ticket voting was left in place for one last election.

Jef Rouner, *Harris County GOP Blames Straight Ticket Losses and 'Communist' Votes*, HoustonPress (Nov. 9, 2018), https://www.houstonpress.com/news/the-last-year-of-straight-ticket-voting-hurt-republicans-says-gop-11025566.

53.     Now that HB 25 is set to take effect for the 2020 election, these same Republicans are optimistic about their party's odds. Harris County Republican Party chairman, Paul Simpson, declared that the end of STV will allow GOP candidates to prevail in Harris County. Jeremy Wallace, *Shell Shocked In 2016 and 2018, Harris County Republicans Are Planning a Comeback*, Houston Chronicle (Sept. 6, 2019), https://www.houstonchronicle.com/news/politics/texas/article/Shell-shocked-in-2016-and-2018-Harris-County-14421510.php. The article reported that "[w]ith the Texas Legislature eliminating [STV] in 2020, the GOP is convinced more Republicans will win both judicial seats and legislative races."

54.     Mark Jones, a political science professor at Rice University explained that in counties like Harris, Dallas, and Bexar, Texas Republicans believe that the elimination of STV

will "allow them to remain competitive in county-wide races." John Austin, *Changes Coming For Straight-Ticket Ballots*, Cleburne Times Review (Oct. 7, 2018), https://www.cleburnetimesreview.com/news/changes-coming-for-straight-ticket-ballots/article_808e9396-c8e1-11e8-bf55-cbc94eaab3d2.html. One reason for this is that Texas Republicans "believe their voters will be more likely to make their way down the ballot" than Democratic voters. *Id.* As the article explained, eliminating STV "has to do with the fact that big cities such as Houston, Dallas and San Antonio are increasingly purple" and "[t]hat means straight-ticket votes in those elections stand to hurt some Republicans." *Id.*

**IV.    HB 25 will lead to longer lines at the polls and increased roll-off, severely burdening Texans' rights, especially African-American and Hispanic Texans and Democratic voters.**

55.    If allowed to go into effect, HB 25's elimination of STV in Texas will wreak havoc in the upcoming general election, which is widely expected to have the highest turnout in decades, if not a century.

56.    Without the availability of STV, more than *5.6 million Texans* who utilized STV in 2018 will be forced to spend significantly more time completing their ballots. Given Texas's existing problem of long polling-place lines during both Election Day *and* the early-voting period, removing the STV option will exponentially increase the time Texans will have to wait to exercise their fundamental right to vote.

57.    This resulting growth of polling-place lines will significantly burden Texans' right to vote. If HB 25 takes effect, a substantial number of additional voters will leave polling-place lines without voting because they must return to work or other obligations. A substantial number of other additional voters will choose not to attempt to vote at all. The State has recognized this effect in prior litigation. *Cotham*, 905 F. Supp. at 399.

58.    What is more, confidence in the accuracy of Texas's elections will decrease. When

voters experience long polling-place lines, they lose confidence that votes are being accurately counted. Charles Stewart III & Stephen Ansolabehere, *Waiting in Line to Vote*, CalTech/MIT Voting Tech. Project 3 (July 28, 2013), http://vote.caltech.edu/working-papers/114. More broadly, the mere existence of long lines causes all voters—"even among those who do not personally experience long lines"—to lose confidence in the accuracy of their elections. *Id.* at 4.

59.     The elimination of STV will disparately impact Texas's minority voters. HB 25 will cause the greatest increase in polling-place waits in Texas's high-density urban areas with large racial and ethnic minority populations. Minority Texans also utilize STV at a disproportionately high rate compared to white Texans. Increases in lines caused by HB 25 will thus be greater in these areas compared to less populated, less diverse areas of Texas. The disproportionately higher number of voters in these areas who will be shifting from STV to making individual selections for each race on the ballot will cause a further disparity in wait times at the polls. Thus, HB 25 will impose a disproportionately high burden on minority voters.

60.     This is precisely what voters experienced in North Carolina after it removed the straight-ticket option from its ballots in 2013. In the following election, polling-place lines were greatest in areas with the highest population density and highest rate of prior STV utilization.

61.     As a general matter, long lines also disparately impact minority voters. As discussed, because African-American and Hispanic voters in Texas bear the socioeconomic effects caused by a long history of racial and ethnic discrimination, they have less ability to withstand long polling-place lines. Thus, as polling-place lines grow, the relative burden on African-American and Hispanic voters increases at a higher rate than the burden on non-minority voters.

62.     In addition to increasing polling-place lines, HB 25 will also cause significantly more roll-off throughout the state. As voters are asked to complete Texas's lengthy ballots, voter

fatigue and roll-off will increase. This will especially impact partisan races further down the ballot. As noted above, the history of discrimination against African Americans and Hispanics in Texas has produced, on average, lower educational attainment among those groups compared to white Texans. For example, the 2017 1-Year American Community Survey ("ACS") estimated that 6 percent of non-Hispanic white Texans lacked a high school diploma or equivalent, compared to 10.5 percent of African-American Texans and 33.8 percent of Hispanic Texans. Moreover, 38.6 percent of non-Hispanic white Texans held a bachelor's degree or higher, compared to 24.2 percent of African-American Texans and 14.5 percent of Hispanic Texans. Because of the inverse relationship between education attainment and roll-off, eliminating the STV option will increase roll-off among minority voters at a much higher rate than among non-minority voters, disproportionately burdening African-American and Hispanic Texans in yet another way.

63.     Further, given the overwhelmingly prevalent use of STV throughout the State, the elimination of STV is likely to cause voter confusion. Voters who have relied on STV for decades will now be forced to navigate a system with which they are unfamiliar. This effect will disparately impact minority voters who, as discussed above, on average have lower educational attainment as a result of historical discrimination. As further evidence that the Legislature intended to produce this outcome, it rejected a proposed amendment that would have required the Secretary of State to educate voters regarding the elimination of STV and allocated funds to do so. House Amendment 5, 85th Legislature, Reg. Sess., May 5, 2017, https://journals.house.texas.gov/hjrnl/85r/pdf/ 85RDAY64FINAL.PDF#page=94. Instead, HB 25 allocates no funding whatsoever to educating voters about the elimination of STV; the Secretary of State is not even obligated to notify counties or voters of the change until less than two months before early voting starts for the 2020 election. *See* Tex. Elec. Code § 31.012(b-1), (d).

64.     As a result of these effects, HB 25 will also disparately burden voters who support the Democratic Party. Minority voters in Texas overwhelmingly support the Democratic Party. In 2018, African-American Texans preferred the Democratic candidate for the U.S. Senate over the Republican candidate by a margin of 89 percent to 11 percent. In 2016, African-American Texans preferred the Democratic candidate for president over the Republican candidate by a margin of 84 percent to 11 percent. Hispanic Texans also support the Democratic Party by large margins. In 2018, Hispanic Texans preferred the Democratic candidate for the U.S. Senate over the Republican candidate by a margin of 64 percent to 35 percent. In the 2016 presidential election, Hispanics preferred the Democratic candidate over the Republican candidate by a margin of 61 percent to 34 percent.

65.     Thus, not only do Texas's long lines disproportionately harm minority voters, they also disproportionately harm voters who support the Democratic Party, Democratic candidates, and the Democratic Party itself. The disproportionate decrease in turnout and increase in roll-off among African-American and Hispanic Texans caused by HB 25 will in turn harm the electoral prospects of Democrats. As one African-American Democratic legislator, Sen. Royce West of Dallas, explained: "Frankly, I don't see any purpose for this legislation other than trying to dilute the vote of Democrats and, more specifically, minorities." House Debate 1.

## V.     The elimination of STV is not appropriately tailored to any state interest.

66.     These alarming effects of HB 25 are not justified by any legitimate, let alone compelling, governmental interest. Indeed, the detrimental effects described above were the motivation for HB 25's passage.

67.     Though proponents of HB 25 claimed it would lead to a more educated and engaged electorate that would be better informed about races down the ballot, they failed to cite a single piece of evidence demonstrating *how* eliminating straight ticket voting would actually achieve

these goals—let alone that it *would* actually result in such outcomes. Rep. Simmons, the author of the bill, admitted that he was not aware of a single study or any empirical data that supports his hypothesis that eliminating STV would lead to a more informed electorate. House Debate 1. Nor did proponents of HB 25 themselves engage in any efforts to confirm their beliefs. *Id.*

68.     Even if encouraging voters to focus on down ballot races was a legitimate state interest, eliminating STV would not have that effect. For example, HB 25 does not require any additional information to be provided to voters about down-ballot candidates and offers no support for voter-education efforts.

69.     Instead of serving legitimate or compelling state interests, the elimination of STV in Texas will burden the fundamental rights of all Texans to vote and associate, and will place disproportionate burdens on African-American and Hispanic Texans.

## VI.     African Americans and Hispanics have historically been excluded from Texas political life.

70.     HB 25, which disparately impacts African-American and Hispanic Texans, was enacted against a backdrop of centuries of discrimination and exclusion of minorities from Texas's political process.

71.     "Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682-83 (S.D. Tex. 2017) (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439-40 (2006) (*LULAC*)).

72.     This pattern of discrimination reaches back to the nineteenth century and continues to present day. After Reconstruction, Texas officials worked tirelessly to prevent minority voters

from participating in the State's elections. As restrictive voter qualifications caused the Democratic Party to dominate Texas politics in the early twentieth century, Texas required the holding of primary elections, understanding that the Democratic Party would explicitly bar African-American and Hispanic voters from participating in its primary. Indeed, in 1923, Texas passed a law explicitly providing that "in no event shall a negro participate in a Democratic primary in the State of Texas and declaring ballots cast by negroes as void." Tex. S. 44, 38th Cong. (1923). After the U.S. Supreme Court invalidated that law, Texas maneuvered around that ruling by giving political parties the ability to set their own qualifications, and the Democratic Party swiftly banned African-American and Hispanic voters from its primaries.

73.     Aside from its white-primary system, Texas disenfranchised African Americans and Hispanics by capitalizing on language barriers and the enormous disparity in literacy rates. Texas first allowed white Democratic election judges to "assist"—that is, influence—illiterate and non-English-speaking voters. Eventually, Texas just banned "illiterate" individuals and those who did not speak English from receiving any help at the polls. These restrictions remained in place until federal court intervention in 1970.

74.     Texas also implemented a poll tax as a way of disenfranchising African-American and Hispanic voters, who were significantly more likely to be living in poverty. Texas's poll tax severely depressed registration and turnout among African Americans and Hispanics throughout much of the twentieth century.

75.     After the Voting Rights Act was passed in 1965 and increased registration rates among African Americans and Hispanics, Texas quickly enacted counteractive measures. The next year, Texas enacted a requirement that every voter re-register every year, a measure intended to mimic the poll tax's burdens on minority voters. After a federal court found this annual-registration

requirement unconstitutional, Texas attempted to purge minority voters from its registration lists by passing a law requiring all voters in the state to re-register before voting in the future.

76.     Texas has also utilized the redistricting process to dilute the power of votes cast by African Americans and Hispanics. In every redistricting cycle since 1970, a federal court has found that Texas diluted minority voting strength in violation of the Voting Rights Act or the U.S. Constitution. In 2006, the U.S. Supreme Court held that the State had enacted a congressional map that unlawfully diluted the voting strength of Hispanic voters in West Texas in direct response to those voters' growing political power. *LULAC*, 548 U.S. at 436-42. Aside from violating the Voting Rights Act, Texas's actions "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 440. After the 2010 Census, Texas again created congressional and state house district maps that intentionally diluted African-American and Hispanic voting strength. *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017); *Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017).

77.     Minority voters often experience intimidation at the polls in Texas. In 2004, for example, African-American voters reported being subjected to racial insults and a disproportionate amount of screening compared to white voters. The same year, police officers stood outside a Harris County early voting site threatening to arrest people and demanding identification without any legal basis for doing so. In 2010, a conservative group called the King Street Patriots implemented an aggressive poll-monitoring campaign in minority neighborhoods that successfully depressed minority turnout. The group's website included a doctored picture of an African-American woman holding a sign reading "I only got to vote once," and a white woman beside her holding a sign reading "I'm with stupid." This pattern continues today. In 2018, a white poll worker in North Houston yelled racial insults at an African-American voter, stating, "[m]aybe if I'd worn

my blackface makeup today you could comprehend what I'm saying to you," and "[i]f you call the police, they're going to take you to jail and do something to you, because I'm white."

78.     The discrimination African Americans and Hispanics have faced in this State has led to significant disparities between the everyday lives of minority Texans and white Texans. African Americans and Hispanics make up a disproportionate number of Texans living in poverty. According to the 2017 ACS 1-Year estimate, 8.5 percent of non-Hispanic white Texans were living below the poverty line, compared to 19 percent of African-African Texans and 20.7 percent of Hispanic Texans.

79.     As stated above, similar disparities exist in educational attainment.

80.     Disparities also exist in the areas of employment and income. According to the 2011-2015 ACS 5-Year estimate, the median income among white Texans ($31,235 for individuals, $56,411 for households) was significantly higher than that of African-American Texans ($26,786 for individuals, $39,469 for households) and Hispanic Texans ($22,402 for individuals, $41,248 for households). And according to a 2018 study by the Economic Policy Institute, white Texans had a significantly lower unemployment rate (3.9 percent) than African-American Texans (5.7 percent) and Hispanic Texans (4.5 percent).

81.     Political campaigns in Texas commonly resort to racial appeals that rely on racial and ethnic stereotypes. The 2018 election cycle was no exception. During the campaign for Texas's seat in the U.S. Senate, Senator Ted Cruz ran ads capitalizing on fears founded on the stereotype that Hispanic immigrants are violent criminals and mocked his opponent's call for an investigation into the police shooting of an unarmed African-American man in his own apartment. In support of Representative Pete Olson, who was facing a challenge by Sri Preston Kulkarni, the Fort Bend County Republican Party circulated an ad depicting a Hindu god, Lord Ganesha, and asking

"Would you worship a donkey or an elephant? The choice is yours." Representative Pete Sessions claimed that his African-American opponent, Colin Allred, wanted to legalize crack cocaine, and also ran a digital ad placing Allred's name over a picture of a dark-skinned hand clasping a white woman's mouth. Local campaigns also included racial appeals. For example, Vic Cunningham, a white candidate for Dallas County Commissioner, explained to the *Dallas Morning News* that he believed it would be "Christian" only if his children married a person "that's Caucasian." All of these statements were widely recognized by the public as capitalizing on race and ethnicity.

82.     As courts have long recognized, voting in Texas is severely racially polarized, with white voters and minority voters consistently and cohesively supporting competing candidates. In recent litigation, the State admitted that there is racially polarized voting in nearly all of its counties. *Veasey v. Perry*, 71 F. Supp. 3d 627, 638 (S.D. Tex. 2014).

83.     African Americans' and Hispanics' unequal opportunity to participate in Texas's political system is also reflected by the fact that they are underrepresented in the State's elected offices. While Hispanics constitute approximately 40 percent of the State's population, just two Hispanic Texans occupy statewide office, and less than 20 percent of seats in Texas's delegation to the U.S. House of Representatives and the Texas Senate are held by Hispanics. While African Americans constitute approximately 13 percent of the State, not a single African American occupies statewide office, and only two African Americans sit in the 31-seat Texas Senate. At the local level, many communities with high African-American or Hispanic populations lack any minority representation at all.

84.     Texas also continues to utilize voting practices that enhance the opportunity for discrimination against African Americans and Hispanics. For example, members of the Texas Supreme Court (the highest state court for civil and juvenile cases) and the Texas Court of Criminal

Appeals (the highest state court for criminal cases) are elected to at-large positions with numbered places. Out of 18 judges on these two courts only one is Hispanic, and none are African American.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of the First and Fourteenth Amendments to the U.S. Constitution
24 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
Undue Burden on the Right to Vote**

85.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

86.    Under the First Amendment and the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the right to vote. When addressing a challenge to a state election law, a court balances the character and magnitude of the burden the law causes on any First and Fourteenth Amendment rights the plaintiff seeks to vindicate against the justifications offered by the State in support of the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

87.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

88.    HB 25 will place a severe burden on the fundamental right to vote by causing drastic increases in polling-place lines. If permitted to take effect, HB 25's elimination of STV will significantly increase line length throughout the State, forcing Texans to wait long periods of time before casting a vote. Long lines impose severe burdens on voters in the form of cost. For many voters, the increased wait times caused by HB 25 will prove too much, forcing them to leave their polling places without casting a vote. For many other voters, the increase in polling-place lines

- 32 -

will dissuade them from voting at all. Even those who eventually do cast a vote will be burdened by the cost of waiting in line for a significantly longer period of time. And HB 25's increase in polling-place lines throughout the State will decrease voter confidence in the accuracy of Texas's elections.

89.     HB 25 will unduly burden all Texans' fundamental right to vote, but African-American and Hispanic voters will experience a disproportionately greater burden. African-American and Hispanic voters in Texas are less able to withstand long polling-place lines than non-minority voters. HB 25 will also cause a greater increase in lines in areas with higher minority population. As a result, the cost of voting caused by HB 25 will be higher for minority voters than non-minority voters. Moreover, HB 25's elimination of STV will cause African-American and Hispanic Texans to fail to complete their ballots at a much higher rate.

90.     HB 25's elimination of straight-ticket voting in Texas serves no legitimate, let alone compelling, governmental interest. HB 25 will severely burden Texans across the State, prevent voters from casting a ballot due to increased polling-place congestion, and depress voter confidence in election outcomes. As a result, the burdens imposed by HB 25 on the fundamental right to vote outweigh any alleged benefits of the law.

91.     Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their fundamental right to vote in future elections including, most immediately, the upcoming general election to be held in November 2020.

## COUNT II

**Violation of the First and Fourteenth Amendments to the U.S. Constitution
24 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
Undue Burden on the Right to Associate**

92.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

93.    First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). Those who support a political party have a fundamental right "to associate in the electoral arena to enhance their political effectiveness as a group," protected by the First Amendment. *Anderson*, 460 U.S. at 794.

94.    In addition to harming voters generally, HB 25's elimination of STV will cause an unjustified severe burden on the First Amendment associational rights of those who support the Democratic Party. As discussed above, the elimination of STV from Texas ballots will produce two significant effects: it will (1) disproportionately cause African-American and Hispanic voters to fail to vote, and (2) disproportionately cause those voters to fail to select a candidate in down-ballot races. Because African-American and Hispanic voters in Texas overwhelmingly prefer the Democratic Party over the Republican Party, HB 25's disproportionate and severe burden on African-American and Hispanic voters also disproportionately and severely burdens the associational rights of those who support the Democratic Party.

95.    HB 25's burden on the associational rights of those who support the Democratic Party is not justified by any legitimate, let alone compelling, governmental interest. By reducing turnout and increasing roll-off among African-American and Hispanic voters, HB 25 will unconstitutionally make it harder for Democratic voters, organizations, and candidates to advance their political interests. As a result, the burdens imposed by HB 25 on the fundamental right to

political association outweigh any alleged benefits of the law.

96.     Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their fundamental right to political association in future elections including, most immediately, the upcoming general election to be held in November 2020.

## COUNT III

### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301(a)
### Results Test

97.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

98.     Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits the enforcement of any "standard, practice, or procedure" that either has the purpose or result of denying or abridging the right to vote on account of race. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

99.     African-American and Hispanic Texans disproportionately utilize STV compared to non-minority voters. African-American and Hispanic Texans also disproportionately live in the State's most populous areas, in which voters encounter the longest ballot lengths and the longest polling-place lines.

100.    HB 25's elimination of STV will thus disproportionately cause longer lines and waiting times among African-American and Hispanic voters compared to non-minority voters. If

HB 25 takes effect, the areas with the most voters switching away from STV will be those with the highest minority populations. Moreover, in light of African-American and Hispanic voters' lower average educational attainment, they will encounter a greater risk of confusion and roll-off.

101.    HB 25's elimination of STV will thus disproportionately abridge and deny African Americans' and Hispanics' right to vote.

102.    Combined with social and historical conditions in Texas, the disproportionate impact of HB 25's elimination of STV will cause an inequality in the opportunities enjoyed by African-American and Hispanic voters to elect their preferred representatives as compared to their non-minority counterparts.

103.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will violate Plaintiffs' rights under the Voting Rights Act in future elections including, most immediately, the upcoming general election to be held in November 2020.

### COUNT IV

**Violation of the Fourteenth and Fifteenth Amendments of the U.S. Constitution and Section 2 of the Voting Rights Act
24 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, 52 U.S.C. § 10301(a)
Intentional Racial Discrimination**

104.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

105.    The Fourteenth Amendment invalidates any state law "'conceived or operated as [a] purposeful device[] to further racial discrimination' by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)).

- 36 -

106.     The Fifteenth Amendment to the United States Constitution prohibits the denial or abridgement of the right to vote "on account of race." U.S. Const. amend. XV, § 1.

107.     As noted above, Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits the enforcement of any "standard, practice, or procedure" that either has the purpose or result of denying or abridging the right to vote on account of race.

108.     To determine whether a law was enacted with discriminatory purpose under the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act, courts examine five non-exhaustive factors and consider both direct and circumstantial evidence. *Veasey v. Abbott*, 830 F.3d 216, 231-32 (5th Cir. 2016). The five factors are: (1) disparate impact on the protected class; (2) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[t]he specific sequence of events leading up to the decision"; (4) departures from usual legislative procedure or from the usual weighing of substantive factors of decision; and (5) "legislative or administrative history," including contemporaneous statements by legislators. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977). While "[p]roof of racially discriminatory intent or purpose is required to show a violation," "racial discrimination need only be one purpose, and not even a primary purpose of an official action for a violation to occur." *Veasey*, 830 F.3d at 230 (quoting *Arlington Heights*, 429 U.S. at 265 and *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). Where a Section 2 intentional discrimination claim has been brought, courts also consider the presence of racially polarized voting. *See, e.g., N.C. Conference of NAACP v. McCrory*, 831 F.3d 204, 222-23 (4th Cir. 2016). "[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *Id.* at 222.

109.    One of the motivating factors behind HB 25 was to discriminate against African-American and Hispanic Texans. First, as discussed above African-American and Hispanic Texans are disparately affected by the elimination of STV.

110.    Second, legislators in support of HB 25 turned a blind eye to concerns regarding this disparate impact on minority voters. The Legislature conducted no inquiry into whether minority voters would be disparately impacted, despite repeated requests and concerns from minority-party legislators and members of the community. The Legislature failed to provide for *any* measures to address these concerns, and it rejected all proposed amendments to HB 25 aimed at ameliorating the impacts of the bill on minority communities, which tend to reside in Texas's most populous counties. And despite claiming that HB 25 would result in a more educated electorate, proponents of HB 25 possessed no evidence whatsoever to support this assertion.

111.    Third, the Legislature departed from its usual practice of election bills being heard by the Senate State Affairs Committee. Instead, the only public hearing on HB 25 before a Senate Committee took place before the Senate Business & Commerce Committee. The Legislature also deviated from its usual course because the author of HB 25 failed to take a position on or answer questions regarding proposed amendments.

112.    Fourth, proponents of HB 25 admitted that the bill was intended to disadvantage Democratic voters, who are disproportionately minority and live in larger counties and who utilized straight-ticket voting to vote out Republican judges.

113.    Finally, there is no doubt Texas has a lengthy and recent history of state-sponsored discrimination. For example, as late as 1975, Texas attempted to suppress minority voting through purging the voter rolls, after its former poll tax and re-registration requirements were ruled unconstitutional, and in every redistricting cycle since 1970, Texas has been found to have violated

the Voting Rights Act. *Veasey*, 830 F.3d at 239. In the three months prior to HB 25's passage, three federal courts found that Texas had intentionally discriminated against African-American and Hispanic Texans with its voting laws. All of this evidence indicates that the Legislature enacted HB 25 with the intent to discriminate against minority voters in Texas.

114.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their right against racial and ethnic discrimination in future elections including, most immediately, the upcoming general election to be held in November 2020.

<u>**COUNT V**</u>

**Violation of the First and Fourteenth Amendments of the U.S. Constitution**
**24 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Viewpoint Discrimination Based on Partisan Affiliation or Voting**

115.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

116.    In *Carrington v. Rash*, 380 U.S. 89, 94 (1965), the Supreme Court held that the Equal Protection Clause prohibits "fencing out" from access to the right to franchise "a sector of the population because of the way they may vote." Likewise, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

117.    The elimination of STV in Texas disproportionately burdens the right to vote of individuals who are likely to vote for Democratic candidates. In 2018, for example, African-American Texans preferred the Democratic candidate for the U.S. Senate over the Republican

candidate by nearly 80 points. In 2016, African-American Texans preferred the Democratic candidate for president over the Republican candidate by nearly 75 points. Hispanic Texans also support the Democratic Party at significantly higher rates than the Republican Party. In 2018, Hispanic Texans preferred the Democratic candidate for the U.S. Senate over the Republican candidate by a margin of 64 percent to 35 percent. In the 2016 presidential election, Hispanics preferred the Democratic candidate over the Republican candidate by a margin of 61 percent to 34 percent. Because African-American and Hispanic voters in Texas overwhelmingly prefer the Democratic Party over the Republican Party, HB 25's disproportionate and severe burden on African-American and Hispanic voters also disproportionately and severely burdens the associational rights of those who support the Democratic Party.

118.    The Texas Legislature eliminated STV precisely for that reason. Texas Republicans chose to pass HB 25 following consistent growth in Democratic use of STV and consistent decline in Republican use of STV, which resulted in electoral gains for Democratic candidates. Between 2004 and 2016 in every one of Texas's seven largest counties, which account for about 50 percent of Texas's current population, straight-ticket votes for the Democratic Party increased, while straight-ticket votes for the Republican Party fell.

119.    The Texas Legislature, without a compelling reason and with intent to achieve a partisan advantage, manipulated the State's election mechanics in way that burdened Democratic voters. Because "voter qualifications and election administration should not be political at all, and partisan gain can never justify a legislative enactment that burdens the right to vote," *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 929 (W.D. Wis. 2016), the Texas Legislature's elimination of STV violates the First and Fourteenth Amendments to the United States Constitution.

120.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their right against intentional partisan discrimination in future elections including, most immediately, the upcoming general election to be held in November 2020.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a. Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that HB 25 violates the First, Fourteenth, and Fifteenth Amendments to the United States Constitution, as well as Section 2 of the Voting Rights Act;

b. Preliminarily and permanently enjoining Defendant, her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to HB 25 under the authority granted to this Court by Federal Rule of Civil Procedure 65(a) and 28 U.S.C. § 2202;

c. Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d. Granting such other and further relief as the Court deems just and proper.

March 27, 2020                          Respectfully submitted,

                                        /s/ Skyler M. Howton
                                        Skyler M. Howton
                                        Attorney-in-Charge
                                        TX# 24077907
                                        SDTX#2395101
                                        PERKINS COIE LLP
                                        500 North Akard St., Suite 3300
                                        Dallas, TX 75201-3347
                                        Telephone: (214) 965-7700
                                        Facsimile: (214) 965-7799

- 41 -

SHowton@perkinscoie.com

Marc E. Elias*
Bruce V. Spiva*
Lalitha D. Madduri*
Daniel C. Osher*
Emily R. Brailey*
Stephanie I. Command*
MElias@perkinscoie.com
BSpiva@perkinscoie.com
LMadduri@perkinscoie.com
DOsher@perkinscoie.com
EBrailey@perkinscoie.com
SCommand@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W. Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

*Counsel for All Plaintiffs*

*\*Pro Hac Vice* Application Pending

Chad W. Dunn, TX# 24036507
Brazil & Dunn, LLP
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

*Counsel for Plaintiff Texas Democratic Party*