**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| Sylvia Bruni, Texas Democratic Party, DSCC, DCCC, and Jessica Tiedt, <br><br>                 Plaintiffs, <br><br>     v. <br><br> RUTH HUGHS, in her official capacity as the Texas Secretary of State, <br><br>                Defendant. | Civil Action No. 5:20-cv-35 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ................................................................................................ 1

NATURE AND STAGE OF PROCEEDING AND ISSUES PRESENTED ................................ 2

ARGUMENT ...................................................................................................... 3

I.    Summary of Argument ................................................................... 3

II.    Plaintiffs are highly likely to succeed in their challenge to HB 25. .................................. 3

    A.    HB 25 will violate the First and Fourteenth Amendments by unjustifiably burdening Texans' fundamental rights to vote and associate. ........................................................ 3

        1.  HB 25 will dramatically increase polling-place wait times and ballot roll-off, severely burdening Texans' First and Fourteenth Amendment rights. ......................................... 4

        2.  HB 25 will most severely burden African American and Hispanic voters. ................. 11

        3.  HB 25 will severely burden the associational rights of voters who support the Democratic Party ........................................................................................ 14

        4.  No legitimate governmental interest justifies these burdens ........................................ 15

    B.    HB 25 will violate Section 2 of the VRA by denying African American and Hispanic voters an equal opportunity to participate in Texas's political system. ..................... 17

    C.    HB 25 will violate the Fourteenth and Fifteenth Amendments because a substantial motivation for its passage was to impede political participation by African American and Hispanic Texans. ................................................................................. 24

        1.  Legal Standard ........................................................................................ 24

        2.  The Texas Legislature acted on an incentive to suppress minority votes. ................. 26

        3.  HB 25's proponents knew STV repeal would have a disproportionate impact on African American and Hispanic voters and offered no response ................................ 28

        4.  HB 25 was enacted under extremely unusual procedures and represents an enormous departure from century-old law ................................................................... 31

        5.  The historical background of HB 25 weighs in favor of finding that a motivating factor behind HB 25 was intent to discriminate. ................................................... 32

    D.    HB 25 will violate the First Amendment because its purpose is to impede the political participation of certain Texans due to their political beliefs. ..................................... 33

III.    Plaintiffs and all Texas voters will suffer irreparable harm absent an injunction. .......... 34

## TABLE OF CONTENTS

**PAGE(S)**

IV.  The balance of equities and the public interest weigh in favor of a preliminary
injunction......................................................................................................................... 35

CONCLUSION............................................................................................................................... 35

## TABLE OF AUTHORITIES

CASES            PAGE(S)

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983).............................................................................................14

*Burdick v. Takushi*,
   504 U.S. 428 (1992)...............................................................................................4

*Carrington v. Rash*,
   380 U.S. 89 (1965)........................................................................................33, 34

*Cotham v. Garza*,
   905 F. Supp. 389 (S.D. Tex. 1995) ......................................................................9

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181 (2008)......................................................................................11, 12

*Cunningham v. Adams*,
   808 F.2d 815 (11th Cir. 1987) ............................................................................34

*Elrod v. Burns*,
   427 U.S. 347 (1976).............................................................................................34

*Hadnott v. Amos*,
   394 U.S. 358 (1969).............................................................................................14

*Hunter v. Underwood*,
   471 U.S. 222 (1985).............................................................................................25

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
   88 F.3d 274 (5th Cir. 1996) ................................................................................35

*Jacobson v. Lee*,
   411 F. Supp. 3d 1249 (N.D. Fla. 2019)...............................................................14

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006)......................................................................................18, 20

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ........................................................................34, 35

*Marks v. United States*,
   430 U.S. 188 (1977).............................................................................................12

*Mich. State A. Philip Randolph Inst. v. Johnson*,
   833 F.3d 656 (6th Cir. 2016) ..............................................................................15

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ....................................................................... passim

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Nat'l Ass'n for the Advancement of Colored People State Conf. of Pa. v. Cortés*,
    591 F. Supp. 2d 757 (E.D. Pa. 2008) ............................................................9

*Norman v. Reed*,
    502 U.S. 279 (1992)....................................................................................4

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ...............................................................34, 35

*Ohio Democratic Party v. Husted*,
    834 F.3d 620 (6th Cir. 2016) ..................................................................11

*Ohio State Conf. of NAACP v. Husted*,
    768 F.3d 524 (6th Cir. 2014) .............................................................12, 16

*One Wis. Inst., Inc. v. Thomsen*,
    198 F. Supp. 3d 896 (W.D. Wis. 2016) ...................................................34

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ..................................................................34

*Patino v. City of Pasadena*,
    229 F. Supp. 3d 582 (S.D. Tex. 2017) ...............................................20, 24

*Patino v. City of Pasadena*,
    230 F. Supp. 3d 667 (S.D. Tex. 2017) ....................................................35

*Perez v. Abbott*,
    253 F. Supp. 3d 864 (W.D. Tex. 2017)...........................................18, 19, 26

*Pub. Integrity All., Inc. v. City of Tucson*,
    836 F.3d 1019 (9th Cir. 2016) ................................................................11

*Rogers v. Lodge*,
    458 U.S. 613 (1982)....................................................................................24

*Speaks v. Kruse*,
    445 F.3d 396 (5th Cir. 2006) ...................................................................2

*Tex. Indep. Party v. Kirk*,
    84 F.3d 178 (5th Cir. 1996) ..................................................................3, 4

*Texas v. Holder*,
    888 F. Supp. 2d 113 (D.D.C. 2012) ........................................................19

*Texas v. United States*,
    887 F. Supp. 2d 133 (D.D.C. 2012) ........................................................19

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)........................................................................................20

*United States v. Brown*,
    561 F.3d 420 (5th Cir. 2009) ...................................................................25

*United States v. Texas*,
    508 F.2d 98 (5th Cir. 1975) ....................................................................25

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) (en banc) ........................................ passim

*Veasey v. Abbott*,
    796 F.3d 487 (5th Cir. 2015) ...................................................................19

*Veasey v. Perry*,
    71 F. Supp. 3d 627 (S.D. Tex. 2014) ..............................................12, 19

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004)........................................................................33

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..........................................................25, 31, 32, 33

STATUTES

52 U.S.C. § 10301(a) ..............................................................................16

Tex. Elec. Code § 65.007(c) ...........................................................15, 16

## INTRODUCTION

This lawsuit challenges Texas's attempt to end straight-ticket voting, which will unjustifiably and discriminatorily burden Texans' fundamental right to vote and produce catastrophic wait times at the polls in November. For the last 100 years, if a Texas voter wished to vote for the candidates running under the banner of a political party, she could use straight-ticket or one-punch voting (STV) to make an initial selection corresponding to that party, which would automatically select the party's nominee in each race. The voter could then modify her choice in any individual race.

Voters and election administrators in Texas have come to rely on STV as an integral component of the voting process: in 2018, approximately two-thirds of voters—over 5.6 million Texans—used STV to cast their ballots. STV reduces voting time, decreases wait times at polling places, and ensures voters make selections in all items on the ballot. It is particularly crucial in Texas, where ballots are among the longest in the country; in recent years, voters in Texas's larger counties have had to make selections in as many 95 partisan races. Despite all of this, Secretary of State Hughs will soon order the elimination of the STV option pursuant to House Bill 25 (HB 25).

Without intervention by this Court, Texas's upending of a century-old voting practice—with no plan to mitigate the resulting long lines or the increased likelihood that voters will fail to vote in all races—will result in disaster at the polls. Each of the more than 5.6 million Texans who relied on STV in the last federal election will take significantly more time to complete their ballots. In turn, Texas's already lengthy polling-place lines will grow dramatically, forcing Texans to endure unreasonably long wait times or forgo their fundamental right to vote altogether.

These burdens will uniquely and disparately impact African American and Hispanic Texans, whose recent increase in political strength was the motivation behind HB 25's enactment.

African American and Hispanic Texans use STV at significantly higher rates than white Texans. They also live in more densely populated areas, where wait times at polling places will increase even more dramatically if STV is eliminated. Moreover, due to Texas's long history of discrimination, African Americans and Hispanics endure socioeconomic conditions that make them more vulnerable to the burdens of long lines. These conditions also make it more likely that, without STV, minority voters will not complete their ballots. And because these voters overwhelmingly support Democratic candidates, the removal of STV will hinder the ability of those who support the Democratic Party to exercise their fundamental right to associate to advance their political beliefs.

Because all of the relevant factors strongly favor a preliminary injunction, the Court should issue an order enjoining HB 25's implementation and requiring the Secretary to ensure all Texans have the option of voting straight ticket in the upcoming November 2020 election.

### NATURE AND STAGE OF PROCEEDING AND ISSUES PRESENTED

Plaintiffs filed this suit on March 5, 2020. Plaintiffs served Secretary Hughs with the Summons and a copy of the Complaint by certified mail on March 17, 2020. Plaintiffs filed an amended complaint on March 27, 2020.

This motion presents the issue of whether the Court should grant a preliminary injunction enjoining HB 25's implementation. A preliminary injunction "should issue" when a plaintiff shows: (1) "a substantial likelihood of success on the merits," (2) "a substantial threat of irreparable injury if the injunction is not issued," (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006).

- 2 -

**ARGUMENT**

**I.     Summary of Argument**

      If allowed to take effect, HB 25 will violate a bevy of constitutional and statutory provisions. First, HB 25 will impose an unjustified and severe burden on Texans' fundamental rights to vote and associate under the First and Fourteenth Amendments by producing excessive polling-place lines and causing Texans to fail to complete their ballots. This burden will be most severe on African American and Hispanic voters, as well as Texans who support the Democratic Party. Second, HB 25's disproportionate burdens on African American and Hispanic voters will deny them an equal opportunity of political participation in violation of Section 2 of the Voting Rights Act (VRA). Third, HB 25 will violate the Fourteenth and Fifteenth Amendments and Section 2 of the VRA because a substantial motivation behind its passage was an intent to impede African American and Hispanic voters' electoral participation. Last, HB 25 will violate the First and Fourteenth Amendments because it is intended to impede certain Texans' electoral participation due to their political beliefs.

      If HB 25 is not enjoined, it will irreparably injure Plaintiffs, their members, and other Texans by denying them their fundamental rights to vote and associate. These interests, and the public's interest in the vindication of constitutional rights and a fair election, significantly outweigh the minimal burden (if any) the Secretary would encounter by maintaining the status quo and continuing to permit straight-ticket voting.

**II.    Plaintiffs are highly likely to succeed in their challenge to HB 25.**

      **A.     HB 25 will violate the First and Fourteenth Amendments by unjustifiably burdening Texans' fundamental rights to vote and associate.**

      By drastically expanding polling-place lines and causing voters to submit incomplete ballots, HB 25 will unjustifiably burden Texans' fundamental rights to vote and associate with

others. To assess this claim, the Court "weigh[s] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by [HB 25]." *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). The applicable scrutiny depends on the burden HB 25 imposes on such rights. "When those rights are subjected to severe restriction, the regulation must be narrowly tailored to advance a compelling state interest." *Id.* But even if HB 25's burdens are less than severe, it must be supported by state "interest[s] sufficiently weighty to justify the limitation." *Norman v. Reed*, 502 U.S. 279, 288-89 (1992). Regardless of the level of scrutiny, the Court must take "into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

HB 25 will severely burden Texans' First and Fourteenth Amendment rights in two ways. First, by significantly increasing the amount of time it will take voters to complete their ballots— which are among the longest in the country—HB 25 will dramatically increase polling-place lines, particularly in areas in which minority voters reside. This will force Texans to wait unreasonable lengths of time to exercise their fundamental right to vote. Eliminating STV will also cause voters, particularly minority voters, to "roll off" their ballots by failing to make selections in all items on their ballots. Second, HB 25 will disproportionately impact voters who support the Democratic Party, severely limiting their ability to organize and elect the candidates of their choice, and particularly so in down-ballot races. Because no governmental interest justifies—let alone necessitates—these burdens, HB 25 will violate the First and Fourteenth Amendments.

      **1.  HB 25 will dramatically increase polling-place wait times and ballot roll-off, severely burdening Texans' First and Fourteenth Amendment rights.**

If allowed to take effect, HB 25's elimination of STV will cause a massive disruption to

Texas's elections. Particularly in recent years, Texans have relied heavily on STV as an efficient method of expressing their electoral preferences. During the 2018 general election, for example, approximately two-thirds of voters in Texas voted using STV. Stefan Haag & William R. Peck, Straight-Ticket Voting in Texas 1998-2018 at 1 (Feb. 2019) (Decl. of Bruce V. Spiva, Ex. 1). If HB 25 takes effect, it will take significantly more time for each of those 5.6 million voters to complete their ballots. This result is particularly problematic in Texas, where ballots include an enormous number of partisan races. In 2018, voters in Harris County had *90 to 95 partisan ballot items*, not counting nonpartisan races and ballot questions.[1] In 2016, they had 46 to 50 partisan races, along with nonpartisan races and ballot questions.[2] In Travis County, voters in 2018 had at least 42 partisan ballot items, as well as numerous nonpartisan races and ballot issues[3]; in 2016, they had at least 30 partisan races.[4] Dallas County voters had 63 to 65 partisan items in 2018, and 22 to 25 partisan races in 2016.[5] This is likely part of the reason Texans already wait, on average, in longer lines to vote than other Americans. Expert Decl. of Dr. Allan Lichtman 56-58 (Ex. 2).

This November, as a result of the COVID-19 pandemic, Texans' ballots will be even longer. Governor Abbott recently ordered that jurisdictions may delay their local elections, which would otherwise occur in May, until the November general election. *See* Election Advisory No.

---

[1]    *See*    Harris    County    Election    Results    (Nov.    6,    2018), https://www.harrisvotes.com/HISTORY/20181106/cumulative/cumulative.pdf.
[2]    *See*    Harris    County    Election    Results    (Nov.    8,    2016), https://www.harrisvotes.com/HISTORY/20161108/cumulative/cumulative.pdf.
[3]    *See*    Travis    County    Election    Results    (Partisan    Races)    (Nov.    6,    2018), https://countyclerk.traviscountytx.gov/images/pdfs/election_results/20181106cume1.pdf.
[4]    *See*    Travis    County    Election    Results    (Partisan    Races)    (Nov.    8,    2016), https://countyclerk.traviscountytx.gov/images/pre/election_results/2016.11.08/Run12/20161108cume1.pdf.
[5]    *See*    Dallas    County    Election    Results    (Nov.    6,    2018), https://assets01.aws.connect.clarityelections.com/Assets/Connect/RootPublish/dallas-tx.connect.clarityelections.com/ElectionDocuments/2018/General%20181106/181106G%20General%20and%20Joint%20Election%20Canvass%20Final%20Cum%20Totals%20WOverUnders_EL45A.pdf; Dallas County Election Results (Nov. 8, 2016), https://assets01.aws.connect.clarityelections.com/Assets/Connect/RootPublish/dallas-tx.connect.clarityelections.com/ElectionDocuments/2016/General%20Election%20161108/161108G%20General%20Final%20Cum%20Totals_EL45A.pdf.

2020-12 (Mar. 18, 2020), https://www.sos.state.tx.us/elections/forms/adv-12-may-2-2020-uniform-election-date.pdf. This will add even more items to Texans' already overloaded ballots.

By substantially increasing the amount of time most Texans will take to complete their ballots, HB 25 will drastically increase lines at polling places. Dr. Muer Yang's expert declaration provides an alarming glimpse into what Texans will encounter at the polls in November if HB 25 is not enjoined. Using official turnout and resource-allocation information from Travis and Fort Bend counties, Dr. Yang utilized well-recognized queuing models and simulations to illustrate the additional amount of time voters would have had to wait in line to cast their votes on Election Day in 2016 had STV *not* been available to them. *See* Expert Decl. of Dr. Muer Yang (Ex. 3).

Because neither Travis County nor Fort Bend County provides information regarding the amount of time voters took to complete their ballots in 2016, Dr. Yang calculates his results using a range of average times voters might have taken to complete their ballots with the STV option available.[6] Compared to results of studies of the length of time voters take to complete a certain number of items on a ballot, the range of times Dr. Yang used to model the increase in waiting time that eliminating STV would have caused is extremely conservative. *Id.* ¶¶ 37, 54.

Even using extremely conservative assumptions, Dr. Yang's results demonstrate that removing the STV option would have produced catastrophic results on Election Day in 2016. If Fort Bend County voters, who made selections in an average of 5 ballot items in 2016, took just three minutes on average to complete their ballots, removing STV would have caused more than 32% of polling places in the county—representing over 22,000 Texans—to have average wait times of 25 minutes. *Id.* ¶ 59. If Fort Bend County voters took just five minutes to cast their ballots in 2016, removing STV would have caused almost two-thirds of polling places—over 41,000

---

[6] As Dr. Yang explains, he selected ranges of average voting times based on his calculation of the average number of ballot items on which Election Day voters in each county actually made a selection. *See id.* at ¶¶ 28-35, 46-51.

voters—to have average wait times of *more than an hour*. *Id.* ¶ 61. And if Fort Bend voters took an average of six minutes to complete their ballots, removing the STV option would have caused those 63% of polling places to have average wait times of *more than two hours*. *Id.* ¶ 62.

Travis County presents an even more alarming scenario. If Travis County voters, who made selections in an average of 12 ballot items in 2016, took just six minutes to cast their ballots, removing STV would have multiplied the average wait times at each polling place by factors ranging between three and 70. *Id.* ¶ 43. One polling place in Dr. Yang's sample would have had an average wait of more than 9 hours, and nearly a third of all polling places would have had an average wait of more than an hour. *Id.* If Travis County voters took just an average of eight minutes to complete their ballots, removing the STV option would have caused all but five of the 19 sample polling places Dr. Yang analyzed to have average wait times of more than an hour. *Id.* ¶ 44. And if voters took just ten minutes to cast 12 ballot items—still a conservative assumption—removing the STV option would have caused *nearly all polling places to have average wait times of over an hour*. *Id.* ¶ 45.

For several reasons, elimination of STV will likely force Texas voters to wait in even longer than what these results estimate. First, in light of Dr. Yang's 2014 study finding that it took voters an average of six minutes to complete six ballot items, his estimated ranges are *extremely* conservative. *Id.* ¶¶ 37, 54. Second, Dr. Yang's results provide only averages, which tend to "mask and underestimate the real waiting problems at polling places." *Id.* ¶ 18. And third, because neither Travis County nor Fort Bend County collects information about the time at which voters arrived at the polls on Election Day, Dr. Yang's analyses assume a normal distribution of voters throughout the day; but most in-person voters arrive at polling places at the very beginning or very end of polling hours. *Id.* ¶ 14. For example, Collin County records show that 46% of voters who

waited in line on Election Day 2016 arrived between 7:00 a.m. and 8:00 a.m. *See* Collin County Election Day Vote Centers, Line Length Data (Ex. 4).

Texans *already* wait in extremely long lines. *See* Decl. of Matthew Haley (Ex. 5); Decl. of William Sharry (Ex. 6); Decl. of LaQuita Middleton-Holmes (Ex. 7); Lichtman 56-58. Yet, HB 25 provides counties no resources to mitigate the further increase in lines that it will produce. Indeed, the Secretary has informed county officials that the State has no money to provide for the additional resources needed to handle this anticipated increase.[7] As discussed below, *infra* Section II.C, the Legislature rejected all amendments that would have mitigated HB 25's disastrous effect.

The excessive polling-place lines caused by HB 25 will impose severe burdens on voters and the candidates they support. Political scientists have long analyzed the act of voting under a "cost/benefit" analysis in which "voter turnout rates are very sensitive to relative changes in the costs of voting." Expert Decl. of Dr. Jason Roberts ¶ 10 (Ex. 8). "[E]ven small increases in the costs of voting have a deterrent effect on turnout and ballot completion." *Id.* Long polling-place lines impose significant costs that deter individuals from voting. Because of other responsibilities—such as work, school, or family obligations—voters have a finite period of time they can commit to standing in a polling-place line. The longer a voter must wait in line, the more likely she is to give up voting or not attempt to vote at all. *E.g.*, Haley ¶ 7. "Long lines have been shown to have a detrimental effect on the voting process by discouraging voters from voting, increasing economic costs for those who wait in long lines, and by reducing voter confidence in elections." Roberts ¶ 14. And while there have been few real-time studies of polling-place lines, a recent observational study found that having just five additional voters standing in line tripled the

---

[7] *See* John Austin, *Changes Coming for Straight-Ticket Ballots*, Cleburne Times-Review (Oct. 7, 2018), https://www.cleburnetimesreview.com/news/changes-coming-for-straight-ticket-ballots/article_808e9396-c8e1-11e8-bf55-cbc94eaab3d2.html.

likelihood that a would-be voter would give up on trying to vote. *Id.*

Courts agree that excessive polling-place lines impose severe burdens on voters. As one court explained, there "come[s] a point when the burden of standing in a queue ceases to be an inconvenience or annoyance and becomes a constitutional violation because it, in effect, denies a person the right to exercise his or her franchise." *Nat'l Ass'n for the Advancement of Colored People State Conf. of Pa. v. Cortés*, 591 F. Supp. 2d 757, 764 (E.D. Pa. 2008). This imposes an injury "of the gravest magnitude and will give rise to a violation of at least the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 765. For this reason, Texas claims an interest in reducing the time voters spend completing their ballots. *See Cotham v. Garza*, 905 F. Supp. 389, 399 (S.D. Tex. 1995) (noting the State's argument that increasing the time "voters spend marking their ballots" would cause "other voters [to] be discouraged from voting").

Beyond making the process of voting more difficult, long lines decrease the likelihood that voters will even attempt to vote in the first place. A nationwide study following the 2008 election estimates that approximately 11% of Americans who chose not to vote did so because of long lines. Caltech/MIT Voting Technology Project, 2008 Survey of the Performance of Am. Elections at 59 (2009) (Ex. 9). And a study of the 2016 election finds that, among registered voters aged 18 to 29 who did not participate in the election, 19% of those with some college experience cited long polling-place lines as a reason they did not vote, as did 27% of those without college experience.[8] Long lines also harm voters' confidence in the accuracy of election outcomes. The mere existence of long lines causes all voters—"even among those who do not personally experience long lines"— to lose confidence in the accuracy of their elections. Caltech/MIT Voting Technology Project,

---

[8] Center for Information & Research on Civic Learning & Engagement (CIRCLE), Why Youth Don't Vote – Differences by Race and Education (2018), https://circle.tufts.edu/latest-research/why-youth-dont-vote-differences-race-and-education.

Waiting in Line to Vote at 4 (2013) (Ex. 10).

In addition to drastically increasing lines, HB 25 will also significantly increase the number of Texans who fail to complete their ballots. Ballot "roll-off"—when a voter casts a ballot but leaves at least one down-ballot item blank—significantly increases when STV is unavailable. "At a purely mechanical level, it takes additional time and physical effort to complete a ballot when a voter must make an individual selection in each partisan contest," which "induce[s] voter fatigue as voters struggle to wade through the ballot," causing many to "turn in their ballots before they have marked choices for all races and ballot questions." Roberts ¶ 12. Dr. Roberts' study of elections between 1956 and 2000 "found a consistent relationship between the presence of a[n STV] option and ballot rolloff." *Id.* ¶ 13. Remarkably, the study found an average roll-off rate of 4% between presidential races and races for seats in the U.S. House of Representatives, which are listed, at most, just a few items apart on a given ballot. *Id.* Because some Texans are asked to select candidates in as many as 90 partisan races, eliminating STV will produce a much greater roll-off effect here. And as Dr. Roberts's and Lichtman's analyses demonstrate, there already is a strong negative relationship between level of STV use and roll-off in Texas: the less STV use in a county, the more roll-off. *Id.* ¶ 51; Lichtman 52-53.

North Carolina provides a clear example of this effect. In 2013, North Carolina eliminated STV from its ballots as part of an omnibus election bill. While the bill was crafted with "almost surgical precision" to harm minority voters, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016), it caused ballot roll-off to surge among all voters. Even though the 2014 ballot in North Carolina was short, the roll-off rate was more than double the rate in 2010. Roberts ¶ 31. In 2016, counties where voters previously used STV at higher rates saw much larger increases in roll-off than counties with lower STV use rates. *Id.* ¶¶ 34-35. The same happened in Missouri,

where eliminating STV caused roll-off to grow by nearly 80% in the following election. Lichtman 51-52. Given Texas's significantly longer ballots than those in Missouri, *id.* at 52, HB 25's roll-off effect will be even more dramatic.

Using North Carolina as a comparator, Dr. Roberts performed a Coarsened Exact Machine analysis to demonstrate the effect HB 25 will have in Texas. Roberts ¶¶ 52-58. This commonly used methodology entailed matching North Carolina and Texas counties based on pertinent characteristics, and then transposing the roll-off effect observed in the North Carolina counties to their comparable Texas counties. His analysis predicts that if STV were not available in Texas in 2016, there "would have likely [been] a 1.41% increase in ballot rolloff," "equat[ing] to approximately 123,000 additional ballots not fully completed." *Id.* ¶ 56.

In sum, HB 25's elimination of STV will severely burden Texas voters by drastically increasing polling-place lines in the November election *and* making it more likely that those who withstand such lines fail to complete the entire ballot.

### 2.  HB 25 will most severely burden African American and Hispanic voters.

In addition to its burdens on all Texans, HB 25 will impose disproportionate burdens on African American and Hispanic voters. This fact is directly relevant to the *Anderson-Burdick* analysis. In *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), a majority of the Supreme Court agreed that in evaluating burdens, courts should consider not only a given law's impact on the general electorate, but also its impact on identifiable subgroups, for whom the burden may be more severe. *Id.* at 199-203 (plurality opinion); *id.* at 212-23, 237 (Souter, J., dissenting); *id.* at 237 (Breyer, J., dissenting). Lower courts, including a court in this district, have followed these instructions. *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) (explaining *Crawford* instructs that "courts may consider not only a given law's impact on

the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe"); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627-32 (6th Cir. 2016) (measuring challenged law's "disparate burden on African-American voters"); *Veasey v. Perry*, 71 F. Supp. 3d 627, 686 (S.D. Tex. 2014) ("This Court reads *Anderson* and *Burdick*, as well as the lead opinion in *Crawford*, to require balancing the state's interest against the burdens impose upon the subgroup [of voters most impacted by the challenged law]."), *vacated in part on other grounds*, 830 F.3d 216 (5th Cir. 2016) (en banc).[9]

HB 25 will have a particularly severe impact on African American and Hispanic Texans, who use STV at significantly greater rates than white Texans. Analyzing data from Texas's last three general elections, Dr. Maxwell Palmer found a "strong relationship" between the minority population of a given precinct and the percentage of voters in that precinct that used the STV option: "[p]recincts with a larger share of minority voters have a significantly larger share of straight-ticket ballots." Expert Decl. of Dr. Maxwell Palmer ¶ 9 (Ex. 11). By 2018, 82.4% of African Americans and 71.2% of Hispanic voters relied on STV when casting a vote, compared to 61.1% of white voters. *Id.* tbl. 2. Similar gaps existed in 2014 and 2016. *Id.* These results are consistent with the findings of other studies. *E.g.*, Stefan Haag & William R. Peck, The Effects of Eliminating Straight-Ticket Voting in Texas 19 (Aug. 2019) (Ex. 12) ("[S]traight-ticket voting is more common among racial and ethnic minorities and in urban areas.").

If HB 25 takes effect, the disproportionate rate of African American and Hispanic Texans switching away from STV will cause particularly long lines in the communities in which they live. African Americans and Hispanics are concentrated in Texas's largest counties, which have the

---

[9] Other courts reach the same conclusion by finding that, under *Marks v. United States*, 430 U.S. 188, 193 (1977), the *Crawford* plurality's subgroup-focused analysis is narrowest. *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 544 (6th Cir. 2014) (adopting the subgroup-focused approach because (1) it was endorsed by a majority of the Supreme Court, and (2) "[a]lternatively," the plurality's decision controls under *Marks*).

longest ballots in the State. Lichtman 55-56 & tbl. 6. Moreover, African American and Hispanic voters in Texas already wait in longer lines than white voters. *Id.* at 56-58, tbls. 7, 8. Each of these factors will compound HB 25's effects to produce particularly long lines in African American and Hispanic communities.

Moreover, even if the increase in lines caused by HB 25 was uniform, those increases would nonetheless impose greater relative burdens on African American and Hispanic voters. The relative burden a voting restriction imposes on an individual depends in large part on the voter's socioeconomic status. Less flexible employment, lower educational achievement, less access to transportation, and/or less access to family-care assistance make political participation significantly more difficult. *Id.* at 65-66 & nn.129-30; Roberts ¶ 16; *see* Middleton-Holmes ¶ 6; Sharry ¶ 13. As discussed further below, *see infra* Section II.B, due to Texas's long history of racial and ethnic discrimination, African American and Hispanic Texans on average lag significantly behind white Texans in a wide range of areas, including education, income, poverty, unemployment, vehicle accessibility, literacy, English proficiency, and health insurance coverage, Lichtman tbls. 11-13.

The increase in roll-off caused by HB 25 will also be most severe among African American and Hispanic Texans. As discussed above, when STV is eliminated, areas with higher usage rates of STV experience significantly greater roll-off. Roberts ¶¶ 29-38. Because African American and Hispanic Texans utilize STV at significantly higher rates than white voters, the roll-off effect caused by HB 25 will be significantly greater among those minority voters. *Id.* ¶¶ 39-46. And because African American and Hispanic Texans tend to live in the highest-population counties, Lichtman 55-56, tbl. 6, their ballots are significantly longer, which will also produce disproportionately increased roll-off. Moreover, political scientists agree that a voter's educational

achievement has a negative relationship with roll-off. Roberts ¶ 12. Again, due to Texas's history of discrimination, African Americans and Hispanics have, on average, significantly less educational achievement than white voters. All of these factors demonstrate that HB 25 will produce significantly greater roll-off among African American and Hispanic Texans.

### 3. HB 25 will severely burden the associational rights of voters who support the Democratic Party.

The disproportionately severe burdens that HB 25 will impose on African American and Hispanic voters will also result in a particularly severe burden on voters who support the Democratic Party. As discussed further below, *infra* Section II.B, voting in Texas is severely racially polarized, with African American and Hispanic voters overwhelmingly supporting the Democratic Party, and white voters overwhelmingly supporting the Republican Party. *See* Palmer ¶¶ 13-18. Statewide, African American support for Democratic gubernatorial, senatorial, and presidential candidates between 2014 and 2018 ranged between 89% and 92.4%, and Hispanic support for the same candidates ranged between 62% and 76.5%. *Id.* at tbl. A2. In the ten most populous counties, the results were even starker: African Americans supported those candidates between 96.6% and 98.5%, and Hispanic support ranged from 69.8% to 84.2%. *Id.* at tbl. A3.

In light of African American and Hispanic Texans' overwhelming preference for the Democratic Party, the fact that those voters will face the severest of HB 25's burdens means that HB 25 will also severely impede Texas Democrats' First Amendment right "to associate in the electoral arena to enhance their political effectiveness as a group." *Anderson*, 460 U.S. at 794; *see also Hadnott v. Amos*, 394 U.S. 358, 364 (1969) (recognizing the First Amendment's protection of the "right to band together for the advancement of political beliefs"). By impeding the franchise rights of Texans who support the Democratic Party at a significantly disproportionate rate, and causing many to fail to complete their ballots, HB 25 severely decreases Texas Democrats'

electoral prospects and thus severely burdens their First Amendment rights. *Cf. Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1274-75, 1282-83 (N.D. Fla. 2019) (invalidating Florida law burdening the rights of Democratic voters "by systematically allocating [a] small but statistically significant advantage to Republican candidates"). As discussed below, this result was exactly what HB 25's proponents sought to achieve.

### 4. No legitimate governmental interest justifies these burdens.

Regardless of the level of scrutiny that *Anderson-Burdick* calls for in this case, HB 25 will violate the First and Fourteenth Amendments because none of the purported governmental interests identified during HB 25's passage justify the burdens just described.

While HB 25's proponents claimed the bill would create a more "informed" electorate by forcing voters to focus on individual candidates' merit rather than their party label, Lichtman 41-43, nothing suggests eliminating STV from Texas's ballots would produce that outcome. The Sixth Circuit rejected this exact argument when it refused to stay a preliminary injunction against Michigan's elimination of STV in 2016. *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 665-66 (6th Cir. 2016). As that court explained, "it is far from evident that" requiring each voter "to look, at least briefly, at each section of the partisan ballot in order to identify and fill in the desired bubble" will "foster[] an engaged electorate," because, like in Texas, the "party affiliation of each partisan candidate will still appear beside the candidate's name." *Id.* "[A] voter desiring to vote for all of the candidates of his or her desired political party may still do so without reading any of the candidate's names, without knowing the office for which the candidate is running, and without knowing a single fact about either." *Id.*

The Sixth Circuit's reasoning is particularly apt in Texas, where voters can alter their choices in individual races *after* selecting the STV option. *See* Tex. Elec. Code § 65.007(c). Even

with STV, if a Texan wishes to vote for Republican candidates throughout her ballot but nonetheless wants to vote for a particular Democratic district judge candidate, she can select the STV option and then alter her choice in that specific race. The Texas Legislature could not identify *any* evidence that forcing voters to make individual selections in all races would cause them to become more informed about those elections.

Nor does eliminating STV produce better candidates by prompting voters to split their tickets (*i.e.*, choose candidates of different parties in different races), as some legislators apparently believed. Lichtman 43-45. HB 25's proponents identified no reason to believe that (1) eliminating STV even increases ticket-splitting, or (2) ticket-splitting produces better candidates. *Id.* Indeed, pertinent studies suggest the opposite: ticket-splitting "benefits incumbents and well-funded candidates," enhancing the electoral advantage they already enjoy. *Id.*

Finally, to the extent Texas sought to bring itself into conformity with other States by eliminating STV, Lichtman 46-47, that purpose is not a legitimate governmental interest. *Cf. Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 547 n.7 (6th Cir. 2014) (explaining "other states' electoral laws and practices" are irrelevant to the *Anderson-Burdick* analysis), *vacated on other grounds by* 2014 WL 10384647 (6th Cir. Oct. 1, 2014). Plaintiffs are aware of no case suggesting conformity with other States' election laws justifies burdening fundamental rights. Other states' election laws are irrelevant to the legality of HB 25 because each state's unique electoral characteristics determine the appropriateness of each regulation. Because Texas's ballots are among (if not the) longest in the country, removing STV when most Texans rely on it will cause significantly higher burdens on voters in this state than it would elsewhere.

Because HB 25 is not supportive of—let alone narrowly tailored to—any legitimate state interest, HB 25 fails *Anderson-Burdick* and will violate the First and Fourteenth Amendments.

**B.** **HB 25 will violate Section 2 of the VRA by denying African American and Hispanic voters an equal opportunity to participate in Texas's political system.**

By imposing a disparate burden on African Americans and Hispanics, HB 25 will also violate Section 2 of the VRA. *See* 52 U.S.C. § 10301(a) (prohibiting election practices that "result[] in a denial or abridgement of the right of any citizen . . . to vote on account of race or color").[10] Congress passed the VRA "to prevent . . . invidious, subtle forms of discrimination," including "needlessly burdensome laws with impermissible racially discriminatory impacts." *Veasey*, 830 F.3d at 247. A violation of Section 2 can "be proved by showing discriminatory effect alone." *Id.* at 243. The "essence" of this claim is that HB 25 "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Id.* at 273 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986)).

The pertinent analysis follows two steps. The first "inquires about the nature of the burden imposed [by the law] and whether it creates a disparate effect in that 'members of the protected class, have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Veasey*, 830 F.3d at 244 (quoting 52 U.S.C. § 10301(a)). As already explained, *supra* Section II.A.2, HB 25 disparately impacts African American and Hispanic Texans, for whom elimination of STV will create the largest increase in polling-place lines and ballot roll-off. This Section does not repeat that discussion; instead, it focuses on the second step of the Section 2 analysis.

The second step asks whether there is a "causal link between the burden on voting rights" created by the challenged law "and the fact that this burden affects minorities disparately because [the law] interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Veasey*, 830 F.3d at 245. To make this determination,

---

[10] Section 2 of the VRA also guards against intentional discrimination, as discussed below. *See infra* Section II.C.

courts look to an authoritative list of factors set forth in the Senate Judiciary Committee report that accompanied Congress's creation of Section 2's disparate-impact claim. *Id.*[11] Commonly referred to as the "Senate Factors," they "provide salient guidance from Congress and the Supreme Court on how to examine the current effects of past and current discrimination and how those effects interact with a challenged law." *Id.* at 246. They "are not exclusive, and 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.' Not every factor will be relevant in every case." *Id.* (quoting *Gingles* 478 U.S. at 45).

Each of the relevant factors confirms that eliminating STV would interact with conditions in Texas to deny African Americans and Hispanics equal electoral opportunities. *Id.* at 256.[12]

### *Factor One*: Texas's long history of official voting-related discrimination.

Texas has a long and ongoing history of official voting-related discrimination. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439-40 (2006) (*LULAC*); *Perez v. Abbott*, 253 F. Supp. 3d 864, 959 (W.D. Tex. 2017). For more than a century, Texas directly and systemically barred African Americans and Hispanics from voting. Lichtman 8-11. Texas has conceded this history in other litigation. *Perez*, 253 F. Supp. 3d at 959.

Texas continues to do so, but often in more subtle forms. Following the most recent

---

[11] These factors are: (1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process"; (2) "the extent to which voting in the elections of the state or political subdivision is racially polarized"; (3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group"; (4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process"; (5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process"; (6) "whether political campaigns have been characterized by overt or subtle racial appeals"; (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction"; (8) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"; and (9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* at 245-46 (quoting *Gingles*, 478 U.S. at 36-37).

[12] Senate Factor Four does not apply to modern elections in Texas, where slating processes are not used.

- 18 -

redistricting cycle, two different federal courts found that Texas intentionally discriminated against minority voters in drawing its maps. *Texas v. United States*, 887 F. Supp. 2d 133, 159-62, 163-66, 177-78 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013); *Perez v. Abbott*, 253 F. Supp. 3d 864, 945-62 (W.D. Tex. 2017).

Less than ten years ago, Texas enacted the most restrictive photo identification law in the country. Every court to review that law found it harmed minority voters across the State. *Texas v. Holder,* 888 F. Supp. 2d 113 (D.D.C. 2012); *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014); *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc). Moreover, just last year, the Texas Secretary of State issued an advisory decision to county registrars claiming to have a list of 95,000 non-citizens who were registered to vote. Lichtman 13-14. But that list blatantly failed to account for prior non-citizens who had become naturalized. *Id.* Only after the Texas LULAC filed a lawsuit against the Secretary did he agree to rescind this advisory. *Id.* Moreover, a disproportionate number of polling places in minority communities have recently been shuttered. *Id.* at 14-15. And despite many opportunities to mitigate the State's long history of discrimination relating to voting, the Texas Legislature has rejected numerous recent bills that would have afforded minority voters greater access to the ballot. *Id.* at 14.

### *Factor Two*: Texas voters are racially and ethnically polarized.

There is no doubt that elections in Texas are characterized by racially and ethnically polarized voting. *Perez*, 253 F. Supp. 3d at 946 (finding it "undisputed" that "voting in Texas is strongly racially polarized"). Numerous courts have reached the same conclusion. *Veasey*, 71 F. Supp. 3d at 638; *Veasey*, 830 F.3d at 258 (affirming finding, based on the State's concession, that "racially polarized voting exists throughout Texas"); *see also LULAC*, 548 U.S. at 427.[13]

---

[13] While these courts used the blanket term "racial polarization," they intended the term to reference racial polarization

Drs. Palmer and Lichtman confirm this consensus. In each of the last three federal elections, voters in Texas broke along racial and ethnic lines. Palmer ¶ 17; Lichtman 60-62. In 2014, 90.6% of African American voters and 66.5% of Hispanic voters voted for gubernatorial candidate Wendy Davis, compared to 15% of white voters. Palmer tbl. A2; Lichtman tbl. 9. In 2016, 92% of African Americans and 75.8% of Hispanics voted for Hillary Clinton, compared to 16.9% of white voters. Palmer tbl. A2; Lichtman tbl. 9. In 2018, 90.3% of African American voters and 70.2% of Hispanic voters voted for gubernatorial candidate Lupe Valdez, compared to 17% of white voters. Overall, from 2014 to 2018, nearly 90% of African Americans and nearly 60% of Hispanic voters preferred Democratic candidates, compared to just 16.7% of white voters. Palmer ¶ 17; Lichtman tbl. 9. When considering voters in the 10 counties with the highest number of ballots cast, these disparities become even starker. *See* Palmer tbl. A3.

### *Factor Three*: Texas's voting practices enhance the opportunity for discrimination.

Throughout Texas, at-large voting and the use of large legislative districts provide opportunities to discriminate against African Americans and Hispanics. Texas employs at-large voting for its highest courts, a practice that *Gingles* itself highlighted as an example of a practice that enhances discrimination. 478 U.S. at 45; *see also Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 714 (S.D. Tex. 2017) (finding this factor met when city in Texas employed a majority-vote requirement). Despite its stature as the second largest and second most populous state, Texas refuses to create reasonably-sized legislative districts. Lichtman 62-65. Moreover, while some of Texas's largest counties encompass thousands of miles and millions of people, they hold numerous at-large elections and keep the number of county-commissioner precincts low. *Id.* These practices enable white voters to vote as a bloc and prevent minority communities from electing their

---

(disparities in the candidates of choice among African Americans and non-Hispanic whites), *and* ethnic polarization (disparities in the candidates of choice among Hispanics and non-Hispanic whites).

candidates of choice. *Id.*

### *Factor Five*: The effects of discrimination impair African American and Hispanic Texans' ability to participate in the political process.

It cannot be disputed that Texas's history of discrimination against African Americans and Hispanics has led to racial and ethnic disparities in all aspects of daily life. In 2017, African American and Hispanic Texans' median household incomes were $45,092 and $46,855 respectively, compared to white Texans' $76,361. Lichtman tbl. 11. While 18.9% of African Americans and 20.7% of Hispanics in Texas live in poverty, the poverty rate among white Texans is 8.5%. *Id.* The unemployment rate is 7.7% for African Americans and 5.7% for Hispanics; for white Texans, it is 4.1%. *Id.* While 70.4% of white Texans own their home, only 40.3% of African American Texans and 57.4% of Hispanic Texans do. *Id.* 3.6% of white Texans lack access to a vehicle, compared to 5.6% of Hispanic Texans, and 11.4% of African American Texans. *Id.*

This trend continues in the areas of health and education. 9.8% of white Texans lack health insurance, compared to 14.9% of African American and 26.9% of Hispanic Texans. *Id.* at tbl. 13. The infant mortality rate among African Americans in Texas is a shocking 11.1%; among Hispanic Texans, the rate is 5.4%; and among white Texans, the rate is 4.9%. *Id.* 94% of white Texans over age 25 are high school graduates, compared to 89.6% of African Americans and just 66.2% of Hispanics of the same age. *Id.* at tbl. 12. 38.6% of white Texans hold a bachelor's degree or higher, compared to 24.3% of African Americans and 14.5% of Hispanics. *Id.* 1.2% of white Texans speak English less than "very well," compared to 2% of African Americans and 29.7% of Hispanics. *Id.* 62% of Hispanic Texans and 47% of African American Texans read at an eighth-grade proficiency level or above, compared to 80% of white Texans. *Id.*

These disparities lead to diminished political participation among African Americans and Hispanics. Those with fewer resources have less capacity to engage in political participation. *Id.*

- 21 -

at 65-66 & nn.129, 130. Socioeconomic hardships make it more difficult for minority voters to spend time traveling to a polling place, waiting in line, and actually voting. *Id.* And for a disproportionate number of minority Texans, this reality puts other forms of political participation—such as campaigning for candidates, lobbying officeholders, or making campaign contributions—completely out of reach. *Id.*

> *Factor Six*: **Texas's political campaigns feature racial appeals.**

Racial appeals are a common feature of contemporary Texas politics. Here, Plaintiffs highlight just a few of the many recent incidents discussed in Dr. Lichtman's report. *See* Lichtman 68-73. In 2014, after musician Ted Nugent referred to President Obama as a "subhuman mongrel" and a "chimpanzee," stated that African Americans could not "honestly celebrate the legacy of Dr. King" until they "admit[ted] to the self-inflicted destructo-derby they are waging," and declared that he would like to "shoot" undocumented immigrants "dead," then-gubernatorial-candidate Greg Abbott made Nugent a prominent face of his campaign. *Id.* at 69. Not to be outdone, then-Agriculture Commissioner candidate Sid Miller, who had appointed Nugent the Treasurer of his campaign, announced he would not "distance" his campaign from Nugent based on these statements because if his campaign "had concerns about some of the things that Mr. Nugent has said or done," they "wouldn't have reached out to [Nugent] and asked him to become involved in our campaign on such a high level." *Id.* at 69-70. Both of these candidates were elected.

The most recent federal election was no better. U.S. Representative Pete Sessions ran a digital ad with his African American opponent's name over a picture of a darkened hand over the mouth of a white woman. *Id.* at 72. And Dallas County Commissioner candidate Vic Cunningham told the *Dallas Morning News* that it would only be "Christian" if his children married people who were also "Caucasian." *Id.*

While Texans may be accustomed to these racial appeals, their damage is no less harmful. Such appeals divide the electorate along racial and ethnic lines, and they cause voters to support particular candidates as a result of racial and ethnic stereotypes.

### *Factor Seven*: African American and Hispanic candidates are rarely elected to public office despite their large portion of the population.

African Americans and Hispanics are vastly underrepresented in Texas's public offices. African Americans and Hispanics together make up 42.7% of the State's voting-age population. Lichtman 73. Nonetheless, out of Texas's nine executive statewide offices, not one is occupied by an African American, and just one is occupied by a Hispanic individual. *Id.* at 73, tbl. 14. The same is true of Texas's Supreme Court, on which there are no African Americans and just one Hispanic justice. *Id.* No African American or Hispanic judge sits on Texas's Court of Criminal Appeals. *Id.* Overall, among all 29 offices elected in statewide partisan elections, *none* are held by an African Americans, and Hispanics occupy just three positions. *Id.* This paltry representation "contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process." *Veasey*, 830 F.3d at 261.

### *Factor Eight*: Texas is not responsive to the needs of its minority communities.

As the discussion above indicates, Texas is not responsive to the needs of its minority communities. Texas's history of discrimination speaks for itself, as do the stark racial and ethnic disparities in socioeconomic wellbeing. Recent legislative action (and inaction) by the State further confirms that it is unresponsive to minority Texans' interests. For example, Texas refuses to adopt the Medicaid expansion available under the Affordable Care Act, despite the fact that its African American and Hispanic citizens are disproportionately more likely than its white citizens to lack coverage. Lichtman 74-75. Texas also ranks third-to-last in financial support of its public schools, enrollment of which is disproportionately African American and Hispanic. *Id.* at 75-77.

Instead of ensuring that its minority residents have access to health care and quality education, the Legislature enacts legislation targeting racial and ethnic minorities for harassment. In 2017, Texas passed SB 4, an anti-immigration law that authorized police to inquire into the immigration status of anyone they detain or arrest, even during minor traffic stops. *Id.* at 77. Every major Hispanic organization in the state opposed the law, as did police chiefs across the state. *Id.* "Ignoring clear and supported objections about the racially disparate impact of a proposed law is probative of a lack of responsiveness to minority concerns." *Patino*, 230 F. Supp. 3d at 717.

*Factor Nine*: The policy underlying the elimination of STV is tenuous.

As discussed, *supra* Section II.A.4, no legitimate governmental interest justifies HB 25's elimination of STV. Instead, as the following Section explains, the justifications HB 25's proponents gave for its passage were blatant pretext for their actual motive: diminishing political participation among African American and Hispanic Texans.

\*     \*     \*

Each of the relevant Senate Factors strongly indicates that HB 25's unmistakable disparate impact on African American and Hispanic voters will deny them an equal opportunity to participate in Texas's political process. As a result, HB 25 will violate Section 2 of the VRA.

**C.**   **HB 25 will violate the Fourteenth and Fifteenth Amendments because a substantial motivation for its passage was to impede political participation by African American and Hispanic Texans.**

**1.**   **Legal Standard**

Laws "conceived or operated as purposeful devices to further racial discrimination" violate the Fourteenth and Fifteenth Amendments and Section 2 of the VRA. *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (internal quotations omitted). To violate these provisions, "[r]acial discrimination need only be one purpose, and not even a primary purpose" of the challenged law. *Veasey*, 830 F.3d at 230 (citing *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). Because "[proving the

- 24 -

motivation behind official action is often a problematic undertaking," the applicable analysis considers a series of non-exhaustive factors: (1) disparate impact on the protected class[14]; (2) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[t]he specific sequence of events leading up to the decision"; (4) departures from usual legislative procedures or the usual weighing of substantive factors of a decision; and (5) "legislative or administrative history," including contemporaneous statements by legislators. *Veasey*, 830 F.3d at 230-32, 324; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977). In a Section 2 claim asserting intentional discrimination, courts also consider the presence of racially polarized voting. *See McCrory*, 831 F.3d at 222-23. In making its determination, the Court considers "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions." *Brown*, 561 F.3d at 433 (internal quotation marks omitted). As the Fifth Circuit has recognized, "[t]o require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions." *Veasey*, 830 F.3d at 235-36. Here, the evidence shows that a substantial factor behind HB 25's enactment was an intent to diminish electoral participation among African American and Hispanic Texans in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the VRA.

When a plaintiff proves that racial discrimination was a "substantial" or "motivating" factor behind a challenged law, the burden shifts to defendant to demonstrate the law would have been enacted absent any racial purpose. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). In determining whether a defendant's burden has been carried, "courts must scrutinize the legislature's actual non-racial motivations to determine whether they alone can justify the

---

[14] Plaintiffs have already explained how the removal of STV will have an indisputable discriminatory impact on African American and Hispanic Texans. *Supra* Section II.A.2.

legislature's choices." *McCrory*, 831 F.3d at 221 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982)). Importantly, partisanship-related justifications do not cure a violation: "intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *Id.* at 222. As discussed above, *see supra* at II.A.4, and further below, HB 25 does not serve any of the blatantly pretextual non-racial justifications HB 25's proponents gave for the law's passage.

### 2.   The Texas Legislature acted on an incentive to suppress minority votes.

The sequence of events leading to HB 25's passage makes clear that HB 25 was meant to combat increasing African American and Hispanic electoral strength. This is nothing new in Texas. *Perez*, 253 F. Supp. 3d at 959 (noting Texas's pattern of enacting "restrictive and discriminatory voting laws . . . in response to a perception of increased voting power by emerging demographic groups" (citing *Veasey*, 830 F.3d at 241 n.30)). In the years preceding HB 25's passage, Texas's minority population, which uses STV at a much higher rate, grew significantly relative to the white population. Between 2008 and 2018, Texas's minority citizen voting-age population (CVAP) increased from 39.4% to 42.7%, while its white CVAP fell from 56.4% to 52.2%—about a 7.5-point shift. Lichtman tbl. 1. And because African American and Hispanic Texans overwhelmingly support Democratic candidates, *see supra* Section II.A.3; Palmer figs. 6-7, this shift altered the partisan landscape in Texas: between 2012 and 2016, Republican's partisan advantage statewide fell significantly. Lichtman 24. Simultaneously, between 2004 and 2016, STV usage shifted 11 points in favor of Democrats. *Id.* fig. 3. When white Texans held a much stronger demographic and electoral advantage in 2013, the Legislature rejected legislation to eliminate STV. *Id.* at 27-28. But in 2017, when minority usage grew to the point at which it was harming Republicans' electoral prospects, the Legislature decided to eliminate STV through HB 25.

2012 and 2016 election results from Harris County, one of Texas's most diverse counties, confirms this motive. In 2016, Harris County voters cast 70,000 more Democratic straight-ticket votes than Republican straight-ticket votes, but just four years earlier, that margin was only 3,000 votes. Lichtman 29. This drastic shift resulted in Democrats sweeping all 34 down-ballot countywide offices. *Id.* Republican proponents of HB 25 recognized the impact of minority STV use on their electoral prospects, and they lobbied to repeal STV for that very reason. At a House hearing on HB 25, a defeated Harris County Republican judge claimed that STV was "why [she's] no longer a judge" and "the only reason [Republicans] all lost" in 2016. *Id.* at 30. At the same hearing, a former Bexar County resident explained that she supported the bill because "Republican judges in [] large population areas [] get swept out of office because of the straight party Democrat voting." *Id.* After another Democratic electoral sweep in 2018, the Harris County GOP Chairman echoed these sentiments, lamenting that Republicans did not repeal STV before 2018: "I've been warning about it for years. . . At the last minute, [lawmakers] put [STV] back in for 2018, and I told some legislators then, '2018 will not be the same as 2014.'"[15] Increased use of STV among voters in Texas's largest and most diverse counties, and the resulting electoral losses for Republicans, were key factors in the Legislature's decision to eliminate STV. But as the Fifth Circuit has explained, racial discrimination as a means to a partisan end is no less unlawful than racial discrimination for its own sake. *Veasey*, 830 F.3d at 241 n.30 ("Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive. . . . [A]cting to preserve legislative power in a partisan manner can also be impermissibly discriminatory."); *see also McCrory*, 831 F.3d at 222-23 ("[T]argeting a particular race's access to the franchise because its members vote

---

[15] Emma Platoff, *Straight-Ticket Voting Ends in 2020. For Some Down-Ballot Republicans, That Wasn't Soon Enough*, Tex. Tribune (Nov. 16, 2018), https://www.texastribune.org/2018/11/16/straight-ticket-voting-ed-emmett-harris-county-texas/.

for a particular party, in a predictable manner, constitutes discriminatory purpose.").

### 3. HB 25's proponents knew STV repeal would have a disproportionate impact on African American and Hispanic voters yet offered no response.

Against this backdrop, HB 25's legislative history reveals its proponents' systematic refusal to acknowledge or consider HB 25's discriminatory impact on minorities. During HB 25's consideration, legislators and community members expressed grave concerns that the bill was unlawful and discriminatorily impacted Texans of color. HB 25's proponents claimed ignorance of the impact, and instead offered unsupported, pretextual reasons to pass the law anyways. This repeated pattern demonstrates that race was a motivation behind HB 25. *Veasey*, 830 F.3d at 236.

During debate over HB 25, opponents accurately pointed out that minority voters rely on STV at much higher rates than white voters. Lichtman 36-40; *see* Palmer ¶ 12. For example, Representative Turner (D), highlighted "that precincts with a higher percentage of African American and Hispanic voters have more straight party ballots than precincts with lower percentages of African American and Hispanic voters." Lichtman 45. Republicans, notably HB 25's author, Representative Simmons, repeatedly ignored these facts, responding only that he was "not advised." *Id.* at 37, 45; *see Veasey*, 830 F.3d at 236-237 (legislator's statement that he was "not advised" of possible disparate impact was relevant to intent inquiry). When asked if he would have offered the bill if he had been aware that it would disenfranchise African Americans and Hispanic voters, Simmons refused to provide an answer. Lichtman 45-46.

In response to concerns that legislators had not actually considered whether HB 25 would violate the Voting Rights Act, Simmons first claimed that HB 25 had "[n]othing to do with race." Lichtman 46. However, he later admitted that no one had examined HB 25's racial impact, despite repeated calls for such an inquiry. *Id.* at 37; *Veasey*, 830 F.3d at 237 (legislator's refusal to delay implementation of bill until an impact study had been completed was relevant to intent inquiry).

- 28 -

Despite his admission that he "did not commission . . . any study, related to this bill," Simmons nonetheless claimed that he did "not believe this bill disenfranchises any voter." Lichtman 40, 45-46. In reaching this conclusion, which Simmons conceded was baseless, he and the Legislature failed to consult any minority leaders, such as from the Mexican-American Legislative Caucus, the Black Legislative Caucus, NAACP, MALDEF, LULAC, the Urban League, Southwest Voter, or Mi Familia Vota. *Id.* at 36. And despite repeated concerns about HB 25's disparate impact, the Legislature, without any debate or reasoning, rejected amendments to have the United States Department of Justice evaluate whether HB 25 violated the Voting Rights Act or the U.S. Constitution prior to its implementation. *Id.* at 31-32; *Veasey*, 830 F.3d at 237 (legislator's refusal to explain rejection of amendments, both at the time and in subsequent litigation, was circumstantial evidence relevant to intent to discriminate). The Legislature's awareness that HB 25 would suppress minority voting rights in Texas, its efforts to deliberately blind itself to that fact, and its clear political motivation to suppress minority voting rights, all combine to support an inference that the Legislature passed HB 25 because of its disparate impact on minority voters.

> Numerous legislators also raised concerns about increased lines at the polls. One observed that
>
> [l]ong waits at polling places already are huge problems in some parts of Texas, especially in urban areas where many voters line-up to vote for many races on the ballot. On the first day of early voting for the November, 2016, election, for example, long waits—sometimes hours—were reported in Bexar, Harris, Nueces, and Denton counties . . . . Lines and ballot fatigue can exhaust voters' patience, and eliminating the straight-party option would only make things worse and cause many either to skip down-ballot races altogether or not go to the polls at all. The effect would be to suppress voting and voter turnout.

Lichtman 54. HB 25's proponents again offered no response and admitted that they had not reviewed any studies regarding the potential for increased voting times, longer lines, and decreased voter turnout as a result of HB 25. *Id.* at 40. They also ignored concerns raised by election officials who testified that STV's elimination will cause longer polling-place lines, require increased budgets for additional

voting stations, and hit largest counties the hardest. *Id*. at 54-55; *Veasey*, 830 F.3d at 237. And the Legislature rejected a proposed amendment making elimination of STV contingent on counties' determining that sufficient funding would be allotted to address wait times at polls. Lichtman 31. In fact, they failed to include *any* measures that would address HB 25's increased burdens on counties. When asked who would cover increased costs of election administration resulting from HB 25, Simmons responded that he was "not advised as to what [those costs] would be or wouldn't be, so [he] d[id]n't know one way or the other." *Id*. at 34. He likewise had no response to evidence that HB 25 would increase Dallas County's election costs by nearly a million dollars. *Id*. at 33-34. Indeed, HB 25 did not even include a fiscal note, which would have estimated the costs of its implementation. *Id.*

Proponents also ignored Texas's uniquely lengthy ballots. When asked whether he was aware that ballots in Dallas and Harris Counties can have more than 100 items, Simmons again claimed ignorance, responding: "if that's how many places are on the ballot . . . assuming they wanted to vote in every race," voters could make individual selections. *Id*. at 59-60. Implying he was not concerned that voters may not complete their ballots, he stated: "[o]f course, it's obviously their choice as to how they want to handle that." *Id*. at 60. The Legislature also rejected an amendment that would have permitted an STV option in counties with 25 or more items on the ballot. *Id*. at 31.

After hearing the dire warnings regarding HB 25's impact on minority voters, the Legislature's intentional ignorance and utter refusal to take any measures to lessen the disproportionate burden on African American and Hispanic voters—even with repeated opportunities to do so—demonstrate that a substantial motivation behind HB 25 was the intent to depress minority turnout in Texas's elections.

Meanwhile, the reasons HB 25's proponents gave for passing the law—which were based solely on the unsubstantiated, personal opinions of a few legislators—were blatantly pretextual. For example, proponents claimed HB 25 would lead to a more informed electorate. But, as discussed, *supra* Section II.A.4, there is no evidence supporting this hypothesis. When confronted by this fact, Simmons

admitted he was not aware of "any empirical data" supporting this primary justification for HB 25. Lichtman 41. When asked if any such study had been conducted in connection with HB 25, Simmons again claimed he was "not advised." *Id*. at 42. And when another proponent of HB 25 was asked if he was aware of "any studies or any evidence" supporting this claim, he too could not point to a single source; instead, he said he thought "there is a lot of belief" that this hypothesis was true. *Id*. Proponents also claimed the law would produce better candidates and campaigns. But, again, not one of them indicated any knowledge of any evidence to support this supposition. *Id*. at 43-45.

Finally, HB 25's proponents claimed they were passing the bill to bring Texas into conformity with other states. Not only is this not a legitimate state interest, *see supra* Section II.A.4, it is simply not credible, Lichtman 46-47. The same legislators who claimed to be looking to other states simultaneously argued that the findings of a federal court about the discriminatory impact of Michigan's elimination of STV had no bearing on HB 25's lawfulness. *Id*. at 37-38.

### 4. HB 25 was enacted under extremely unusual procedures and represents an enormous departure from century-old law.

Procedural and substantive deviations during HB 25's passage also "afford evidence that improper purposes . . . play[ed] a role" in its passage. *Arlington Heights*, 429 U.S. at 267. The Legislature enacted HB 25 hastily, engaging in numerous procedural deviations along the way. And by eliminating a century-old practice in Texas, HB 25 will bring an enormous substantive change to this State's law.

The Legislature held just two brief public hearings in Austin; no hearings were held in any other part of the State, including any of its numerous other minority-dense areas. Lichtman 35-36. One of the two hearings that did occur was before the Senate Committee on Business and Commerce, which does not normally hear election-related bills. *Id.* at 32. Aside from HB 25, no Senate consideration of recent voting legislation has occurred in Business and Commerce. *Id. at*

33. When questioned about this deviation from usual practice, Republican Senator Hancock offered the clearly pretextual explanation that bills are "very often" heard in committees on which the bill's author sits, suggesting he had authored HB 25. *Id.* at 32. But Senator Hancock then quickly admitted that he neither authored HB 25 nor played any role in its creation. *Id.* at 32-33.

Even the Legislature's procedure of rejecting amendments seeking to ease HB 25's burdens on minority voters were abnormal. Republicans refused to engage in debate on ameliorative amendments, and the bill's author refused to explain or even take a position on any amendment, as is customary. *Id.* at 35-36. Another legislator called this refusal "rather extraordinary." *Id.* at 36.

Each of these procedural deviations demonstrates HB 25's proponents' desire to pass the bill as quickly as possible, with little debate or public input. The purpose of these deviations were to avoid meaningful examination of the bill, which would have confirmed the repeated concerns about the racially discriminatory effects STV's repeal will have. These procedural deviations become even more alarming considering that Texas has had a form of STV for more than a century. *See Arlington Heights*, 429 U.S. at 267.

### 5. The historical background of HB 25 weighs in favor of finding that a motivating factor behind HB 25 was intent to discriminate.

Finally, as discussed, *supra* Section II.B, Texas has a long and well-recognized history of electoral discrimination against both African Americans and Hispanics. *See* Lichtman 8-18. While these practices have evolved from overtly racist to subtler forms of discrimination, they are anything but a relic of the past. Such "official actions taken for invidious purposes," especially those that are "reasonably contemporaneous with the challenged decision," are relevant in determining discriminatory purpose. *Veasey*, 830 F.3d at 232. Texas continues to discriminate against African American and Hispanic Texans when it comes to voting. In fact, during the Legislature's debate on HB 25, one legislator noted that in just the preceding three months, federal

courts had issued three separate rulings finding Texas had intentionally discriminated against minority voters. Lichtman 38-39. Simmons's only response was that he was unaware of such rulings because he had "been busy down here." *Id.* at 39.

### D. HB 25 will violate the First Amendment because its purpose is to impede the political participation of certain Texans due to their political beliefs.

Because HB 25 was also intended to diminish electoral participation among voters who support the Democratic Party, it will independently violate the First and Fourteenth Amendments. The Equal Protection Clause prohibits "fencing out" from access to the franchise rights of "a sector of the population because of the way they may vote." *Carrington v. Rash*, 380 U.S. 89, 94 (1965); *McCrory*, 831 F.3d at 222 (noting "legislatures [may not] restrict access to the franchise based on the desire to benefit a certain political party"). Likewise, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring). To determine whether a law was motivated by such intent, a court should consider the same *Arlington Heights* factors discussed in the Section above. After a plaintiff demonstrates the challenged law was passed with the intent of impeding the political participation of voters based on their partisan preferences, the defendant must then prove the law would have passed without this discriminatory intent. *Arlington Heights*, 429 U.S. at 270 n.21. The plaintiff prevails if she shows that Defendant's other justifications were pretextual. *Id.*

As already explained, HB 25 was passed as a means to limit the rising political power of African Americans and Hispanics. *Supra* Section II.C.2. A primary reason for this was the way that those voters vote: in Texas, African Americans and Hispanics overwhelmingly support Democratic candidates. *See* Section II.A.3. Thus, a primary purpose of HB 25 was to prevent "a sector of the population" from casting votes "because of the way they may vote." *Carrington*, 380

U.S. at 94. But "election administration should not be political at all, and partisan gain can never justify a legislative enactment that burdens the right to vote," *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 929 (W.D. Wis. 2016). And as also already explained, in the absence of these impermissible motivations, Texas would not have passed HB 25: the law does not serve any of the pretextual interests its proponents described. *Supra* Section II.A.4. Because the true motivations behind HB 25 were to depress political turnout of racial and ethnic groups due to their political beliefs, it violates the First and Fourteenth Amendments.

## III.   Plaintiffs and all Texas voters will suffer irreparable harm absent an injunction.

HB 25 will unlawfully burden Plaintiffs', their members', and other Texans' fundamental constitutional right to vote. It is well established that, where a plaintiff establishes a constitutional violation, no further showing of irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms . . . unquestionably constitutes irreparable injury."); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (internal quotations omitted)).

Unless HB 25 is enjoined, the increased lines and ballot roll-off it will produce will substantially and irreparably injure Plaintiffs, their members, and other Texas voters. Once the November 2020 election has come and gone, these injuries cannot be "undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (*LWVNC*) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (*OFA*) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. When constitutional rights are threatened or impaired, irreparable injury is presumed." (citation and internal quotation

marks omitted)). This is because "once the election occurs, there can be no do-over and no redress." *LWVNC*, 769 F.3d at 247. Because these harms—which strike at the very heart of a fair and democratic society—cannot be remedied post-election, they are by definition irreparable. *Patino v. City of Pasadena*, 229 F. Supp. 3d. 582, 590 (S.D. Tex. 2017) (finding irreparable harm and noting, in a vote dilution case, that "holding an election under the dilutive map undermines the integrity of the democratic system"); *OFA*, 697 F.3d at 436.

## IV. The balance of equities and the public interest weigh in favor of a preliminary injunction.

The balance of the equities and the public interest also heavily favor granting a preliminary injunction. The injunction Plaintiffs seek would maintain the status quo, which favors the public interest. *See United States v. Texas*, 508 F.2d 98, 101 (5th Cir. 1975). And the balance of equities are simple: an injunction will relieve Texans of significant burdens on their fundamental right to vote, while requiring the State to continue offering STV—as it has done for a century—will impose no meaningful burden on the State. Moreover, the public interest is always served by injunctions preventing violations of constitutional rights. *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). This is particularly so when voting rights are at issue, because "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *OFA*, 697 F.3d at 437. If HB 25 is not enjoined, it will directly interfere with the fundamental rights of millions of Texas voters and the political causes they support.

## CONCLUSION

For these reasons, Plaintiffs request that the Court issue a preliminary injunction: (1) barring the implementation of HB 25, and (2) requiring the Secretary to allow for STV in the upcoming November general election, as well as any future general elections occurring during the pendency of this litigation.

- 35 -

March 30, 2020                              Respectfully submitted,

                                           /s/ Skyler M. Howton
                                           Skyler M. Howton
                                           Attorney-in-Charge
                                           TX# 24077907
                                           SDTX#2395101
                                           PERKINS COIE LLP
                                           500 North Akard St., Suite 3300
                                           Dallas, TX 75201-3347
                                           Telephone: (214) 965-7700
                                           Facsimile: (214) 965-7799
                                           SHowton@perkinscoie.com

                                           Marc E. Elias*
                                           Bruce V. Spiva*
                                           Lalitha D. Madduri*
                                           Daniel C. Osher*
                                           Emily R. Brailey*
                                           Stephanie I. Command*
                                           MElias@perkinscoie.com
                                           BSpiva@perkinscoie.com
                                           LMadduri@perkinscoie.com
                                           DOsher@perkinscoie.com
                                           EBrailey@perkinscoie.com
                                           SCommand@perkinscoie.com
                                           PERKINS COIE LLP
                                           700 Thirteenth Street, N.W. Suite 800
                                           Washington, D.C. 20005-3960
                                           Telephone: (202) 654-6200
                                           Facsimile: (202) 654-6211

                                           *Counsel for All Plaintiffs*

                                           **Pro Hac Vice* Application Pending

                                           Chad W. Dunn, TX# 24036507
                                           Brazil & Dunn, LLP
                                           4407 Bee Caves Road, Suite 111
                                           Austin, Texas 78746
                                           Telephone: (512) 717-9822
                                           Facsimile: (512) 515-9355
                                           chad@brazilanddunn.com

                                           *Counsel for Plaintiff Texas Democratic Party*

                                                   - 36 -

## CERTIFICATE OF CONFERENCE

Pursuant to the Local Rules and Standing Orders and Procedures of this Court, I hereby certify that counsel for movant Plaintiffs and respondent Defendant have electronically conducted a conference at which there was a discussion regarding Defendant's position on Plaintiffs' Motion. The parties have been unable to resolve the matters presented in Plaintiffs' Motion.

Certified to on March 30, 2020

*/s/ Skyler M. Howton*
Skyler M. Howton


## CERTIFICATE OF SERVICE

I hereby certify that March 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. As no counsel of record has appeared for Defendant, I further certify that I will have a copy of the foregoing document personally served on Defendant through a third-party process server.

*/s/ Skyler M. Howton*
Skyler M. Howton