**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | |
|---|---|
| SYLVIA BRUNI; TEXAS DEMOCRATIC PARTY; DSCC; DCCC; and JESSICA TIEDT, *Plaintiffs*, <br><br> v. <br><br> RUTH R. HUGHS, in her official capacity as the Texas Secretary of State, <br><br> *Defendant*. | CIVIL ACTION NO. 5:20-cv-00035 |

**THE TEXAS SECRETARY OF STATE'S MOTION TO DISMISS OR, IN THE
ALTERNATIVE, TRANSFER VENUE**

# Table of Contents

Table of Contents .................................................................................................................. ii

Table of Authorities............................................................................................................... iii

Introduction and Summary of the Argument.......................................................................1

Background ..............................................................................................................................2

Statement of the Issues .........................................................................................................5

Argument .................................................................................................................................6

   I.     This Case Does Not Belong in the Southern District ............................................6

   II.    The Secretary Is Not a Proper Defendant......................................................9

      A.    Sovereign Immunity Bars Plaintiffs' Claims...........................................11

      B.    Plaintiffs Lack Article III Standing to Sue the Secretary.......................13

   III.   Plaintiffs Do Not Have Standing to Challenge HB 25 ................................13

      A.    Plaintiffs' Claims Rest on Speculation...................................................14

      B.    Plaintiffs Lack Associational Standing....................................................16

      C.    Plaintiffs Do Not Have Organizational Standing....................................17

      D.    Plaintiffs Cannot Rely on Third-Party Standing....................................17

   IV.   Federal Law Does Not Mandate Straight-Ticket Voting ............................19

      A.    Plaintiffs' *Anderson-Burdick* Claims Fail .................................................19

      B.    Plaintiffs' Section 2 Results Claim Fails...................................................27

      C.    HB 25 is Neutral and Does Not Discriminate .......................................32

      D.    Plaintiffs' Viewpoint-Discrimination Claim Fails....................................36

   V.    Laches and Unclean Hands Bar Plaintiffs' Claims .....................................37

Conclusion ............................................................................................................................40

**TABLE OF AUTHORITIES**

## Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ................................................................. 37

*ACORN v. Fowler*, 178 F.3d 350 (5th Cir. 1999) ............................................................. 15

*Ala. State Conference of NAACP v. Alabama*, 949 F.3d 647 (11th Cir. 2020) (Branch, J., dissenting)... 13

*Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772 (5th Cir. 1999) ................................... 40

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........................................................... 31, 32

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) ..................................................... 32

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016) .................... 18

*Ambraco, Inc. v. Bosclip B.V.*, 570 F.3d 233 (5th Cir. 2009).............................................. 5

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................. 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 33

*Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994) ........................................................................... 16

*Baker v. Carr*, 369 U.S. 186 (1962) .......................................................................... 37

*Ballas v. Symm*, 351 F. Supp. 876 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974).................. 12

*Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046 (S.D. Tex. 2000) ............................ 7

*Broadway Nat'l Bank v. Plano Encryption Techs., LLC*, 173 F. Supp. 3d 469 (W.D. Tex. 2016).......... 5, 6

*Buckley v. Valeo*, 424 U.S. 1 (1976) .......................................................................... 22

*Bullock v. Calvert*, 480 S.W.2d 367 (Tex. 1972) ........................................................... 11

*Burdick v. Takushi*, 504 U.S. 428 (1992) .................................................................... 19

*Cabot Oil & Gas Corp. v. Water Cleaning Servs., LLC*, No. 4:12-cv-665, 2012 WL 2133589 (S.D. Tex. June 12, 2012) ................................................................................................. 6

*Carrington v. Rash*, 380 U.S. 89 (1965) ..................................................................... 36

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019) .................................................... 11

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) ............................................................... 30

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)............................................... 14, 15, 17

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, No. 18-1171, 2020 WL 1325816 (U.S. Mar. 23, 2020) .......................................................................................................... 33

*Common Cause v. Biden*, 909 F. Supp. 2d 9 (D.D.C. 2012), *aff'd on other grounds*, 748 F.3d 1280 (D.C. Cir. 2014) .......................................................................................................... 17

*Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015) ........................... 18

*Conn v. Gabbert*, 526 U.S. 286 (1999) ..................................................................... 18

*Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017) .................................................................................... 30, 31

*Contreras v. Tri-Nat'l, Inc.*, No. 5:11-cv-74, 2012 WL 12897927 (S.D. Tex. Jan. 9, 2012) (Marmolejo, J.) ......................................................................................................... 7, 8

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) .......................................................... 18

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ............................................................ 5

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)................................. 20, 22, 24, 36

*Danos v. Jones*, 652 F.3d 577 (5th Cir. 2011) ............................................................... 18

*Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221 (W.D. Tex. July 27, 2018) 15

*Delancey v. City of Austin*, 570 F.3d 590 (5th Cir. 2009) ............................................. 31, 32

*Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796 (7th Cir. 2008) ................ 16

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016) (Souter, J.) .......................................................... 16

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ........................................................................................................................................... 15

*Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697 (5th Cir. 2007) ................................ 31

*Ex parte Young*, 209 U.S. 123 (1908) ............................................................................... 11, 12

*Faas v. Cascos*, 225 F. Supp. 3d 604 (S.D. Tex. 2016) ............................................................ 24

*Feldman v. Ariz. Sec'y of State's Office*, 208 F. Supp. 3d 1074 (D. Ariz. 2016) ...................... 36

*Ga. Republican Party v. SEC*, 888 F.3d 1198 (11th Cir. 2018) ................................................ 16

*Gettman v. DEA*, 290 F.3d 430 (D.C. Cir. 2002) ...................................................................... 16

*Gilby v. Hughs*, No. 1:19-cv-1063-LY (W.D. Tex.) .............................................................. 8, 38

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ............................................................................ 14, 32

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................................... 17

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ........................................... 16

*IberiaBank Corp. v. Illinois Union Ins. Co.*, 953 F.3d 339 (5th Cir. 2020) ................................ 6

*In re Stalder*, 540 S.W.3d 215 (Tex. App.—Hous. [1st Dist.] 2018) ....................................... 11

*Kennedy v. Pablos*, No., 1:16-cv-1047, 2017 WL 2223056 (W.D. Tex. May 18, 2017) ...................... 24

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933) ........................................... 39

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ................................................................................ 19

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ................................... 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........................... 18

*Libertarian Party of Va. v. Alcorn*, 826 F.3d 708 (4th Cir. 2016) ........................................... 24

*Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163 (9th Cir. 2013) .............................................. 31

*Lopez v. Abbott*, 339 F. Supp. 3d 589 (S.D. Tex. 2018) ........................................................... 29

*Lucas v. Townsend*, 698 F. Supp. 909 (M.D. Ga. 1988) ........................................................... 27

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................... 5, 14, 15

*LULAC v. Abbott*, 369 F. Supp. 3d 768 (W.D. Tex. 2019) ................................................. 24, 30

*LULAC, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) .................... 28, 29, 35

*Marshall v. Meadows*, 921 F. Supp. 1490 (E.D. Va. 1996) ...................................................... 38

*McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407 (5th Cir. 2004) ......................................... 11

*McDonald v. Grand Traverse Cty. Election Comm'n*, 255 Mich. App. 674 (2003) .................... 25

*Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) .... 34

*Meyer v. Texas*, No., 4:10-cv-3860, 2011 WL 1806524 (S.D. Tex. May 11, 2011) .............................. 22

*Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342 (6th Cir. 2018) ........................ passim

*Miller v. Hughs*, No. 1:19-cv-1071-LY (W.D. Tex.) .............................................................. 8, 38

*Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014) ................................................................. 11

*Morse v. Republican Party of Va.*, 517 U.S. 186 (1996) ........................................................... 30

*NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010) ........................................................ 15, 16

*Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698 (5th Cir. 1994) ........... 6, 38

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996) ........................ 17

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) ........................................... 12, 13

*Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708 (S.D. Ohio), *rev'd on other grounds*, 834 F.3d 620 (6th Cir. 2016) ........................................................................................................................... 36

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc) ................................................... 13

*One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016) ................................ 23, 24, 36

*Orr v. Edgar*, 298 Ill. App. 3d 432 (1998) ............................................................................... 25

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ........................................... 34, 35

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945).................................. 39, 40

*Quern v. Jordan*, 440 U.S. 332 (1979) ................................................................................................ 13

*Smith v. Allwright*, 321 U.S. 649 (1944).............................................................................................. 39

*Southampton, Ltd. v. Le Norman*, No. 3:18-cv-1089, 2019 WL 7902959 (N.D. Tex. Sept. 3, 2019) ....... 7

*Stringer v. Hughs*, 5:20-cv-46-OLG (W.D. Tex.) ............................................................................... 38

*Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019)................................................................................ 14

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .......................................................................... 16

*Tex. Democratic Party v. Hughs*, No. 5:20-cv-8-OLG (W.D. Tex.) ................................................. 9, 38

*Tex. Democratic Party v. State of Texas*, No. D-1-GN-20-1610 (Tex. Dist. Ct.—Travis Cty.) .............. 38

*Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024 (W.D. Tex. Jan. 22, 2014)..... 16

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ........................................................................................ 28

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ..................................................... 20, 24

*United States v. Perez-Torres*, 15 F.3d 403 (5th Cir. 1994) .............................................................. 39

*United States v. Salerno*, 481 U.S. 739 (1987)............................................................................... 20, 27

*Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011) .................................................... 11

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ............................................................................... 30

*Vieth v. Pennsylvania*, 188 F. Supp. 2d 532 (M.D. Pa. 2002) ......................................................... 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ................................... 33

*Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ........................................................... 19

*White v. Daniel*, 909 F.2d 99 (4th Cir. 1990) .................................................................................. 38

*Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995) .................................................................................. 6

*Woodruff v. Herrera*, No. 1:09-cv-449, 2010 WL 11505703 (D.N.M. Feb. 1, 2010) ........................... 25

*Zapata v. Smith*, 437 F.2d 1024 (5th Cir. 1971)............................................................................... 12

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)........................................................................................ 32

**Statutes**

28 U.S.C § 124 ...................................................................................................................................... 8

28 U.S.C. § 1391(b)(2) ........................................................................................................................... 6

28 U.S.C. § 1404(a) ............................................................................................................................... 7

28 U.S.C. § 1406(a) ............................................................................................................................... 6

52 U.S.C. § 10301 ........................................................................................................................ passim

52 U.S.C. § 10304 ............................................................................................................................... 27

52 U.S.C. § 10308 ............................................................................................................................... 32

Tex. Elec. Code § 105.002 ................................................................................................................... 12

Tex. Elec. Code § 123.031 ............................................................................................................. 10, 21

Tex. Elec. Code § 125.001 ............................................................................................................. 10, 21

Tex. Elec. Code § 221.003 ................................................................................................................... 13

Tex. Elec. Code § 232.002 ................................................................................................................... 13

Tex. Elec. Code § 31.001 ..................................................................................................................... 11

Tex. Elec. Code § 31.012 ............................................................................................................... 10, 13

Tex. Elec. Code § 43.002 ....................................................................................................................... 9

Tex. Elec. Code § 51.003 ............................................................................................................... 10, 21

Tex. Elec. Code § 52.002 ....................................................................................................................... 9

Tex. Elec. Code § 52.071 ....................................................................................................................... 9

Tex. Elec. Code § 62.012 ..................................................................................... 21
Tex. Elec. Code § 64.031 ..................................................................................... 21
Tex. Elec. Code § 64.032 ..................................................................................... 21
Tex. Elec. Code § 82.001 ..................................................................................... 21
Tex. Elec. Code § 82.004 ..................................................................................... 21
Tex. Elec. Code § 85.001 ..................................................................................... 21
Tex. Elec. Code § 85.006 ..................................................................................... 21
Tex. Elec. Code § 85.062 .................................................................................. 9, 21
Tex. Loc. Gov't Code § 101.002 ........................................................................... 10
Tex. Loc. Gov't Code § 101.003 ........................................................................... 10
Tex. Loc. Gov't Code § 101.022 ........................................................................... 10
Tex. Loc. Gov't Code § 102.007 ........................................................................... 10

**Other Authorities**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 .................................... 18

**Rules**

28 C.F.R. § 51.13 ................................................................................................. 28
Fed. R. Civ. P. 12(b)(3) ........................................................................................ 6

**Constitutional Provisions**

U.S. Const. amend. XV ................................................................................... 30, 33

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The consensus against straight ticket voting is nearly nationwide. With HB 25, Texas joined forty-three other states in requiring voters to make individual selections on their ballots. Not one of those laws has been held unconstitutional. This Court should likewise reject Plaintiffs' claims.

But the Court need not reach the merits. This case should not be on the Court's docket in the first place. Venue in the Southern District is improper. None of the events giving rise to Plaintiffs' claim occurred in the Southern District. The Secretary is the only defendant, and any official action that she takes regarding HB 25 would occur in the Western District.

Plaintiffs' claims also suffer from jurisdictional flaws. First, the *Ex parte Young* exception to sovereign immunity does not apply because the Secretary does not enforce HB 25. Second, Plaintiffs lack standing because, even if the Secretary took no action at all, local officials would continue to implement HB 25. Thus, the Secretary does not cause Plaintiffs' supposed injuries, and relief against her could not redress those injuries. Third, Plaintiffs lack standing to challenge HB 25 because they have not plausibly alleged any Article III injury in fact. Plaintiffs' unsubstantiated theory rests on speculation about how third parties not before the Court will react to HB 25. And Plaintiffs failed to plausibly allege associational standing, organizational standing, or third-party standing.

On the merits, HB 25 is constitutional. No state law repealing straight ticket voting has been held unconstitutional.

It is no surprise courts have upheld these laws. Repealing straight ticket voting does not burden anyone's right to vote. All eligible Texans can still vote for their preferred candidates. In fact, they can still vote for all candidates from one party, if they so choose. Voters simply have to make individual selections, just as they do in primary and non-partisan elections.

Plaintiffs attempt to distinguish Texas from forty-three other States not offering straight ticket voting by complaining about "Texas's lengthy ballots." ECF 1 ¶ 61. Ballots are lengthy because Texans

have the right to elect so many of their leaders. Texans chose a system that lets them vote for more offices than people in other States can. While Plaintiffs may disagree with that public policy choice, it cannot be said that increasing the number of elected offices *reduces* Texans' voting rights.

HB 25 furthers important State interests since it leads to more-informed voting and better-qualified candidates. HB 25 also reduces "roll off" for non-partisan ballot items, minimizes voter confusion, makes elections more competitive, and makes incumbents more responsive to voters.

Plaintiffs' other claims fail as well. First, the Voting Rights Act does not require straight ticket voting. Under HB 25, all voters remain able to participate in Texas elections. HB 25 does not affect minority voters' ability to elect candidates of their choice. In any event, Congress did not authorize Plaintiffs to bring a private cause of action. Second, HB 25 does not violate the Equal Protection Clause since the law is neutral and it does not discriminate against anyone. It draws no racial distinctions and was not intended to do so. Third, Plaintiffs' viewpoint-discrimination claim rests on a theory no court has recognized in the context of straight ticket voting.

Finally, Plaintiffs are not entitled to equitable relief. They had *years* to file this action. Yet they waited until the eleventh hour, during the midst of a pandemic, to burden the State with this suit. Plaintiffs should not benefit from their delay. Laches bars Plaintiffs' claims.

## BACKGROUND

Forty-four states will not offer straight ticket voting in 2020.[1] In recent years, more and more States have repealed straight ticket voting. They recognize its central problems: encouraging voters to ignore every consideration except partisan affiliation. That is a recipe for bad governance.

Respected Texas judges have repeatedly warned about the dangers of straight ticket voting. Chief Justice Jefferson, for example, recommended "eliminat[ing] straight-ticket voting that allows

---

[1] National Conference of State Legislatures, Straight Ticket Voting States (Mar. 25, 2019), https://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx (last visited Apr. 9, 2020).

judges to be swept from the bench . . . not for poor work ethic, not for bad temperament, not even for their controversial but courageous decisions—but because of party affiliation." He pointed to wave elections, some of which had harmed Republicans and some of which had harmed Democrats, but all of which had harmed the Texas judiciary: "We saw this in Dallas County four years ago and in Harris County in the 1990s, in 2008 and just last year. Hordes of judges replaced for no good reason."[2]

Unsurprisingly, many Texas legislators have attempted to repeal or limit straight ticket voting. Between 1999 and 2017, Texas legislators introduced at least 23 bills aimed at curtailing straight ticket voting,[3] including five repeal bills authored or co-authored by Democratic legislators.[4]

Nearly three years ago, a bill succeeded: HB 25. Legislators were concerned "that straight-party voting pulls a voter's attention away from down-ballot candidates . . . and that this practice

---

[2] Chief Justice Wallace B. Jefferson, *State of the Judiciary* (Feb. 23, 2011), https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-2011.pdf; *see also, e.g.*, Chief Justice Nathan L. Hecht, *The State of the Judiciary in Texas* (Feb. 1, 2017), https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-2017.pdf ("removing judges from straight-ticket voting would help"); Chief Justice Wallace B. Jefferson, *The State of the Judiciary in Texas* (Feb. 11, 2009) https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-2009.pdf ("So long as we cast straight ticket ballots for judges, the fate of all judges is controlled by the whim of the political tide."); Chief Justice John L. Hill, Jr., *The State of the Judiciary Message* (Jan. 22, 1985), https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-1985.pdf (noting a committee's recommendation of "[b]allot changes to prevent straight-party voting in judicial races").

[3] These bills are as follows: *76th Legislature, Regular Session (1999):* SB 59, HB 3837; *77th Legislature, Regular Session (2001):* SB 129, HB 405, HB 1518; *80th Legislature, Regular Session (2007):* SB 134; *81st Legislature, Regular Session (2009):* HB 135, HB 1768, SB 317, SB 392; *82nd Legislature, Regular Session (2011):* SB 139, HB 638; *83rd Legislature, Regular Session (2013):* SB 103; HB 1857, HB 2060; *84th Legislature, Regular Session (2015):* SB 1702, HB 25, HB 1288, HB 1444, HB 1555; *85th Legislature, Regular Session (2017):* HB 25, HB 433, SB 2175.

[4] The Democratic authors or co-authors of straight ticket voting repeal bills were Rodney Ellis, Robert Junell, Senfronia Thompson, Bob Turner, and Mark Homer. *See* TEX. LEGISLATURE ONLINE, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=76R&Bill=SB59 (SB 59); TEX. LEGISLATURE ONLINE https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=77R&Bill=SB129 (SB 129); TEX, LEGISLATURE ONLINE, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=77R&Bill=HB405 (HB 405); TEX. LEGISLATURE ONLINE, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=77R&Bill=HB1518 (HB 1518); TEX. LEGISLATURE ONLINE, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=81R&Bill=HB1768 (HB 1768). These legislators' party affiliation can be confirmed at the following website: https://lrl.texas.gov/legeLeaders/members/lrlhome.cfm.

discourages a voter from researching all the candidates on the ballot."[5]

Another justification for HB 25 was avoiding unintentional "roll off," a phenomenon in which voters vote in up-ballot races but fail to vote in down-ballot races. Straight ticket voting "causes voters to miss out on casting votes in nonpartisan races or propositions."[6] After selecting a party at the top of the ballot, some voters thought they were finished. But the end of the ballot often contains nonpartisan races and propositions to which a straight party ticket does not apply. Because some voters thought they had no need to advance beyond the first page, they never even realized they were not voting on some races or propositions.[7]

HB 25 had bipartisan support. Nine Democratic legislators voted for it.[8] As one of them explained, "I do not believe [HB 25] affects minority voting. I believe it promotes making an informed decision." He continued, "It's a good thing to encourage voters to look down the ballot and choose candidates who have varied opinions and don't prescribe 100 percent to whichever party they are associated with during an election."[9]

On June 1, 2017, Governor Abbott signed HB 25 into law. A delayed effective date, September 1, 2020, gave everyone time to adjust.[10]

Plaintiffs filed suit on March 5, 2020, two years and nine months after HB 25 was signed, and

---

[5] Bill Analysis, TEX. HOUSE COMMITTEE REPORT, *available at* https://www.legis.state.tx.us/tlodocs/85R/analysis/pdf/HB00025H.pdf#navpanes=0.

[6] Bill Analysis, TEX. HOUSE RESEARCH ORGANIZATION, *available at* https://hro.house.texas.gov/pdf/ba85r/hb0025.pdf#navpanes=0.

[7] *See, e.g.*, Hidalgo County Sample Ballot 145-05 for the November 2018 General Election, https://www.hidalgocounty.us/DocumentCenter/View/31392/145-05_Style64_English_Electronic.

[8] TX. HOUSE J., 85th Leg., Reg. Sess., at 3982–83 (May 20, 2017), *available at* https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY76FINAL.PDF#page=90. These nine legislators were Terry Canales, Ryan Guillen, Ina Minjarez, Renè Oliveira, Mary Ann Perez, Joseph Pickett, Senfronia Thompson, and Hubert Vo. *See id.* These legislators' party affiliations can be confirmed at https://lrl.texas.gov/legeLeaders/members/lrlhome.cfm.

[9] *Brianna Stone, Texas Allows Straight-Ticket Voting, But for How Long? Curious Texas has the Answer*, THE DALLAS MORNING NEWS (Oct. 31, 2018), https://www.dallasnews.com/news/curious-texas/2018/10/31/texas-allows-straight-ticket-voting-but-for-how-long-curious-texas-has-the-answer/.

[10] *See* TEX. LEGISLATURE ONLINE, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill=HB25.

only months before ballots must be finalized for the next election. *See* ECF 1. They served the

Secretary twelve days later. On March 27, before the Secretary could file a motion to dismiss, Plaintiffs

amended their complaint. *See* ECF 16. The Secretary now moves to dismiss Plaintiffs' First Amended

Complaint.

### STATEMENT OF THE ISSUES

1.   Should this case be heard in the Southern District when the events giving rise to Plaintiffs
     claim did not occur in the Southern District?

     No, venue is improper and inconvenient. *See infra* Part I.

     Standard of Review: "Once [venue is] challenged, the burden of sustaining venue lies with the
     plaintiff." *Broadway Nat'l Bank v. Plano Encryption Techs., LLC*, 173 F. Supp. 3d 469, 473 (W.D.
     Tex. 2016). "[I]n deciding whether venue is proper, 'the court is permitted to look at evidence
     beyond simply those facts alleged in the complaint and its proper attachments.'" *Id.* (quoting
     *Ambraco, Inc. v. Bosselip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009)).

2.   Can Plaintiffs challenge HB 25 by suing the Secretary when the Secretary does not enforce
     HB 25, does not cause their asserted injuries, and cannot redress those injuries?

     No, sovereign immunity and Article III standing requirements bar this suit. *See infra* Part II.

     Standard of Review: "The party invoking federal jurisdiction bears the burden of establishing"
     it. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[A] trial court has the power to dismiss
     for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint
     alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the
     complaint supplemented by undisputed facts plus the court's resolution of disputed facts."
     *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (quotation omitted).

3.   Do Plaintiffs have standing when their claim rests on a speculative injury?

     No, Plaintiffs have not plausibly alleged an Article III injury in fact. *See infra* Part III.

     Standard of Review: Same as Issue 2.

4.   Does federal law require States to offer straight ticket voting, contrary to the judgment of
     forty-four States and every court to consider the issue?

     No, HB 25 is consistent with both the Constitution and the Voting Rights Act. *See infra* Part
     IV.

     Standard of Review: "To survive a motion to dismiss, a complaint must contain sufficient
     factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim
     has facial plausibility when the plaintiff pleads factual content that allows the court to draw
     the reasonable inference that the defendant is liable for the misconduct alleged. Importantly,

the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *IberiaBank Corp. v. Illinois Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020) (quotations and citations omitted).

5.    Can Plaintiffs seek equitable relief after inexcusably and prejudicially delaying this suit?

No, laches bars Plaintiffs' claims. *See infra* Part V.

Standard of Review: To prove laches, the defendant must show "(1) a delay on the part of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue prejudice to the defendant's ability to present an adequate defense." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994).

**ARGUMENT**

**I.    This Case Does Not Belong in the Southern District**

This Court should dismiss for improper venue. Fed. R. Civ. P. 12(b)(3); *see also* 28 U.S.C. § 1406(a).[11] "Once challenged, the burden of sustaining venue lies with the plaintiff." *Broadway Nat'l Bank*, 173 F. Supp. 3d at 473. Plaintiffs claim that "venue is proper in the Laredo Division of the U.S. District Court for the Southern District of Texas because a substantial part of the events that give rise to Plaintiffs' claims occurred here." ECF 16 ¶ 18 (citing 28 U.S.C. § 1391(b)(2)). But that is not true.

"A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." 28 U.S.C. § 1391(b)(2). This analysis "require[s] courts to focus on relevant activities of the defendant, not of the plaintiff." *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995); *see also Cabot Oil & Gas Corp. v. Water Cleaning Servs., LLC*, No. 4:12-cv-665, 2012 WL 2133589, at *2 (S.D. Tex. June 12, 2012) (similar).

The only events giving rise to Plaintiffs' claims against the Secretary occurred in the Western District. Plaintiffs focus on the fact that "the Texas Legislature passed HB 25," which occurred in Austin. ECF 16 ¶ 27. Plaintiffs also claim the Secretary "will order the elimination of the STV option

---

[11] The Court can consider venue before other issues, even jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425, 429 (2007); *Hill v. Keliher*, No. 4:19-cv-2528, 2019 WL 3837113, at *3 (S.D. Tex. Aug. 14, 2019); *Watson v. Lifeshare Transplant Donor Servs. of Okla., Inc.*, No. 2:09-cv-130, 2009 WL 10702544, at *2 n.1 (S.D. Tex. Sept. 3, 2009).

from all Texas ballots pursuant to House Bill 25." *Id.* ¶ 7. That is not true, for the reasons explained below, *see infra* Part II, but even if it were, it would also occur in Austin, where the Secretary's office is located. Any official action the Secretary takes regarding HB 25 would occur in the Western District.

This case has no significant ties to the Southern District. The Secretary does not maintain an office in the Southern District, and no relevant action that can "be attributed to" the Secretary has been taken in the Southern District. *Southampton, Ltd. v. Le Norman*, No. 3:18-cv-1089, 2019 WL 7902959, at *5 (N.D. Tex. Sept. 3, 2019). One of the five Plaintiffs seems to reside in the Southern District, but that does not matter. "[T]he fact that a plaintiff residing in a given judicial district feels the effects of a defendant's conduct in that district does not mean that the events or omissions occurred in that district." *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000).

For these reasons, venue in the Southern District is improper, and the Court should dismiss. In the alternative, the case should be transferred to the Western District "[f]or the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a).

Venue is appropriate in the Western District because that is where the "defendant resides." *Id.* § 1391(b)(1). Thus, the Court should "look[] to the private and public interest factors" to assess the propriety of transfer. *Contreras v. Tri-Nat'l, Inc.*, No. 5:11-cv-74, 2012 WL 12897927, at *2 (S.D. Tex. Jan. 9, 2012) (Marmolejo, J.). Both favor transfer.

"The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) (quotation omitted). Sources of proof related to HB 25 are in the Western District. Defendant, her employees, and her records are in Austin. The Legislature's records are also in Austin. Plaintiff TDP is

headquartered in Austin,[12] and Plaintiff Tiedt is running for office in the Western District. *See* ECF 16 ¶ 24.[13] All of Defendant's attorneys and one of Plaintiffs' attorneys are in Austin. Only one Plaintiff and no counsel are located in Laredo. Plaintiffs are likely to seek evidence or testimony from legislators, as they have in similar litigation. Legislators are more likely to be found, and subject to the court's subpoena power, in the Western District than the Southern District. The cost of travel for witnesses and counsel would be lower if the case were heard in Austin. The distance to Laredo far exceeds the "100-mile threshold" the Fifth Circuit has established for assessing "inconvenience to witnesses." *Volkswagen*, 545 F.3d at 317; *see also Contreras*, 2012 WL 12897927, at *4.

The public interest factors also favor transfer to the Western District. They "are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Volkswagen*, 545 F.3d at 315 (quotation omitted). Regarding court congestion, the Southern District has significantly more pending cases than the Western District does.[14]

Moreover, three similar cases brought by some of the same Plaintiffs (and the same law firms) are currently pending in the Western District. *See Miller v. Hughs*, No. 1:19-cv-1071-LY (W.D. Tex.); *Gilby v. Hughs*, No. 1:19-cv-1063-LY (W.D. Tex.); *Tex. Democratic Party v. Hughs*, No. 5:20-cv-8-OLG

---

[12] Texas Democratic Party, Contact Us, https://www.texasdemocrats.org/contact/ (last visited Apr. 5, 2020).
[13] House District 20 includes Burnet, Milam, and Williamson Counties. *See* Texas Legislative Council, District Population Analysis with County Subtotals, https://wrm.capitol.texas.gov/fyiwebdocs/PDF/house/dist20/r4.pdf. Those counties are in the Western District. *See* 28 U.S.C § 124(d)(1)–(2).
[14] *See* Administrative Office of the U.S. Courts, Table C-1—U.S. District Courts–Civil Statistical Tables For The Federal Judiciary (December 31, 2019), https://www.uscourts.gov/statistics/table/c-1/statistical-tables-federal-judiciary/2019/12/31 (showing 5,910 civil cases in the Southern District in cell E47 and 3,158 civil cases in the Western District in cell E48); Administrative Office of the U.S. Courts, Table D—U.S. District Courts–Criminal Statistical Tables For The Federal Judiciary (December 31, 2019), https://www.uscourts.gov/statistics/table/d/statistical-tables-federal-judiciary/2019/12/31 (showing 9,307 criminal cases in the Southern District in cell I53 and 5,895 criminal cases in the Western District in cell I54).

(W.D. Tex.). Two of those cases are before Judge Yeakel, who has already held a motion-to-dismiss hearing considering some of the same arguments raised here. Judicial economy favors transferring this case to the Western District and Judge Yeakel as well.

## II.     The Secretary Is Not a Proper Defendant

Venue is reason enough to dismiss or transfer this case, but Plaintiffs' claims also suffer from jurisdictional defects stemming from the Secretary's limited role under the Election Code. The Secretary does not implement the challenged portions of HB 25. Under Texas law, various local officials are charged with preparing ballots, depending on the type of election. *See* Tex. Elec. Code § 52.002.  Before HB 25, those local officials were charged with formatting the ballot to allow for straight ticket voting. *See id.* § 52.071. But HB 25 deleted that provision.[15] As a result, local officials will now prepare ballots that do not provide a "straight ticket" option.

Plaintiffs' assertion that the Secretary "will order the elimination of" straight ticket voting is incorrect as a matter of law. ECF 1 ¶ 7. Under HB 25, the Secretary does not have the authority to eliminate straight ticket voting. The Legislature already did that, and local officials will implement its decision regardless of whether the Secretary does anything.

Plaintiffs suggest that their purported injuries flow from the way polling places will be operated in 2020. *See* ECF 1 ¶¶ 29–35. But the Secretary does not operate polling places and does not control the length of lines to vote. Local officials have primary responsibility for reducing lines.

Plaintiffs' sources generally blamed lines to vote on two factors: a shortage of voting machines and the closing of polling sites. In Texas, local officials control those factors. The Election Code gives local officials significant discretion in determining the number of voting sites and their locations. *See* Tex. Elec. Code § 43.002 (local control over precincts); *id.* § 85.062 (local control over early voting

---

[15] An Act Relating to the Elimination of Straight-Party Voting, H.B. 25, § 8, https://capitol.texas.gov/ tlodocs/85R/billtext/pdf/HB00025F.pdf (repealing Section 52.071).

polling places). Local officials also have broad authority to procure election supplies and equipment as well as to determine how such materials will be distributed among that county's polling places. *See* Tex. Elec. Code §§ 51.003, 123.031, 125.001. A county has its own budget and can appropriate funds toward elections as it sees fit. *See* Tex. Loc. Gov't Code §§ 101.002–.003, 101.022, 102.007.

With 254 counties, Texas sees some variation in how local officials exercise their discretion. Conditions differ from county to county. When mistakes are made, local officials are eager to fix them going forward. For example, Plaintiffs allege voters faced long lines in Harris County during the March 2020 primary elections. *See* ECF 1 ¶¶ 29–35. Harris County's Clerk, a Democrat, publicly apologized, took "full responsibility," and "committed to rethinking voting machine allocations."[16]

To be sure, HB 25 requires the Secretary to provide information about the elimination of straight ticket voting to the public as well as local and party officials. *See* Tex. Elec. Code § 31.012(a), (b-1). But Plaintiffs do not complain about the Secretary's role in keeping people informed. In fact, providing information should alleviate Plaintiffs' concern about "voter confusion." ECF 16 ¶ 63.

Similarly, HB 25 directs the Secretary to "adopt rules and establish procedures as necessary for the implementation of the elimination of straight-party voting to ensure that voters and county election administrators are not burdened by the implementation." *Id.* § 31.012(d). But again, Plaintiffs do not challenge that aspect of HB 25. Those rules and procedures do not even exist yet. In any event, the rules and procedures will not themselves eliminate straight ticket voting. The statute does that. And regulations eliminating burdens can only benefit Plaintiffs. They do not allege otherwise.

In sum, the Legislature eliminated straight ticket voting by altering its instructions to the local officials who prepare ballots. The Secretary provides information to interested parties and ensures no one is burdened by HB 25, but those are not the issues about which Plaintiffs complain.

---

[16] *See* Alexa Ura, *Harris County Clerk Apologizes to Voters, "Takes Full Responsibility" for Long Waits to Vote in Houston*, THE TEXAS TRIBUNE (Mar. 6, 2020), https://www.texastribune.org/2020/03/06/harris-county-clerk-apologizes-long-waits-vote-houston/.

This results in two independent jurisdictional defects. First, the *Ex parte Young* exception to sovereign immunity does not apply. Second, Plaintiffs lack standing to sue the Secretary.

## A.     Sovereign Immunity Bars Plaintiffs' Claims

Sovereign immunity precludes claims against state officials unless the *Ex parte Young* exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004). *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). Consequently, *Ex parte Young* applies only when the defendant enforces the challenged statute. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("some connection with the enforcement of the act"); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) ("the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty").

As explained above, the Secretary does not implement the elimination of straight ticket voting. Local officials do so when they prepare ballots. Plaintiffs identify no enforcement actions taken by the Secretary. Instead, they cite two unrelated statutory provisions. First, Plaintiffs highlight the Secretary's role as "chief election officer," ECF 1 ¶ 24 (quoting Tex. Elec. Code § 31.001(a)), but that title is not "a delegation of authority to care for any breakdown in the election process." *Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972) (narrowly interpreting "chief election officer").

The Secretary cannot coerce local officials into enforcing HB 25. Local officials do not report to the Secretary. They are elected or appointed locally, and they are not bound by the Secretary's policies. *See In re Stalder*, 540 S.W.3d 215, 218 n.9 (Tex. App.—Hous. [1st Dist.] 2018) (expressing doubt that a "party chair lacked the authority to then form and act upon her own ultimate legal judgment" despite "having received the Secretary of State's assistance and advice in response to an

inquiry"); *Ballas v. Symm*, 351 F. Supp. 876, 888 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) ("Plaintiff admits that the Secretary's opinions are unenforceable at law and are not binding.").

Even if the Secretary could coerce local officials, a federal court could not order her to do so. The *Ex parte Young* exception is limited to injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." *Ex parte Young*, 209 U.S. at 159. It does not authorize injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949) (noting sovereign immunity applies "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign"). Thus, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity." *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971).

Second, Plaintiffs contend that "the Secretary is specifically responsible for prescribing 'the form of the ballot.'"  ECF 1 ¶ 24 (quoting Tex. Elec. Code § 105.002(c)). But the Secretary does not prescribe the form of ballots generally, only the form of the "State Write-In Ballot" for "Voting by Military Personnel or Other Persons Overseas." Tex. Elec. Code ch. 105 (title); *id.* § 105.002 (title). The vast majority of voters are ineligible to use that ballot. *See id.* § 105.002(a). Moreover, changes in federal law have left the State Write-In Ballot largely unused, even by military voters.[17] In any event, Plaintiffs do not allege that they, or anyone they could conceivably represent, will use the State Write-In Ballot. The Secretary's authority under § 105.002(c) has nothing to do with Plaintiffs' claims.

Neither provision allows the Secretary to enforce HB 25's elimination of straight ticket voting in a way that could affect Plaintiffs. As a result, sovereign immunity bars Plaintiffs' claims.[18]

---

[17] *See, e.g.*, Election Advisory 2018-04 (Jan. 9, 2018), https://www.sos.texas.gov/elections/laws/advisory2018-04.shtml ("As a practical matter, these changes to the FWAB mean that the State Write-In Ballot (SWAB) under Section 105.002 of the Code has little importance in the general election for state and county officers."); Election Advisory 2016-18 (Sept. 15, 2016), https://www.sos.texas.gov/elections/laws/advisory2016-18.shtml (same).

[18] *OCA-Greater Houston v. Texas* held, without analysis, that the Voting Rights Act abrogates sovereign immunity. *See* 867 F.3d 604, 614 (5th Cir. 2017). That holding does not apply to Plaintiffs' other claims because Section

### B.    Plaintiffs Lack Article III Standing to Sue the Secretary

Plaintiffs cannot establish standing to sue the Secretary because her actions do not cause their alleged injuries. Whether a ballot includes a straight ticket voting option depends on the actions of local officials, not the Secretary. Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant"; they are "the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation and alterations omitted).

Plaintiffs' argument that a *statute* causes their injuries is irrelevant to the question at hand: whether *the defendant* causes their injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (dismissing for lack of standing because courts should not "confuse[] the *statute's* immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*").

Similarly, Plaintiffs' purported injuries are not redressable. Relief against the Secretary would not help Plaintiffs. Local officials would still prepare ballots without straight ticket voting. And Plaintiffs' requested injunction might exacerbate their alleged injuries by preventing the Secretary from informing the public and from "ensur[ing] that voters and county election administrators are not burdened." Tex. Elec. Code § 31.012.[19]

## III.    Plaintiffs Do Not Have Standing to Challenge HB 25

Plaintiffs' objection to HB 25 relates to election results, not injuries in fact. Federal courts are "not responsible for vindicating generalized partisan preferences." *Gill v. Whitford*, 138 S. Ct. 1916,

---

1983 does not abrogate sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 341 (1979). Also, the Secretary preserves the argument that *OCA-Greater Houston* was wrong. "Congress did not unequivocally abrogate state sovereign immunity under Section 2 of the Voting Rights Act." *Ala. State Conference of NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (Branch, J., dissenting). Nor could it have. *See id.* at 656 & n.2.

[19] *OCA-Greater Houston* found standing to sue the Secretary, but its reasoning does not apply here. *OCA-Greater Houston* distinguished *Okpalobi* on the ground that *Okpalobi* involved a private right of action. *See OCA-Greater Hous.*, 867 F.3d at 613. This case also involves a private right of action. Although the Secretary cannot enforce HB 25 against local officials, in appropriate circumstances a losing candidate can through an election contest. *See* Tex. Elec. Code §§ 221.003(a), 232.002. In any event, the extent of the Secretary's power must be determined on a case-by-case basis. As a result, *OCA-Greater Houston's* ruling on that issue cannot extend beyond the record and briefing before that court. To the extent it does, the Secretary preserves the argument that it was wrongly decided.

1933 (2018). Plaintiffs lack Article III standing because they complain about "group political interests, not individual legal rights." *Id.*

Of course, in appropriate circumstances, a voter can plausibly allege that a law interferes with his ability to vote. But Plaintiffs cannot do that here. Three Plaintiffs are artificial entities that do not vote. The two individual Plaintiffs do not allege that they are registered voters who intend to vote in future elections. *See* ECF 16 ¶¶ 20, 24. Thus, they cannot rely on any voter-related injuries in fact.

Even putting that aside, Plaintiffs have not established standing because their claims rest on speculation. In addition, Plaintiffs cannot rely on associational, organizational, or third-party standing.

### A.    Plaintiffs' Claims Rest on Speculation

Because Plaintiffs seek prospective relief, they must establish an "imminent" future injury. *Lujan*, 504 U.S. at 564. The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). Allegations of "an imminent injury" must be "[p]laintiff-specific." *Stringer v. Whitley*, 942 F.3d 715, 722 (5th Cir. 2019). "[F]uture injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 721.

Plaintiffs have not plausibly alleged a certainly impending future injury. Their claims rest on speculation. First, Plaintiffs argue HB 25 will lead to "increased polling-place lines." ECF 16 ¶¶ 20–24. Plaintiffs seem to believe that voters will take longer to complete their ballots and that local officials will not use their state-law authority to ameliorate the situation. That is pure speculation about "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. Even if Plaintiffs could plausibly allege that local officials in *some* counties would fail to act (which they have not done), they would not haves standing to challenge the implementation of HB 25 in *other* counties.

Second, Plaintiffs argue HB 25 will cause voter "confusion." ECF 16 ¶¶ 20–24. Unexplained assertions of voter confusion are not plausible. Again, Plaintiffs speculate about "the independent

action of some third party not before the court." *Lujan*, 504 U.S. at 560. Texans are not confused by ballots in primary and non-partisan elections, which do not include "straight party" options.

Finally, Plaintiffs allege they are "aware of the effects" discussed above and that they will "divert and expend additional time and resources" "to combat these effects." ECF 16 ¶¶ 20–24. But Plaintiffs' reactions to HB 25 cannot constitute injuries in fact. A plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that is not itself an injury in fact. *Clapper*, 568 U.S. at 402; *see also Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("[A]ny resources [the plaintiff] used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were a self-inflicted budgetary choice that cannot qualify as an injury in fact." (quotation omitted)).

There are additional reasons Plaintiffs' expenditures cannot support standing. "Not every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). To establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238).

Plaintiffs cannot satisfy either requirement. First, their alleged reactions to HB 25 do not meaningfully differ from their "day-to-day operations." *ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999). Plaintiffs' only alleged reactions are to support Democratic candidates, which is what they always do. *See* ECF 16 ¶¶ 20–24. "Plaintiffs have not explained how" their reactions "differ from [their] routine [political] activities." *City of Kyle*, 626 F.3d at 238. Second, Plaintiffs "have not identified any specific projects that [they] had to put on hold or otherwise curtail in order to respond to" HB 25. *City of Kyle*, 626 F.3d at 238. Vague references to "other efforts" do not suffice. ECF 16 ¶¶ 20–24.

### B.     Plaintiffs Lack Associational Standing

For associational standing, Plaintiffs must "identify members who have suffered the requisite harm" to establish injuries in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also City of Kyle*, 626 F.3d at 237 (requiring evidence of "a specific member").

Because Plaintiffs have not identified any specific members, let alone specific members with certainly impending future injuries, their claims should be dismissed. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (holding that the Georgia Republican Party lacked associational standing because it "has failed to allege that a specific member will be injured by the rule, and it certainly offers no evidence to support such an allegation"); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) (dismissing under Rule 12(b)(1) because plaintiff did not identify a member who was affected by the challenged regulation); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (concluding a plaintiff "has not established associational standing" because its "Complaint does not identify any . . . disabled student with standing to bring suit").

Plaintiffs have not even alleged facts showing that they have members within the meaning of the associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). Plaintiffs must allege they have members who "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014). Plaintiffs say they have "members, volunteers, and constituents." ECF 16 ¶¶ 21–23. But they do not allege that those individuals "participate in and guide the organization's efforts." *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994). That some Texans "regularly support [Democratic] candidates" is not sufficient. ECF 16 ¶ 23. Non-members affiliated with an association cannot create associational standing. *See Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002) (rejecting a magazine's associational

standing based on "readers and subscribers" because "readership is not the same as membership").

### C.    Plaintiffs Do Not Have Organizational Standing

To establish standing based on HB 25 "perceptibly impair[ing]" their activities, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), Plaintiffs must plausibly allege both that it makes their "*activities* more difficult" and that there is "a direct conflict between the defendant's conduct and [their] *mission*." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Plaintiffs have not done so here. As a result, "it is entirely speculative whether the defendant's conduct is impeding the organization's activities." *Id.*

Plaintiffs do not allege that HB 25 prohibits their activities. Nor could they. The statute does not regulate Plaintiffs at all. Plaintiffs remain free to engage in all of their previous political activities. Plaintiffs instead rely on the contention that HB 25 "decreas[es] the electoral prospects of" Democratic candidates. ECF 16 ¶¶ 21–23. But there is no "direct conflict" between HB 25 and Democratic candidates winning elections. *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. Implementation of HB 25 "is but an intermediate step" in a speculative chain of events that, on Plaintiffs' telling, could lead to a Democratic candidate losing an election. *Common Cause v. Biden*, 909 F. Supp. 2d 9, 22 n.8 (D.D.C. 2012), *aff'd on other grounds*, 748 F.3d 1280 (D.C. Cir. 2014)

As explained above, Plaintiffs cannot establish standing based on their alleged diversions of resources. *See supra* Part III.A. They "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that is not itself an injury in fact. *Clapper*, 568 U.S. at 402. Because there is no "direct conflict" between HB 25 and the election of Democratic candidates, Plaintiffs have not plausibly alleged that their "expenditure of funds is truly necessary" rather than "unnecessary alarmism constituting a self-inflicted injury." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

### D.    Plaintiffs Cannot Rely on Third-Party Standing

Even if Plaintiffs had Article III standing, they would lack statutory standing. *See Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 nn.3–4 (2014). Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights" at issue. 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on a *third party's* rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" under § 1983 because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Here, all of Plaintiffs' claims depend on the right to vote. ECF 16 ¶¶ 86, 94, 98, 105–07, 117. But as discussed above, Plaintiffs have not plausibly alleged they are registered voters who intend to vote in future elections. *See* ECF 16 ¶¶ 20, 24. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002); *see also Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015). As a result, Plaintiffs are necessarily asserting the rights of third parties and therefore cannot sue under § 1983. Because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply."); *see also* Currie, 1981 Sup. Ct. Rev. at 45.

But even if this were an issue of prudential rather than statutory standing, Plaintiffs have not alleged any prudential exception to the bar on third-party standing. Plaintiffs do not allege that they

have "a 'close' relationship with" voters or that voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

## IV.    Federal Law Does Not Mandate Straight-Ticket Voting

Forty-four states will not offer straight ticket voting in 2020.[20] "None of [those states' laws] have ever been declared unconstitutional." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 355 (6th Cir. 2018) (Kethledge, J., concurring). Plaintiffs ask this Court to upend American election law. The Court should decline.

Plaintiffs' claims all proceed from the premise that selecting individual candidates takes more time than casting a straight-party ticket does. They predict that the extra time will lead to longer lines at the polls and some voters choosing not to vote in every race. As explained above, Plaintiffs' predictions rest on speculation about the actions of third parties not before the Court. *See supra* Part III.A. But even if Plaintiffs' speculation were right, their claims would fail on the merits.

### A.    Plaintiffs' *Anderson-Burdick* Claims Fail

Plaintiffs challenge HB 25 under the *Anderson-Burdick* framework. *See* ECF 1 ¶¶ 84–95 (Counts I and II). This challenge fails as a matter of law.  The *Anderson-Burdick* test requires a court to:

(1) consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate; then

(2) identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule; and finally

(3) weigh the character and magnitude of the asserted injury against the precise interests put forward by the State, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387–88 (5th Cir. 2013) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "[S]evere" restrictions on voters' rights are subject to strict scrutiny and must be narrowly drawn to advance a compelling state interest.

---

[20] National Conference of State Legislatures, Straight Ticket Voting States (Mar. 25, 2020), https://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx (last visited Apr. 8, 2020).

*Burdick*, 504 U.S. at 434. "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quotation omitted).

Plaintiffs challenge HB 25 on its face, so they must plausibly allege that the statute lacks a "plainly legitimate sweep," *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 202 (2008) (plurality), and "that no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987). But Plaintiffs do not allege that HB 25 will burden the rights of all voters in all counties. *See* ECF 16 ¶ 43 (complaining the Legislature did not adopt an amendment that would have limited HB 25 to counties with fewer than twenty-five ballot items).

HB 25 satisfies *Anderson-Burdick*. It imposes at most a *de minimis* burden and furthers weighty state interests. But even if HB 25 were likely to cause problems in some places (it is not), Plaintiffs' facial claim would fail.

### 1.     HB 25 Does Not Burden the Right to Vote

HB 25 does not burden anyone's right to vote. It simply channels votes through individual selections. As the American Civil Liberties Union of Pennsylvania has explained,  "eliminating the straight party voting option" does not create "a barrier to voting," and "[n]o one will lose the right to vote because of [it]."[21] To the extent having to make individual selections is a burden, it represents no more than "the usual burdens of voting." *Crawford*, 553 U.S. at 198 (plurality); *id.* at 209 (Scalia, J., concurring in the judgment). Any burden is also neutral and non-discriminatory because all voters will now make individual selections.

Moreover, Plaintiffs ignore crucial context. Plaintiffs argue lines to vote will be a problem. Of course, lines are a potential issue in any election, but Texas law mitigates those concerns. For example,

---

[21] Reggie Shuford, *This is Why the ACLU-PA Supports Legislation Reforming our Election Laws*, PENN. CAPITAL-STAR (Oct. 30, 3019), https://www.penncapital-star.com/commentary/this-is-why-the-aclu-pa-supports-legislation-reforming-our-election-laws-opinion/ (last visited Mar. 10, 2020).

Texas provides nearly two weeks of early voting in most elections. *See* Tex. Elec. Code § 85.001(a). Texas has an expansive early voting framework, including weekend voting in the large counties on which Plaintiffs focus. *See id.* § 85.006(d)–(e). Of course, local officials have discretion to increase early voting capacity as needed. *Id.* § 51.003 (procuring and allocating election supplies); *id.* § 85.006(a)–(c) (weekend voting); *id.* § 85.062 (additional polling places); *id.* § 123.031 (acquiring voting system equipment); *id.* § 125.001 (allocating voting machines). Plaintiffs do not dispute that local officials can and do make use of these powers. Texas also allows various people to vote by mail, *see id.* § 82.001– .004, which reduces demand for in-person polling places. By contrast, some States do not allow early voting at all or do not allow it on weekends.[22]

Plaintiffs insultingly suggest that minority voters must rely on straight ticket voting due to "lower educational attainment." ECF 16 ¶ 10. The Secretary completely disagrees with their suggestion that minority voters are not capable of making individual selections. At any rate, Plaintiffs provide no plausible factual allegations to support their conclusory assertion. Making individual selections is simple. Voters do it across the country, and Texans already do it in primary and nonpartisan elections. Plaintiffs' contention that minority voters are not sufficiently educated to make individual selections is unfounded and implausible on its face.

To the extent a voter suffers from "lower educational attainment," Texas law helps. ECF 16 ¶ 10. Voters who cannot read a ballot can have their ballot read to them. *See* Tex. Elec. Code § 64.031– 64.032. Voters who need an interpreter can bring one. *Id.* § 61.034. Voters who want more time can review the "sample ballot [posted] in one or more locations in the polling place." *Id.* at § 62.012.

In short, Plaintiffs have not plausibly alleged that HB 25 will burden anyone's right to vote. They certainly have not alleged it creates a severe burden in all applications (as is necessary for a facial

---

[22] *State Laws Governing Early Voting*, NCSL, https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx (last visited Mar. 12, 2020).

claim) or when considered "categorically" rather than based on "the peculiar circumstances of individual voters" (as is necessary for all claims). *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment).

### 2.      HB 25 Furthers Important State Interests

Texas, like forty-three other states, decided "that it is better if voters are encouraged or required to make individual assessments of candidates, rather than mass choices." *Mich. State*, 749 F. App'x at 346 (6th Cir. 2018) (Boggs, J.). "That choice is not an arbitrary one." *Id.* It "is supported by good policy reasons." *Id.* at 355 (Kethledge, J., concurring).

*More-Informed Voting*: "Democracy depends on a well-informed electorate." *Buckley v. Valeo*, 424 U.S. 1, 49 n.55 (1976). Straight ticket voting undermines that interest. It "pulls a voter's attention away from down-ballot candidates for certain offices that most directly affect the voter" and "discourages a voter from researching all the candidates on the ballot."[23] With straight ticket voting, a voter chooses numerous candidates based on only a single piece of information: party affiliation. But there is more to a candidate than party affiliation. Under HB 25, more voters will consider additional information, like relevant news coverage and campaign materials.

*Better Qualified Candidates*: Straight ticket voting helps unqualified candidates. First, it sometimes leads voters to select a candidate who they would not have selected if they had considered the race individually. Second, straight ticket voting discourages qualified candidates from running for office in the first place. With straight ticket voting, relatively few voters give any consideration to the qualifications of individual down-ballot candidates. And to the extent qualifications for office are not helpful to winning election, better qualified candidates are given less reason to run.

*Reducing Roll Off*: Straight ticket voting "causes voters to miss out in casting votes in

---

[23]      Bill        Analysis,       TEX.    HOUSE    COMMITTEE    REPORT,    *available    at* https://www.legis.state.tx.us/tlodocs/85R/analysis/pdf/HB00025H.pdf#navpanes=0.

nonpartisan races or propositions."[24] Voters who stop reading the ballot after selecting a straight ticket option fail to vote on nonpartisan propositions and amendments down ballot. Eliminating straight ticket voting reduces the risk voters will accidentally overlook non-partisan down-ballot items. *See One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 946 (W.D. Wis. 2016).

*Making Elections More Competitive*: HB 25 also benefits Texans by making third-party and independent candidates more viable. Representatives from the League of Independent Voters, the Green Party of Texas, and the Libertarian Party all testified in favor of HB 25.[25] As Representative Justin Amash, an Independent, explained, "Straight-ticket voting makes it prohibitive to run outside of the major parties."[26] Thus, the elimination of straight ticket voting is beneficial for the voters who prefer third-party and independent candidates. It also helps everyone else. HB 25 makes incumbents more susceptible to third-party challenges, which increases their accountability to voters.

The legitimacy of these interests is widely recognized. In Utah, for example, legislators from both parties have sponsored a bill repealing straight ticket voting. The Democratic sponsor explained that eliminating straight ticket voting would "encourage people to learn more about the candidates" and "result[] in more informed voters."  According to her, straight ticket voting has confused Utah voters into thinking "they don't need to look at the rest of their ballots."[27]

Plaintiffs' unsupported assertion that the Legislature acted with partisan intent is both untrue

---

[24]   Bill   Analysis,   Tex.   House   Research   Organization,   *available   at* https://hro.house.texas.gov/pdf/ba85r/hb0025.pdf#navpanes=0.

[25]   *See*   Witness   List   for   HB   25,   House   Elections   Committee   (Mar.   13,   2017), https://www.legis.state.tx.us/tlodocs/85R/witlistbill/pdf/HB00025H.pdf#navpanes=0.

[26] Matt Welch, *Justin Amash: "Straight-Ticket Voting Makes it Prohibitive to Run Outside of the Major Parties"*, REASON (Aug. 30, 2018), https://reason.com/2018/08/30/justin-amash-straight-ticket-voting-make/.

[27] Mori Kessler, *"This is an Outdated Method"; Bill Repealing Straight Ticket Voting Heads to Senate*, ST. GEORGE NEWS   (Mar.   3,   2020),   https://www.stgeorgeutah.com/news/archive/2020/03/03/mgk-lgl20-this-is-an-outdated-method-bill-repealing-straight-ticket-voting-heads-to-senate/#.XmpA8qhKiUk;   Roger McDonough, *Six Years Later, Lawmaker Still Trying to Eliminate Straight Party Ballot Option in Utah*, KCPW (Mar. 1,   2020),   http://kcpw.org/blog/local-news/legislative-coverage/2020-01-30/six-years-later-lawmaker-still-trying-to-eliminate-straight-party-ballot-option-in-utah; *see HB 70 Repeal of Single-Mark Straight Ticket Voting*, https://le.utah.gov/~2020/bills/static/HB0070.html (last visited Mar. 12, 2020).

and irrelevant. *See* ECF 16 ¶ 48. "[I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Crawford*, 553 U.S. at 204 (plurality).

Nor should the State's interests be ignored because this case is at the pleading stage. *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 719 (4th Cir. 2016) (rejecting the argument that the court "may not weigh [the State's] interests without discovery"). The Secretary need not provide "elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons*, 520 U.S. at 364. Thus, courts in this Circuit frequently dismiss *Anderson-Burdick* claims at the pleading stage. *See, e.g.*, *LULAC v. Abbott*, 369 F. Supp. 3d 768, 781–84 (W.D. Tex. 2019); *Kennedy v. Pablos*, No., 1:16-cv-1047, 2017 WL 2223056, at *3–5 (W.D. Tex. May 18, 2017); *Faas v. Cascos*, 225 F. Supp. 3d 604, 607 (S.D. Tex. 2016); *Meyer v. Texas*, No., 4:10-cv-3860, 2011 WL 1806524, at *3–7 (S.D. Tex. May 11, 2011).

### 3. This Court Should Follow the Uniform Precedent Upholding Repeals of Straight Ticket Voting

Repealing straight ticket voting imposes no serious burden on voters but advances important state interests. That is why numerous courts have upheld laws like HB 25.

*Wisconsin*: In *One Wisconsin Institute*, the court upheld Wisconsin's repeal of straight ticket voting against a challenge brought by some of the same Plaintiffs, represented by some of the same counsel. *See* 198 F. Supp. 3d at 906, 945–46. The *One Wisconsin* plaintiffs made the same argument Plaintiffs make here: that the repeal of straight ticket voting creates long voting lines and voter confusion and thus "burdens the right to vote, particularly for voters with lower levels of educational attainment." *Id.* at 945–46. The court found the plaintiffs' claims speculative. *See id.* It noted that eliminating straight ticket voting "creates only a slight burden on the right to vote, even among populations with lower levels of educational attainment or who have less time to spend voting." *Id.* at 945. The court found that repealing straight ticket voting advanced Wisconsin's important interests of: (1) "decreas[ing] the

chance of a voter selecting a straight-ticket option and then voting for candidates on the rest of the ballot"; (2) "encourage[ing] voters to become more informed about candidates or issues"; and (3) "ensur[ing] that voters do not accidentally overlook items on a ballot." *Id.*

*Illinois*: Illinois' repeal of straight ticket voting was upheld in *Orr v. Edgar*, 298 Ill. App. 3d 432, 436–37 (1998). Applying the rational basis test, the court concluded:

> [T]he legislation in question does not infringe upon the right to vote. Rather, the legislation affects the manner in which citizens exercise their right to vote. The Act does not prohibit voters from voting a straight-party ballot. Indeed, an individual voter still has the right to cast a ballot entirely for candidates of one political party. The Act only dictates the manner in which the voter may select candidates.

*Id.* at 438. The court found that the repeal was rationally related to Illinois' legitimate interests of: (1) increasing voter awareness; (2) selecting better qualified candidates by the political parties; and (3) increasing involvement by third-party groups in the political process. *Id.* at 439.

*New Mexico & Michigan (State Court)*: In these cases, minority or independent parties challenged the laws that prevented them from benefiting from straight ticket voting while allowing major-party candidates to benefit. *See Woodruff v. Herrera*, No. 1:09-cv-449, 2010 WL 11505703, at *2 (D.N.M. Feb. 1, 2010); *McDonald v. Grand Traverse Cty. Election Comm'n*, 255 Mich. App. 674, 676–77 (2003). Both courts rejected the challenges under the *Anderson-Burdick* test and found that the burden of voting without a straight ticket option was slight. *See Woodruff*, 2010 WL 11505703, at *4 (stating that "cast[ing] . . . votes individually rather than as a straight party vote" required only "slightly more effort"); *McDonald*, 255 Mich. App. at 685 (noting that "any voter who desired to vote for McDonald could do so"). The courts found that the States' important interests in maintaining reasonable regulations of ballots and elections outweighed the minimal burdens their straight ticket voting laws placed on voting rights. *Woodruff,* 2020 WL 11505703, at *5; *McDonald*, 255 Mich. App. at 687–88.

*Michigan (Federal Court)*: One federal court found Michigan's repeal of straight ticket voting unconstitutional, *see Mich. State A. Philip Randolph Inst. v. Johnson*, 326 F. Supp. 3d 532 (E.D. Mich.

2018), but the Sixth Circuit quickly vacated the opinion and criticized its reasoning. *See Mich. State A. Philip Randolph Inst. v. Johnson*, No. 18-1910, 2019 WL 4145547 (6th Cir. Jan. 14, 2019) (vacating opinion); *Mich. State*, 749 F. App'x at 344 ("The district court's opinion is extensive, but its underpinnings are quite weak."); *id.* at 354 (noting "very serious problems with both the factual underpinnings and the legal analysis of the district court's opinion").

The court explained that the burden—requiring voters to take "what would be at most very small additional time to register their choices"—"is very small." *Id.* at 349. It also noted the strong "public interest in allowing states to control their own elections . . . as the Constitution itself makes clear." *Id.* at 349. Numerous States have determined that voters should be "encouraged or required to make individual assessments of candidates." *Id.* at 346. And a State's attempt to encourage a more informed electorate should not be discarded lightly. *Id.* at 346, 349.

Finally, overturning HB 25 due to potential increased voting time would mire courts in litigation about numerous other State policy choices. As the Sixth Circuit explained:

> [A]ny number of policy decisions might influence the length of time it takes an individual voter to vote . . . . Having judicial elections[,] . . . [h]aving non-partisan elections, . . . [and] [a]llowing citizens to vote on legislation or propositions . . . add[] to voting time. Deciding how many local offices to elect can add to that time: some states elect coroners, jailers, drain commissioners, and surveyors on partisan ballots. All of these are policy choices a state may legitimately make, and yet all would be subject to attack if individual voting time were a consideration that courts could use to strike down legislation.

*Id.* at 345. The Sixth Circuit concluded Michigan's repeal imposed a minimal burden on voting rights and thus warranted the lowest level of scrutiny under the *Anderson-Burdick* test. *Id.* at 350. It then denied the plaintiffs' challenge to Michigan's repeal bill on the grounds that "Michigan . . . has shown far more than a rational basis for its decision." *Id.*

Courts have consistently upheld state laws repealing straight ticket voting. There is no reason to stray from these precedents here.

### B.      Plaintiffs' Section 2 Results Claim Fails

Plaintiffs' Section 2 "results test" claim fails as a matter of law. *See* ECF 16 ¶¶ 97–103. They have not plausibly alleged a violation as to *any* Texas voters, and they certainly have not "establish[ed] that no set of circumstances exists under which [HB 25] would be valid." *Salerno*, 481 U.S. at 745.

### 1.      HB 25 Is Lawful

As a threshold matter, the abolition of straight ticket voting is not a "voting qualification or prerequisite to voting or standard, practice, or procedure" covered by Section 2. 52 U.S.C. § 10301(a). As the Sixth Circuit noted, "[t]he language of the statute alone can hardly be read to cover a change in ballot format that applies to all voters, that keeps no one away from the polls, and that prevents no one from registering their vote." *Mich. State*, 749 F. App'x at 353.

Section 2 does not stretch so far. In *Lucas v. Townsend*, a Georgia school board wanted to hold a bond election. *See* 698 F. Supp. 909 (M.D. Ga. 1988). It decided to submit a single question to the voters: whether to approve a $29 million bond covering three separate projects. *See id.* at 910. The plaintiffs wanted the projects submitted as three separate ballot questions and argued that the choice between those alternatives should have been precleared under Section 5. *See id.* The district court rejected that claim because "the form or structure of a question on a bond referendum is not a standard, practice or procedure affecting voting." *Id.* at 912.[28] "The discretionary decision to submit one or more questions to the electorate is one properly left to the political process." *Id.* The Supreme Court summarily affirmed. *See* 493 U.S. 1052 (1990). The same principle applies here. Whether voters select candidates individually or in the aggregate (through straight ticket voting) is no more a "standard, practice, or procedure" than whether voters approve bond projects individually or in the aggregate.[29]

---

[28] The text of Section 5—"voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting"—is materially identical to the text of Section 2. 52 U.S.C. § 10304(a)

[29] Confirming this analysis, the Attorney General has promulgated regulations explaining the meaning of "standard, practice, or procedure" in Section 5, but those regulations give no hint that they would include a

In any event, HB 25 would not violate Section 2. Under Section 2, a plaintiff must plausibly allege that: (1) the challenged law is "responsible for minority voters' inability to elect [their preferred] candidates," *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986), (2) minority voters' inability to elect their preferred candidates is "on account of race," 52 U.S.C. § 10301(a), and (3) "under the 'totality of circumstances,' [minority voters] do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters," *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993) (en banc). Plaintiffs cannot satisfy any of these requirements.

First, Plaintiffs have not plausibly alleged that HB 25 is "responsible for minority voters' inability to elect [their preferred] candidates." *Gingles*, 478 U.S. at 50. Plaintiffs do not allege that minority voters were able to elect candidates of their choice before HB 25 or that they will be unable to do so when it goes into effect. This is a fatal flaw. "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Id.* at 50 n.17. Because Plaintiffs never allege HB 25 will cause minority voters to lose the ability to elect their candidates of choice, their Section 2 claim fails.

Instead of alleging HB 25 will prevent minority voters from electing their candidates of choice, Plaintiffs rely on vague suggestions of "disparate[] impacts." ECF 16 ¶ 70. But any impact that does not affect minority voters' ability to vote or to elect candidates of choice cannot support a Section 2 claim. Moreover, Plaintiffs have not plausibly alleged a disparate impact. *See infra* Part IV.C.

Second, even if Plaintiffs could establish that minority voters face a "lack of success at the polls," they would also need to plausibly allege that "the reasons for, or causes of, these electoral losses" are "racial," not "partisan." *LULAC*, 999 F.2d at 853–54. Courts must be careful not to

---

decision on whether to use straight ticket voting. Instead, they list examples like "the eligibility and qualification procedures for independent candidates." 28 C.F.R. § 51.13(h).

"loose[] § 2 from its racial tether." *Id.* at 850. Political disadvantages are not actionable unless they are "on account of race." *Id.* at 854; 52 U.S.C. § 10301(a). "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates. Rather, § 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *LULAC*, 999 F.2d at 854 (quotation and citation omitted).

Third, the totality-of-the-circumstances analysis cuts against Plaintiffs. This "inquiry . . . is not limited to factors listed in the legislative history of the Voting Rights Act." *Id.* at 871. "The weight, as well as tenuousness, of the state's interest is a legitimate factor in analyzing the totality of circumstances." *Id.* And the strong state interests discussed above support HB 25 here too. *See supra* Part IV.A.2.

The nearly nationwide consensus against straight ticket voting also favors the Secretary. In *LULAC*, the Fifth Circuit emphasized that twenty-five other States had a rule similar to Texas's. *See* 999 F.2d at 872. Here, forty-four states agree. That further "bolster[s]" the Secretary's position. *Id.*

Moreover, Plaintiffs' discussion of the legislative-history factors is not persuasive. They improperly extrapolate from "isolated incidents." *Id.* at 879. They implausibly interpret other incidents. For example, Plaintiffs accuse a Hispanic elected official of running an anti-Hispanic campaign. *See* ECF 16 ¶ 81. Plaintiffs claim certain groups are "underrepresented in the State's elected offices." ECF 16 ¶ 83. But they base their numbers on total percentage of the population, not the relevant "pool of qualified candidates." *LULAC*, 999 F.2d at 888. Plaintiffs also omit the fact that one of Texas's U.S. Senators is Hispanic, meaning that, according to Plaintiffs' own framework, Hispanic voters are "overrepresented." in federal Senate seats.

In their totality-of-the-circumstances allegations, Plaintiffs also rely on State laws that have been upheld as constitutional. For example, Plaintiffs claim that having statewide elections for judges on Texas's highest courts "enhance[s] the opportunity for discrimination." ECF 16 ¶ 84. But a federal

court has specifically rejected that claim. *See Lopez v. Abbott*, 339 F. Supp. 3d 589, 619 (S.D. Tex. 2018).

Incorrectly interpreting Section 2 to prohibit HB 25 would take Section 2 beyond the scope of Congress's "power to enforce [the Fifteenth Amendment] by appropriate legislation." U.S. Const. amend. XV, § 2. At that point, Section 2 would represent "a substantive change in constitutional protections under the guise of enforcement." *Veasey v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016) (Jones, J., concurring in part and dissenting in part) (quotation and citation omitted); *see also LULAC v. Abbott*, 369 F. Supp. 3d 768, 787 (W.D. Tex. 2019), *aff'd*, 951 F.3d 311 (5th Cir. 2020) ("If Section 2 permitted or required a remedy of proportional representation in the Electoral College for political parties it would not be 'congruent or proportional' to the violation of the asserted constitutional right . . . .").

### 2.      Plaintiffs Do Not Have a Private Cause of Action

Plaintiffs' Section 2 claim fails for an additional, independent reason: The Voting Rights Act does not provide them with a private cause of action. The Supreme Court has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2. *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality); *see also Morse v. Republican Party of Va.*, 517 U.S. 186, 288 n.21 (1996) (Thomas, J., dissenting) (noting the Court has "inadvertently, and perhaps incorrectly, allowed private suits to proceed under" Section 2). Multiple minority opinions have suggested, in dicta, that private plaintiffs can enforce Section 2, but the claims implicated a denial or abridgment of an individual's right to vote. *See Morse*, 517 U.S. at 232-33 (1996) (minority opinion of Stevens, J.) (quoting legislative history and discussing "a right to vote"); *id.* at 240 (Breyer, J., concurring in the judgment) (similar). That implied cause of action, if it exists, does not extend to Plaintiffs.[30]

---

[30] Moreover, *Morse*'s reasoning is inconsistent with the later majority opinion in *Sandoval*, which limited its "search for Congress's intent [to] the text and structure of" the statute. 532 U.S. at 288. "[D]ecisions before *Sandoval* frequently implied private rights of action without rigorous analysis; they did so by making a somewhat cursory inspection of the statute and its legislative history." *Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017) (affirming "[e]ssentially for the reasons stated in the district court's comprehensive and well-reasoned opinion"). Such pre-*Sandoval* opinions are "are

The individual Plaintiffs do not allege they are registered voters, do not allege they intend to vote in future elections, and do not bring this suit in their (unalleged) capacities as voters. They do not allege that their rights to vote will be denied or abridged, and they cannot rely on the rights of third-party voters. *See supra* Part III.D. An implied cause of action is available only to "the particular plaintiff" in whom "the statute creates rights." *Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) (quoting *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 701 (5th Cir. 2007)).

Section 2 does not imply a private cause of action for non-voters. In *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), the Supreme Court rejected its previous, looser approach to inferring causes of action. Today, "private rights of action to enforce federal law must be created by Congress." *Id.* at 286. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Unless Congress expresses that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

First, Section 2 contains no indication that Congress intended to create a private right, much less a private remedy, for non-voters. The statute's text is focused on the governmental officials it regulates: "No voting qualification or prerequisite to voting or standard, practice, or procedure s*hall be imposed or applied by any State or political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a) (emphasis added). "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (quotation omitted). Section 2 "is framed in terms of the obligations imposed on the regulated party" (government officials) while voters are "referenced only as an object of that

---

not binding nor persuasive." *Id.* (declining to follow a pre-*Sandoval* Fifth Circuit opinion). Under the Supreme Court's current approach, Section 2 does not create any private cause of action.

obligation." *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013); *see also Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017). Non-voters like Plaintiffs are not mentioned at all. Section 2 therefore does not confer rights on Plaintiffs "in clear and unambiguous terms." *Delancey*, 570 F.3d at 593 (quotation omitted).

Second, Section 2 does not create private remedies for non-voters. Instead, Congress authorized civil and criminal enforcement actions by the federal government. *See* 52 U.S.C. § 10308. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.

Even pre-*Sandoval* precedent does not help Plaintiffs. In *Allen v. State Bd. of Elections*, the Supreme Court held that Section 5 of the Voting Rights Act created a private cause of action, but that decision did not analyze Section 2 or non-voters. *See* 393 U.S. 544, 557 (1969). The Court relied on the fact that Section 5 was "passed to protect a class of citizens," *i.e.*, voters. *Id.* Of course, *Sandoval* abandoned that loose, legislative-history-based approach. *See Sandoval*, 532 U.S. at 287. Indeed, the Supreme Court itself recognized as much when it listed *Allen* as an example of the now-abandoned "*ancien regime.*" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). But even under *Allen*'s approach, there is no reason to think Congress "passed [Section 2] to protect" non-voters.

## C. HB 25 is Neutral and Does Not Discriminate

Plaintiffs also claim HB 25 intentionally discriminates on the basis of race. *See* ECF 16 ¶¶ 104–14. Nothing could be further from the truth. Plaintiffs cannot overcome "the presumption of legislative good faith." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

HB 25 applies equally to everyone. It does not discriminate on the basis of race or anything else. After HB 25, no local official, regardless of race, will prepare a straight ticket ballot, and no voter, regardless of race, will cast a straight ticket ballot.

Indeed, Plaintiffs affirmatively plead the lack of discriminatory intent. Plaintiffs complain that

the Legislature "turned a blind eye to concerns regarding this disparate impact on minority voters." ECF 16 ¶ 110. Of course, turning a blind eye to disparate impact is inconsistent with enacting a law "because of, not merely in spite of, [the statute's] adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quotation omitted).

Discriminatory intent is particularly implausible here. HB 25 was the culmination of a longstanding bipartisan push to eliminate straight ticket voting. Forty-three other States have adopted the same policy. None of those laws have been held unconstitutional. The idea that Texas adopted the same policy as its sister States, but did so for uniquely racial reasons, is implausible, especially given the longstanding bipartisan push to eliminate straight ticket voting.

Plaintiffs attempt to lower their burden on causation. They claim that "[o]ne of the motivating factors behind HB 25 was to discriminate against African-American and Hispanic Texans." *Id.* ¶ 109. Plaintiffs must plausibly allege but-for causation, not mere "motivating factor" causation. The motivating-factor standard does not apply to claims brought under Section 1983 or the Voting Rights Act. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, No. 18-1171, 2020 WL 1325816, at *6 (U.S. Mar. 23, 2020) (rejecting application of the motivating-factor analysis to Section 1981 claims). Indeed, the text suggests the opposite. Language like "on account of," which is found in both the Fifteenth Amendment and the Voting Rights Act, "indicate[s] a but-for causation requirement." *Id.* at *4; *see* U.S. Const. amend. XV, § 1; 52 U.S.C. § 10301(a).

Regardless, Plaintiffs have not plausibly alleged that race was a motivating factor. Their legal conclusions are "bare assertions" that "amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim, namely, that petitioners adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group. As such, the allegations are conclusory and not entitled to be assumed true." *Iqbal*, 556 U.S. at 681 (quotations omitted).

Plaintiffs invoke the *Arlington Heights* factors, but their allegations are implausible. *See Vill. of*

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Plaintiffs do not plausibly allege facts supporting a finding of disparate impact. *See* ECF 16 ¶¶ 100–02. And there is no disparate impact on minority voters—every voter, regardless of race, must make individual selections. To the extent that is a burden, it is an equal one.

Even limiting the analysis to voters who previously used straight ticket voting, as Plaintiffs suggest, does not produce a disparate impact. Plaintiffs concede straight ticket voting was widely used by voters of all races. *See* ECF 16 ¶ 26 (alleging "STV is utilized by a vast majority of Texans"). Plaintiffs do not (and cannot) allege that most users of straight ticket voting were racial minorities. That precludes a finding of disparate impact.

In *Personnel Administrator of Massachusetts v. Feeney*, the plaintiffs challenged a hiring preference given to veterans as discriminatory against women. 442 U.S. 256 (1979). The Supreme Court rejected that claim because even though "few women benefit from the preference," the group disadvantaged "is not substantially all female." *Id.* at 275. The fact that "significant numbers of nonveterans are men, and all nonveterans—male as well as female—are placed at a disadvantage" precludes "the inference that the statute is but a pretext for preferring men over women." *Id.*

Similarly, in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, the court held that a zoning decision precluding a public housing development did not have a disparate impact on racial minorities. 558 F.2d 1283 (7th Cir. 1977). The court emphasized "that the class disadvantaged by the Village's action was not predominantly nonwhite, because sixty percent of the people in the Chicago area eligible for federal housing subsidization in 1970 were white." *Id.* at 1291.

That the Village's action affected "a significantly greater percentage of the nonwhite people in the Chicago area than of the white people in that area" was not enough to establish a disparate impact. *Id.* In this case, Plaintiffs' allegation (that the percentage of minority voters who used straight ticket voting is higher than the percentage of white voters who did so) is similarly irrelevant. *See* ECF 16

¶ 28. Because "the class [allegedly] disadvantaged" is "not predominantly nonwhite," the allegation of disparate impact is "relatively weak" and does not support liability. *Arlington Heights*, 558 F.2d at 1291.

Regardless of how one slices the numbers, straight ticket voting is not about race. As the Sixth Circuit has explained, "actual use of straight-ticket voting is strongly correlated to the partisanship of an area, but not to race directly." *Mich. State*, 749 F. App'x at 348. In the end, "[t]oo many [white voters] are affected by [HB 25] to permit the inference that the statute is but a pretext for preferring [white voters] over [minority voters]." *Feeney*, 442 U.S. at 275.

Indeed, it has been argued that straight ticket voting *hurt* the electoral prospects of minority candidates: "[U]ninformed and straight-ticket voting along party lines can, and in this case does, reinforce minority voters' unequal access to the political process." *LULAC*, 999 F.2d at 912 (King, J., dissenting). With judges declaring straight ticket voting bad for minority voters, it is implausible that the Legislature eliminated straight ticket voting to harm those same minority voters.

The Complaint details the arguments that opponents of HB 25 raised in the Legislature. *See, e.g.* ECF 1 ¶¶ 13, 38–44. But courts "do not judge the intention of a bill's supporters by the characterization of its opponents." *Mich. State*, 749 F. App'x at 351. "[T]he statements of those opposing any bill cannot be taken as a sign that the proponents intended the predicted parade of horribles." *Id.*

Plaintiffs argue "the Legislature departed from its usual practice" because HB 25 was heard in the Senate Business and Commerce Committee and "because the author of HB 25 failed to take a position on or answer questions regarding proposed amendments." ECF 16 ¶ 111. These supposed departures from normal procedures cannot support an inference of discriminatory motive because Plaintiffs failed to allege what the "normal procedures" would be for this kind of high-priority bill

when the legislative minority has signaled it intends to challenge the law in court.[31]

### D. Plaintiffs' Viewpoint-Discrimination Claim Fails

Plaintiffs also press a viewpoint-discrimination claim. Relying on *Carrington v. Rash*, 380 U.S. 89 (1965), Plaintiffs rely on a concept called "partisan fencing." *See* ECF 16 ¶¶ 115–20. "Recent cases, however, have approached partisan fencing claims skeptically." *Feldman v. Ariz. Sec'y of State's Office*, 208 F. Supp. 3d 1074, 1094 (D. Ariz. 2016). And Plaintiffs' claim fails for multiple reasons.

As an initial matter, *Carrington* does not apply because "none of the challenged provisions categorically bar any citizen of [Texas] from voting." *One Wis. Inst.*, 198 F. Supp. 3d at 928. "*Carrington* dealt with an outright prohibition on voting." *Id.* No one disputes HB 25 is not such a prohibition. Plaintiffs cannot bring a "partisan fencing" challenge to a statute that does not fence out anyone, much less on the basis of party.

Even if Plaintiffs could bring a *Carrington* claim, it would be subject to "the *Anderson-Burdick* balancing framework." *Feldman*, 208 F. Supp. 3d at 1094; *see One Wis. Inst.*, 198 F. Supp. 3d at 928–29; *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 767 (S.D. Ohio), *rev'd on other grounds*, 834 F.3d 620 (6th Cir. 2016). Plaintiffs cannot satisfy *Anderson-Burdick* for the reasons explained above. *See supra* Part IV.A.

Plaintiffs make much of their contention that some supporters of HB 25 thought it would help Republican candidates. *See* ECF 1 ¶¶ 50–53. That is irrelevant. "[I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Crawford*, 553 U.S. at 204 (plurality). "[A] provision is not unconstitutional if the legislators who passed it were partly motivated by partisan gain, so long as there were sufficient valid justifications." *One Wis. Inst.*,

---

[31] Insofar as Plaintiffs bring Count IV under the VRA, they lack a private cause of action for the reasons explained in Part IV.B.2.

198 F. Supp. 3d at 929; *see also Mich. State*, 749 F. App'x at 350; *id.* at 355 (Kethledge, J., concurring).

Finally, Plaintiffs ask this Court to decide a non-justiciable political question. Sometimes "the judicial department has no business entertaining [a] claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quotation omitted). Such claims are nonjusticiable because they are "outside the courts' competence and therefore beyond the courts' jurisdiction." *Id.* "Among the political question cases the Court has identified are those that lack 'judicially discoverable and manageable standards for resolving [them].'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

*Rucho* held that partisan gerrymandering presented a political question. Plaintiffs' "partisan fencing" claim is analogous to *Rucho*'s "partisan gerrymandering" claim in three material ways. First, "the Framers' decision to entrust districting to political entities" precluded "hold[ing] that legislators cannot take partisan interests into account." *Rucho*, 139 S. Ct. at 2497. The same is true here. The Framers entrusted ballot design to political entities, and that precludes holding that the Constitution forbids any consideration of partisan interests. Second, courts cannot "even begin to answer" whether partisan gerrymandering (or partisan ballot design) "has gone too far" unless they know the "fair" baseline from which to measure departures. *Id.* at 2500–01. Third, in the gerrymandering context, "fairness" can be defined in different ways, and "[t]here are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Id.* at 2500. So too here. Does fairness depend on how much partisan intent (or how many other intents) are attributable to the Legislature? Does fairness turn on the significance of the effects on voter turnout? The Constitution does not say.

## V.   Laches and Unclean Hands Bar Plaintiffs' Claims

Finally, Plaintiffs are not entitled to the equitable relief they seek. "[T]he declaratory judgment and injunctive remedies are equitable in nature, and other equitable defenses may be interposed."

*Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Here, two equitable doctrines bar Plaintiffs' claims: laches and unclean hands.

"Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994) (quotation omitted). "The defense consists of three elements: (1) a delay on the part of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue prejudice to the defendant's ability to present an adequate defense." *Id.* Each element is met here.

Plaintiffs have certainly delayed instituting suit. The Governor signed HB 25 on June 1, 2017. Plaintiffs could have challenged HB 25 years ago. Instead, they waited two years and nine months to file suit. *See White v. Daniel*, 909 F.2d 99, 103 (4th Cir. 1990).

Plaintiffs have no excuse for their delay. They are sophisticated parties represented by sophisticated counsel. *Cf. Nat'l Ass'n of Gov't Emps.*, 40 F.3d at 709. Given their involvement in the political process, Plaintiffs must have been aware of HB 25 and its alleged effects.

And Plaintiffs' inexcusable delay has prejudiced the Secretary. "Delay and prejudice are a complimentary ratio: the more delay demonstrated, the less prejudice need be shown." *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996); *see also White*, 909 F.2d at 103 ("Given that plaintiffs' delay is inexcusable and unreasonable, the County need not show the degree of prejudice that would be required if the delay had been less aggravated."). But in this case, the prejudice is serious.

DSCC, DCCC, and TDP have filed numerous lawsuits against the Secretary in recent months. *See Miller v. Hughs*, No. 1:19-cv-1071-LY (W.D. Tex.); *Gilby v. Hughs*, No. 1:19-cv-1063-LY (W.D. Tex.); *Tex. Democratic Party v. Hughs*, No. 5:20-cv-8-OLG (W.D. Tex.); *Stringer v. Hughs*, 5:20-cv-46-OLG (W.D. Tex.); *Tex. Democratic Party v. State of Texas*, No. D-1-GN-20-1610 (Tex. Dist. Ct.—Travis Cty.). Trying to cram so many cases into a compressed timeframe before an election taxes public resources and creates inefficiencies.

Moreover, the Secretary has already explained the benefits HB 25 gives the State. Losing those benefits would be prejudice enough, but a last-minute change in the rules would have costs of its own. Candidates have already begun campaigning for the 2020 general election. Political campaigns can make different choices based on whether ballots will include a straight ticket option. Changing the rules mid-campaign would undoubtedly disadvantage candidates and other political actors who have already invested resources in strategies that depend on the lack of straight ticket voting. If Plaintiffs had sued earlier, these harms probably would have been lessened.

Plaintiffs' claims are also barred by the doctrine of unclean hands, which precludes relief "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). The doctrine of unclean hands "assumes 'even wider and more significant proportions' where the matter in issue 'concerns the public interest,' for in such an instance the denial of equitable relief 'averts an injury to the public.'" *United States v. Perez-Torres*, 15 F.3d 403, 407 (5th Cir. 1994) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)).

Here, Plaintiffs seek to use their own history of racial discrimination to support their claim for equitable relief. Plaintiffs rely heavily on the tragic history of discrimination in this State. *See, e.g.*, ECF 16 ¶ 71. Much of that discrimination was committed by—and for the benefit of—the Texas Democratic Party. For example, Plaintiffs focus on the "white primary system." *Id.* ¶¶ 71, 73. As Plaintiffs admit, "the [Texas] Democratic Party swiftly banned African-American and Hispanic voters from its primaries." *Id.* ¶ 72. "[T]he resolution of the Democratic party of Texas extending the privileges of membership to white citizens only" was racially discriminatory and held unconstitutional in *Smith v. Allwright*, 321 U.S. 649, 661 (1944).

That same Texas Democratic Party is a Plaintiff in this case. ECF 16 ¶ 23. The other Plaintiffs are affiliated with TDP and purport to bring claims to advance TDP's electoral interests. *Id.* ¶¶ 20–24

(discussing "Democratic Party candidates" and "candidates of the Democratic party").

Unconstitutional racial discrimination committed by and for a Plaintiff certainly creates unclean hands. It would be unconscionable to allow a Plaintiff with such unclean hands to secure equitable relief on the basis of its previous unconstitutional discrimination.

To be sure, the State also has responsibility for the unjustifiable history of discrimination in Texas elections. Today, it consistently works to redress that history. Unclean hands nevertheless bars Plaintiffs' claims because "'one tainted with inequitableness or bad faith . . .' is barred from a court of equity, *however improper may have been the behavior of the defendant*.'" *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 794 (5th Cir. 1999) (quoting *Precision Instrument*, 324 U.S. at 814). Whether the State's past actions "may have been more reprehensible is immaterial." *Id.* at 794 n.90. What matters here is Plaintiffs' efforts to secure equitable relief based on their own past constitutional violations.

## CONCLUSION

The Secretary respectfully requests that the Court grant her motion to dismiss or, in the alternative, grant her motion to transfer venue.

Date: April 10, 2020

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

/s/ Ryan L. Bangert
RYAN L. BANGERT
Deputy First Assistant Attorney General
Attorney-in-Charge
Texas Bar No. 24045446
Southern District of Texas No. 641892

Respectfully submitted.

PATRICK K. SWEETEN
Associate Deputy for Special Litigation

WILLIAM T. THOMPSON
Special Counsel
Texas Bar No. 24088531
Southern District of Texas No. 3053077

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
ryan.bangert@oag.texas.gov
will.thompson@oag.texas.gov

**COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2020, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

/s/ Ryan L. Bangert
RYAN L. BANGERT