**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | |
|---|---|
| Sylvia Bruni, Texas Democratic Party, DSCC, DCCC, and Jessica Tiedt, <br><br>               Plaintiffs, <br><br>     v. <br><br>RUTH HUGHS, in her official capacity as the Texas Secretary of State, <br><br>               Defendant. | Civil Action No. 5:20-cv-35 |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR TRANSFER VENUE**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

NATURE AND STAGE OF PROCEEDINGS AND ISSUES PRESENTED ............................. 2

ARGUMENT ........................................................................................................................... 4

I.   This District is a proper and convenient forum. ............................................................... 4

   A.   Venue in this District is proper. ................................................................................ 4

   B.   There is no reason to transfer this case. .................................................................... 5

II.  As Texas's Chief Election Officer, the Secretary is the proper defendant in this facial
   challenge to a law governing Texas's elections. ............................................................... 7

   A.   Controlling Fifth Circuit case law demands the conclusion that Plaintiffs' injuries
      are fairly traceable to and redressable by the Secretary. .......................................... 7

   B.   Under *Ex parte Young*, and given the VRA's abrogation of Texas's sovereign
      immunity, the Eleventh Amendment poses no bar to Plaintiffs' claims. ................. 9

III. Plaintiffs will be injured by HB 25's violation of Texans' fundamental rights. ............. 10

   A.   TDP, DSCC, and DCCC have Article III standing. ................................................ 11

   B.   Individual Plaintiffs ............................................................................................... 17

   C.   Plaintiffs' allegations are not speculative. ............................................................. 18

IV.  Plaintiffs plausibly allege that HB 25 will unduly burden Texans' right to vote. ........... 19

   A.   HB 25 will impose severe burdens on Texans' right to vote. ................................. 20

   B.   The interests identified by the Secretary do not justify HB 25's burdens. ........... 22

V.   Plaintiffs plausibly allege that HB 25 will violate Section 2 of the VRA. ...................... 25

   A.   Plaintiffs' allegations easily satisfy the elements of a Section 2 claim. ............... 25

   B.   Plaintiffs can challenge HB 25 under Section 2. ................................................... 28

VI.  Plaintiffs plausibly allege that HB 25 was intended to impede minority political
   participation. ................................................................................................................... 32

VII. Plaintiffs plausibly allege that HB 25 is the product of unconstitutional viewpoint
   discrimination. ................................................................................................................ 35

VIII. The Secretary's equitable defenses fail. ......................................................................... 37

## TABLE OF CONTENTS

CONCLUSION.................................................................................................................... 40

## TABLE OF AUTHORITIES

CASES                                                                PAGES(S)

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*,
   851 F.3d 507 (5th Cir. 2017) ...................................................................9, 10

*Ala. Legislative Black Caucus v. Alabama*,
   575 U.S. 254 (2015)..........................................................................................31

*Ala. State Conf. of NAACP v. Alabama*,
   949 F.3d 647 (11th Cir. 2020) .........................................................................29

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)...................................................................................29, 32

*Allee v. Medrano*,
   416 U.S. 802 (1974).........................................................................................16

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)...................................................................................19, 22

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) ......................................................................11, 16

*Bounty-Full Entm't, Inc. v. Forever Blue Entm't Grp., Inc.*,
   923 F. Supp. 950 (S.D. Tex. 1996) ...............................................................2, 4

*Buchanan v. Fed. Election Comm'n*,
   112 F. Supp. 2d 58 (D.D.C. 2000) ..................................................................18

*Calloway v. Partners Nat'l Health Plans*,
   986 F.2d 446 (11th Cir. 1993) .........................................................................39

*Carrington v. Rash*,
   380 U.S. 89 (1965)...........................................................................................35

*Cherry Knoll, LLC v. Jones*,
   922 F.3d 309 (5th Cir. 2019) ...........................................................................16

*Church of Scientology of Cal. v. Cazares*,
   638 F.2d 1272 (5th Cir. 1981) .........................................................................16

*Claimant ID 100235033 v. BP Expl. & Prod., Inc.*,
   941 F.3d 801 (5th Cir. 2019) .......................................................................3, 39

*Common Cause Ind. v. Marion Cty. Election Bd.*,
   311 F. Supp. 3d 949 (S.D. Ind. 2018) .............................................................10

*Cottrell v. Alcon Labs.*,
   874 F.3d 154 (3d Cir. 2017)............................................................................17

## TABLE OF AUTHORITIES

CASES                                                                 PAGES(S)

*Crawford v. Marion County Election Board*,
    553 U.S. 181 (2008)..........................................................................................22

*Crawford v. Marion Cty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007) ...................................................................13, 22

*Danos v. Jones*,
    652 F.3d 577 (5th Cir. 2011) ..........................................................................17

*Democratic Nat'l Comm. v. Az. Sec'y of State's Office*,
    No. CV-16-01065-PHX-DLR, 2017 WL 3149914 (D. Ariz. July 25, 2017) ..........................31

*Democratic Nat'l Comm. v. Bostelmann*,
    No. 20-cv-240-WMC, 2020 WL 1320819 (W.D. Wis. Mar. 20, 2020) ...........................12, 15

*Democratic Party of Ga., Inc. v. Crittenden*,
    347 F. Supp. 3d 1324 (N.D. Ga. 2018)...........................................................15, 38

*Envt'l Def. Fund v. Marsh*,
    651 F.2d 983 (5th Cir. 1981) ..........................................................................37

*Ex parte Young*,
    209 U.S. 123 (1908)...............................................................................3, 9, 10

*Fla. Democratic Party v. Scott*,
    215 F. Supp. 3d 1250 (N.D. Fla. 2016)..............................................................15

*Frank v. Walker*,
    17 F. Supp. 3d 837 (E.D. Wis.)........................................................................31

*Goodman v. McDonnell Douglas Corp.*,
    606 F.2d 800 (8th Cir. 1979) ..........................................................................38

*Gordon v. City of Houston, Tex.*,
    79 F. Supp. 3d 676 (S.D. Tex. 2015) ..................................................................3

*Hancock Cty. Bd. of Supervisors v. Ruhr*,
    487 F. App'x 189 (5th Cir. 2012) .....................................................................15

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).................................................................................12, 13

*Jacobson v. Fla. Sec'y of State*,
    No. 19-14552, 2020 WL 2049076 (11th Cir. Apr. 29, 2020) ..................................13

*Jacobson v. Lee*,
    411 F. Supp. 3d 1249 (N.D. Fla. 2019)...........................................................36, 37

## TABLE OF AUTHORITIES

CASES                                                                          PAGES(S)

*Jornaleros de Las Palmas v. City of League City*,
    945 F. Supp. 2d 779 (S.D. Tex. 2013) .................................................................16

*K.P. v. LeBlanc*,
    627 F.3d 115 (5th Cir. 2010) ...................................................................3, 10

*Lane v. Halliburton*,
    529 F.3d 548 (5th Cir. 2008) ...................................................................3, 11

*Law v. Royal Palm Beach Colony, Inc.*,
    578 F.2d 98 (5th Cir. 1978) .............................................................3, 37, 38

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...................................................................10

*Leal v. McHugh*,
    731 F.3d 405 (5th Cir. 2013) ...............................................3, 19, 20, 25

*Lee v. Va. State Bd. of Elections*,
    155 F. Supp. 3d 572 (E.D. Va. 2015) ...............................................15, 18

*Lopez v. Merced Cty., Cal.*,
    No. 06-1526, 2008 WL 170696 (E.D. Cal. Jan. 16, 2008) ....................................31

*Lucas v. Townsend*,
    698 F. Supp. 909 (M.D. Ga. 1988) .......................................................29

*LULAC Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) ...................................................................35

*LULAC v. Perry*,
    548 U.S. 399 (2006).............................................................................31, 33

*MacPhail v. Oceaneering Int'l, Inc.*,
    170 F. Supp. 2d 718 (S.D. Tex. 2001) ...................................................4

*Marks v. United States*,
    430 U.S. 188 (1977).............................................................................22

*Matter of Bohart*,
    743 F.2d 313 (5th Cir. 1984) ...................................................................38

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    749 F. App'x 342 (6th Cir. Sept. 5, 2018) ...........................................25

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    833 F.3d 656 (6th Cir. 2016) ........................................................ passim

## TABLE OF AUTHORITIES

CASES                                                                           PAGES(S)

*Mich. State A. Philip Randolph Inst. v. Johnson*,
   326 F. Supp. 3d 532 (E.D. Mich. 2018) ................................................................24

*Milliken v. Bradley*,
   433 U.S. 267 (1977) ................................................................................................10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ................................................................................................39

*Morse v. Republican Party of Va.*,
   517 U.S. 186 (1996) ................................................................................................30

*Murphree v. Winter*,
   589 F. Supp. 374 (S.D. Miss. 1984) .......................................................................39

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ..................................................................................33

*NAACP State Conf. of Pa. v. Cortés*,
   591 F. Supp. 2d 757 (E.D. Pa. 2008) .....................................................................20

*NAACP v. City of Kyle*,
   626 F.3d 233 (5th Cir. 2010) ..................................................................................16

*Nat'l Council of La Raza v. Cegavske*,
   800 F.3d 1032 (9th Cir. 2015) ................................................................................16

*O'Donnell v. Harris Cty.*,
   260 F. Supp. 3d 810 (S.D. Tex. 2017) ...................................................................39

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ........................................................................ passim

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) (en banc) ...................................................................9

*One Wis. Inst., Inc. v. Nichol*,
   186 F. Supp. 3d 958 (W.D. Wis. 2016) ..................................................................31

*One Wis. Inst., Inc. v. Nichol*,
   198 F. Supp. 3d 896 (W.D. Wis. 2016) .............................................................24, 37

*Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*,
   771 F. Supp. 2d 680 (S.D. Tex. 2011) ..............................................................2, 6, 7

*Perez v. Abbott*,
   253 F. Supp. 3d 864 (W.D. Tex. 2017) ..................................................................33

## TABLE OF AUTHORITIES

CASES                                                                                    PAGES(S)

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*,
　533 F.3d 1287 (11th Cir. 2008) ........................................................................37

*Powers v. Ohio*,
　499 U.S. 400 (5th Cir. 1991) ...........................................................................17

*Reynolds v. Sims*,
　377 U.S. 533 (1964) ........................................................................................40

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
　515 U.S. 819 (1995) ........................................................................................36

*Rucho v. Common Cause*,
　139 S. Ct. 2484 (2019) ...............................................................................36, 37

*S. Tex. Neon Sign Co., Inc. v. Ixtapa, Inc.*,
　Civ. A. No. L-08-116, 2008 WL 11397910 (S.D. Tex. Dec. 19, 2008) ...........5, 6, 7

*Sandusky Cty. Democratic Party v. Blackwell*,
　387 F.3d 565 (6th Cir. 2004) ...........................................................................15

*Soltysik v. Padilla*,
　910 F.3d 438 (9th Cir. 2018) ...........................................................................24

*Sw. Voter Registration Educ. Project v. Shelley*,
　344 F.3d 914 (9th Cir. 2003) ...........................................................................28

*Stewart v. Blackwell*,
　444 F.3d 843 (6th Cir. 2006) ...........................................................................29

*Summers v. Earth Island Institute*,
　555 U.S. 488 (2009) ...................................................................................15, 16

*Tex. Democratic Party v. Benkiser*,
　459 F.3d 582 (5th Cir. 2006) ..................................................................... passim

*Texas v. United States*,
　945 F.3d 355 (5th Cir. 2019) ...........................................................................11

*Thomas ex rel. D.M.T. v. School Bd. St. Martin Parish*,
　756 F.3d 380 (5th Cir. 2014) ...........................................................................10

*Thornburg v. Gingles*,
　478 U.S. 30 (1986) ....................................................................................25, 26

*Udeobong v. Hawkins*,
　Civ. A. No. H-08-1833, 2009 WL 7326072 (S.D. Tex. Feb. 19, 2009) ...............4, 7

# TABLE OF AUTHORITIES

| CASES | PAGES(S) |
|---|---|

*United States v. Students Challenging Regulatory Agency Procedures*,
 412 U.S. 669 (1973) ...................................................................................................17

*Veasey v. Abbott*,
 830 F.3d 216 (5th Cir. 2016) (en banc) ....................................................... passim

*Veasey v. Perry*,
 29 F. Supp. 3d 896 (S.D. Tex. 2014) .......................................................................32

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
 535 U.S. 635 (2002) .....................................................................................................9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
 429 U.S. 252 (1977) .................................................................................... passim

*Westwego Citizens for Better Govt. v. City of Westwego*,
 946 F.2d 1109 (5th Cir. 1991) .......................................................................26, 27

## STATUTES

28 U.S.C. § 1391 ........................................................................................................2, 4, 5

52 U.S.C. § 10301 ............................................................................................................28

52 U.S.C. § 10302 ............................................................................................................30

Tex. Elec. Code § 31.003 ..................................................................................................8

Tex. Elec. Code § 31.012(b-1) .........................................................................................8

Tex. Elec. Code § 31.012(d) .............................................................................................8

## OTHER AUTHORITIES

28 C.F.R. § 51.13(b) ........................................................................................................28

## INTRODUCTION AND SUMMARY OF ARGUMENT

Texas's choice to eliminate straight-ticket voting ("STV") through HB 25 is a calculated effort to push back against a rising tide of minority electoral strength. And if allowed to take effect, it will achieve that goal. HB 25 is poised to force more than 5.6 million Texans who used STV in the prior federal election—a significantly disproportionate number of whom are African American and Hispanic—to shift from an efficient form of voting to having to make individual selections on each ballot item. This poses a serious problem in Texas, where ballots can reach lengths of as many as 100 items. As each of those voters takes significantly longer to complete their ballot in the voting booth, the lines at polling places will increase exponentially. This effect will be worst in the most populous areas of the State, where African American and Hispanic voters disproportionately live. And aside from causing long lines, eliminating STV will increase the number of incomplete ballots submitted by Texas voters, particularly African Americans and Hispanics. HB 25 offers nothing to mitigate any of these effects.

The justifications for HB 25 offered by the Legislature, and now the Secretary, are clear pretext. HB 25 will do nothing to make voters more "informed" or consider candidates' qualifications any more than they would have when STV was available. Ballots in Texas include no information other than candidates' names and party affiliation. Forcing voters to briefly look at, and make individual selections in, each item on their ballots has no connection to whether those voters engage in research *prior* to coming to the voting booth.

The Secretary's 40-page Motion to Dismiss throws everything at the wall, hoping something just might stick. And while none of her arguments are ultimately persuasive, several lack even a modicum of legal or factual support. Venue is clearly proper in this District, where HB 25's effects will violate a swath of voters' fundamental rights, directly injuring Plaintiffs Bruni, Texas Democratic Party ("TDP"), DSCC, and DCCC. In asking to transfer this case, the Secretary

utterly fails to prove that the Western District of Texas is a "clearly more convenient" venue than this District. Controlling Fifth Circuit precedent compels the conclusion that the Secretary is the proper defendant in this suit and that sovereign immunity poses no bar. The Amended Complaint sets forth detailed allegations sufficiently demonstrating each Plaintiff's standing and stating plausible claims under each cause of action. And the Secretary's affirmative defenses cannot apply in this case. The Court should deny the Secretary's Motion.

## NATURE AND STAGE OF PROCEEDINGS AND ISSUES PRESENTED

Plaintiffs filed their Amended Complaint on March 27, 2020. ECF No. 16 ("AC"). On April 10, 2020, the Secretary filed the instant Motion to Dismiss. ECF No. 32 ("Mot."). The Motion presents the following issues:

1.   Is venue proper in the Southern District of Texas?

Yes. HB 25 will injure Plaintiff Bruni, a resident of this District, as well as a vast number of voters within this District who are members and constituents of Plaintiffs TDP, DSCC, and DCCC.

Standard: "[T]he defendant has the burden to demonstrate affirmatively that the plaintiff filed the lawsuit in an improper venue." *Bounty-Full Entm't, Inc. v. Forever Blue Entm't Grp., Inc.*, 923 F. Supp. 950, 957 (S.D. Tex. 1996). Venue is proper in any district where "a substantial part of the events . . . giving rise to the claim" will occur. 28 U.S.C. § 1391(b)(2).

2.   Should the Court override the Plaintiffs' choice of venue by transferring this case to the Western District of Texas?

No. None of the relevant factors suggest the Western District of Texas is more convenient than this District, let alone "clearly" so.

Standard: To warrant transfer, the Secretary must prove the Western District is "clearly more convenient" than this District, considering "private" and "public" factors. *Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 709 (S.D. Tex. 2011).

3.   Do Plaintiffs have standing to sue the Secretary?

Yes. "The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017).

Standard: Plaintiffs have standing to sue the Secretary so long as their injury is "fairly traceable to" and "redress[able]" by the Secretary. *Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676, 680-81 (S.D. Tex. 2015).

4.   Does sovereign immunity bar this suit?

No. *Ex parte Young* applies, and the Voting Rights Act ("VRA") abrogated Texas's sovereign immunity.

Standard: Sovereign immunity poses no bar to a plaintiff who (1) seeks prospective injunctive relief (2) against a state actor who has "some connection" to the challenged law's implementation. *K.P. v. LeBlanc*, 627 F.3d 115, 124-25 (5th Cir. 2010).

5.   Do Plaintiffs allege injury sufficient to support standing?

Yes. The Secretary's facial attack to Plaintiffs' standing fails.

Standard: To obtain dismissal in her facial attack on Plaintiffs' standing allegations, the Secretary must prove "that it is beyond doubt that [no] plaintiff can[] prove a plausible set of facts that support" standing. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

6.   Do Plaintiffs plausibly allege HB 25 violates the First, Fourteenth, and Fifteenth Amendments, as well Section 2 of the VRA?

Yes. Plaintiffs state a plausible claim for each cause of action they assert.

Standard: Dismissal under Rule 12(b)(6), which is "viewed with disfavor and is rarely granted," "is appropriate only if the complaint fails to plead enough facts to state a claim to relief that is plausible on its face." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013). In reviewing the pleadings, the Court must take Plaintiffs' "facts as true . . . and the inferences drawn therefrom, in the light most favorable to" Plaintiffs. *Id.* at 413.

7.   Has the Secretary satisfied her burden as to her affirmative defenses?

No. Neither laches nor the unclean-hands doctrine can apply in this suit; even if they could, the Secretary has not met her burden under either doctrine.

Standard: Laches requires the Secretary to prove "inexcusable delay causing undue prejudice to the party against whom the claim is asserted." *Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98, 101 (5th Cir. 1978). At a minimum, the unclean-hands doctrine requires the Secretary to prove (1) "a direct relationship" between a plaintiff's "inequitable conduct" and "the proceeding in which the doctrine is invoked," and (2) that the Secretary "has personally been injured by the plaintiff's conduct." *Claimant ID 100235033 v. BP Expl. & Prod., Inc.*, 941 F.3d 801, 812 (5th Cir. 2019).

**ARGUMENT**

I.     **This District is a proper and convenient forum.**

A.     **Venue in this District is proper.**

Venue is proper because "a substantial part of the events . . . giving rise to [Plaintiffs'] claim[s]" will occur within the Southern District of Texas. 28 U.S.C. § 1391(b)(2). In 1990, Congress "liberalized" § 1391(b)(2) by altering its prior focus on "*the* judicial district" in which such events occurred or will occur, to "*a* judicial district" in which such events occurred or will occur. *Udeobong v. Hawkins*, Civ. A. No. H-08-1833, 2009 WL 7326072, at *1-2 (S.D. Tex. Feb. 19, 2009). In doing so, Congress clarified that a given case will often have "more than one proper venue." *Id.* For this reason, courts in this District and several other circuit courts reject the Eighth Circuit case law relied on by the Secretary, Mot. at 6 (citing *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)), because it approaches the venue inquiry far too narrowly. *Udeobong*, 2009 WL 7326072, at *2 (collecting cases).

Contrary to the Secretary's contention, Mot. at 6, "[w]hen moving to dismiss for lack of proper venue pursuant to Rule 12(b)(3) . . . , the defendant has the burden to demonstrate affirmatively that the plaintiff filed the lawsuit in an improper venue." *Bounty-Full*, 923 F. Supp. at 957; *MacPhail v. Oceaneering Int'l, Inc.*, 170 F. Supp. 2d 718, 720 (S.D. Tex. 2001) (same).

Particularly in cases involving constitutional challenges, venue is appropriate in districts where the defendant's conduct will cause injury. "The Supreme Court has explained that § 1983 actions are similar to personal injury torts," for which "venue is proper where the alleged injury occurred" (or, in a case seeking injunctive relief against future injury, *will* occur). *Udeobong*, 2009 WL 7326072, at *2. As a result, "when challenging the actions of state government officials, proper venue lies both at the government's offices *and* where the effects of the decision are felt." *Id.* The Secretary's contrary approach, which considers only where she "maintain[s] an office,"

Mot. at 7, render § 1391(b)(2) superfluous, as § 1391(b)(1) already sets forth a separate basis for venue in "a judicial district in which any defendant resides." It would also produce the plainly incorrect result that no suit challenging a statewide election law could be litigated anywhere but the Western District. The sheer number of such cases that have been litigated outside the Western District confirm the falsity of this unsupported theory. *E.g.*, *Lopez v. Abbott*, Civ. A. No. 2:16-cv-303 (S.D. Tex.) (statewide election of judges); *Veasey v. Abbott*, No. 2:13-cv-193 (S.D. Tex.) (statewide voter ID law); *Voting for Am., Inc. v. Andrade*, No. 3:12-cv-44 (S.D. Tex.) (statewide registration law); *Session v. Perry*, No. 2:03-cv-354 (E.D. Tex.) (statewide redistricting plan); *Vera v. Bush*, No. 4:94-cv-277 (S.D. Tex.) (statewide redistricting plan); *Cotham v. Garza*, No. 4:94-cv-4033 (S.D. Tex.) (statewide law restricting what may be brought into voting booths).

HB 25 will cause substantial injuries in this District, making it a proper venue for this case. HB 25 will violate the fundamental rights of voters throughout this District, which covers a fourth of the State, including a vast number of Plaintiffs TDP, DSCC, and DCCC's members and constituents. AC ¶¶ 55-65. In fact, some of the highest rates of STV use, the longest polling place lines, and the lengthiest ballots exist in the Southern District. *Id.* ¶¶ 28, 32, 34, 42-44. HB 25's effects will be most devastating in those areas. HB 25 will also directly impede Ms. Bruni, acting in her capacity as the Chair of the Webb County Democratic Party, from turning out Webb County voters who support Democratic candidates. *Id.* ¶ 20.

## B. There is no reason to transfer this case.

The Secretary has not satisfied her burden of "clearly demonstrat[ing]" the Court should override Plaintiffs' choice of venue. *S. Tex. Neon Sign Co., Inc. v. Ixtapa, Inc.*, Civ. A. No. L-08-116, 2008 WL 11397910, at *1-2 (S.D. Tex. Dec. 19, 2008). None of the "private factors" governing this analysis support the Secretary's transfer motion. *Id.* at *2. First, the "sources of proof" for Plaintiffs' claims exist throughout the State, not just in Austin. The vast majority of

Plaintiffs' claims rely on the *effect* of HB 25, the evidence of which comes from counties throughout the State, including the Southern District. AC ¶¶ 28, 32, 34, 42- 44. While a portion of Plaintiffs' claims may require calling legislators to testify regarding their intent, the Secretary's unsupported claim that "[l]egislators are more likely to be found . . . in the Western District," Mot. at 8, is false. Texas Legislators are distributed throughout the State and come to Austin only "less than five months out of every two years." *Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) (en banc). The Secretary has not even tried to meet her burden of "do[ing] more than make a general allegation that certain key witnesses are needed, [and] specifically identify the key witnesses and outline the substance of their testimony." *Pension Advisory*, 771 F. Supp. 2d at 710 (quoting *Hupp v. Siroflex of Am., Inc.*, 848 F. Supp. 744, 749 (S.D. Tex. 1994)). Nor could she. For example, neither Representative Simmons,[1] HB 25's author and chief proponent, nor Senator Kelly Hancock,[2] who introduced HB 25 in the Senate, live in the Western District. *See* AC ¶ 39; ECF No. 29-1 ("Pls.' PI Mot.") at 32-39. For these same reasons, the next two private factors—the Court's "compulsory process to secure the attendance of witnesses" and the "cost of attendance for willing witnesses"—is no more convenient in the Western District than it is here. *Neon Sign*, 2008 WL 11397910, at *3-4. Particularly with respect to the Court's compulsory process, the Secretary has not "established with any certainty" that "compulsory process may be necessary to secure certain witnesses." *Pension Advisory*, 771 F. Supp. 2d. at 711. There are no "other practice problems that make trial of [this] case easy, expeditious, and inexpensive." *Id.*

The Secretary does not even seriously argue that the public factors support her transfer motion. Her only argument, pertaining to the first factor dealing with court "congestion," is that

---

[1] Rep. Ron Simmons, Tex. State Directory, https://www.txdirectory.com/online/person/?id= 44686&office=26619.
[2] Sen. Kelly Hancock, Tex. Senate, https://senate.texas.gov/member.php?d=9.

this District has "more pending cases" than the Western District. Mot. at 8. But that argument says nothing about whether there is a "backlog of cases in this Court," *Pension Advisory Grp.*, 771 F. Supp. 2d at 711, and ignores the fact that more judges sit in this District than the Western District.

As to the remaining public factors, the Secretary's failure to offer any argument amounts to waiver. In any event, those factors do not support transfer. This District has as much of a "local interest" in adjudicating this case as the Western District, because HB 25's "alleged constitutional violations" will occur in both. *Udeobong*, 2009 WL 7326072, at *5. There is no reason to believe this Court is less familiar with federal civil rights law, and there are no conflict-of-law concerns. *Neon Sign*, 2008 WL 11397910, at *4.

Finally, that two voting rights cases are pending before Judge Yeakel in the Western District, Mot. at 8-9, surely does not mean any voting rights case filed in the State of Texas must be transferred there. The cases cited by the Secretary—which involve the order of candidates listed on ballots and limitations on temporary polling locations—have nothing to do with Plaintiffs' claims that HB 25 will drastically increase polling-place line lengths and ballot roll-off. And to the extent the Secretary has offered in those cases the same garden-variety Rule 12 arguments she presents here, *see* Mot. at 9, there is no reason to believe this Court is less familiar with the governing law than any other federal court.

Because the Western District is "not clearly more convenient than the venue chosen by the plaintiff[s], the plaintiff[s'] choice should be respected." *Pension Advisory*, 771 F. Supp. 2d at 712.

## II.     As Texas's Chief Election Officer, the Secretary is the proper defendant in this facial challenge to a law governing Texas's elections.

### A.      Controlling Fifth Circuit case law demands the conclusion that Plaintiffs' injuries are fairly traceable to and redressable by the Secretary.

The Secretary's effort to evade this litigation by renouncing her central role in Texas's elections is foreclosed by controlling Fifth Circuit precedent. "The facial invalidity of a Texas

- 7 -

election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" *OCA*, 867 F.3d at 613 (quoting Tex. Elec. Code § 31.001(a)). Here, Plaintiffs bring a facial challenge to a generally applicable Texas election statute. Under *OCA*'s clear holding, Plaintiffs' injuries are "fairly traceable to and redressable by" the Secretary. *Id.*

Aside from *OCA*'s clear instruction, the indistinguishable facts of that case make clear that the Secretary's argument on this issue is meritless. In *OCA*, plaintiff challenged a Texas law prohibiting counties from allowing unregistered individuals to interpret local election officials' communications with voters. 867 F.3d at 607-08. The Secretary argued that plaintiff's claims lied not with the Secretary, but instead with the local officials who implemented that law. *Id.* at 612-13. The Fifth Circuit disagreed. Because the Secretary is Texas's Chief Election Officer and is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's Election Code, Tex. Elec. Code § 31.003, the Secretary was positioned to redress the plaintiffs' injuries caused by a generally applicable election law. *OCA*, 867 F.3d at 613. Here, Plaintiffs challenge a law prohibiting Texas's counties from including STV on their ballots. The Secretary offers the *exact same* argument offered in *OCA*: Plaintiffs' claims lie not with her, but instead the "local officials [who] will implement" HB 25. Mot. at 9. *OCA* forecloses this argument. If anything, the Secretary has even more involvement here than the law challenged in *OCA*: the Secretary is obligated to implement HB 25 by "adopt[ing] rules and establish[ing] procedures" for the elimination of STV, Tex. Elec. Code § 31.012(d), and, come September 1, 2020, she is responsible for instructing county election administrators "that STV has been eliminated pursuant to H.B. 25," Tex. Elec. Code § 31.012(b-1). In *OCA*, the Secretary played no such role at all.

The Secretary does not even attempt to distinguish *OCA*. Mot. at 13 n.19. She instead points

to *Okpalobi*, Mot. at 13, which, as *OCA* itself explains, 867 F.3d at 613-14, has no application in a challenge to an election law. *Okpalobi* involved a law providing unlimited liability against doctors in suits by patients for damages caused by abortion procedures. *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc). The court concluded plaintiffs' injuries were caused by those private suits, not state officials who had no "enforcement connection to the challenged statute." *Id.* at 427 & n.35. As *OCA* explains, *Okpalobi* has no application in a challenge to Texas's election laws because the Secretary, who is "the 'chief election officer of the state' and is instructed by statute to 'obtain and maintain uniformity in [such laws'] application, operation, and interpretation,'" sufficiently implements those laws to render her the proper defendant. 867 F.3d at 613-14 (quoting Tex. Elec. Code §§ 31.001(a), 31.003).

### B. Under *Ex parte Young*, and given the VRA's abrogation of Texas's sovereign immunity, the Eleventh Amendment poses no bar to Plaintiffs' claims.

For the same reasons the Secretary is a proper defendant in this suit, the *Ex parte Young* exception to sovereign immunity applies. *Ex parte Young* permits Plaintiffs' claims against the Secretary so long as: (1) the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002), and (2) the Secretary has "'some connection' to the state law's enforcement." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). As to the first inquiry, there can be no question Plaintiffs allege that HB 25 will violate their rights under federal law and seek a prospective injunction against HB 25's enforcement.

As for the second inquiry, the Secretary has much more than just "some connection" to HB 25's enforcement. "Enforcement" in this context means only that the Secretary has some "responsibilities" in HB 25's implementation or that she "effectively ensures that the [statutory]

scheme is enforced." *Air Evac EMS*, 851 F.3d at 519; *K.P.*, 627 F.3d at 124-25. Whether this connection "arises out of the general law, or is specially created by the [challenged] act itself, is not material so long as it exists." *K.P.*, 627 F.3d at 124. Here, the Secretary holds clearly defined responsibilities in HB 25's implementation. She must "obtain and maintain uniformity" in HB 25's "application, operation, and interpretation"; she must "adopt rules and establish procedures" to effectuate its elimination of STV; and when HB 25 takes effect, she must instruct counties and voters that STV may no longer be included on Texas's ballots. Tex. Elec. Code §§ 31.003, 31.012(b-1), 31.012(d).

The Secretary's argument regarding mandatory injunctions, Mot. at 12, is irrelevant. Plaintiffs seek a prohibitory, not mandatory, injunction: they ask the Court to maintain the status quo by preventing HB 25's elimination of STV, which Texas has had for a century. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (prohibitory injunctions "maintain the status quo"). The Secretary does not even attempt to explain how complying with such an injunction would require her to take any "affirmative action." Mot. 12.[3]

Finally, the Fifth Circuit has squarely held that the VRA abrogates sovereign immunity. *OCA*, 867 F.3d at 614. The Eleventh Amendment thus poses no bar to Plaintiffs' VRA claim.

## III.    Plaintiffs will be injured by HB 25's violation of Texans' fundamental rights.

HB 25 will cause each of the five Plaintiffs concrete and particularized injuries. Because

---

[3] In any event, the Secretary's argument is wrong, as demonstrated by the long line of cases applying *Ex parte Young* to impose mandatory injunctions. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 288-90 (1977) (holding *Ex parte Young* permitted forcing State to remediate harms caused by prior constitutional violations); *Thomas ex rel. D.M.T. v. School Bd. St. Martin Parish*, 756 F.3d 380, 387-88 (5th Cir. 2014) (noting school board "remained subject to affirmative obligations" by permanent injunction issued by court in 1974 to remedy constitutional harms); *Common Cause Ind. v. Marion Cty. Election Bd.*, 311 F. Supp. 3d 949, 977 (S.D. Ind. 2018), *vacated on mootness grounds*, 925 F.3d 928 (7th Cir. 2019) (issuing injunction requiring county election board to establish satellite early voting centers for general election).

Plaintiffs all seek the same injunctive relief, however, only one needs standing to support the Court's jurisdiction. *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir. 2019).

Because the Secretary offers only a facial challenge to Plaintiffs' standing, the Court treats this motion the same as one under Rule 12(b)(6), "accept[ing] as true all material allegations of the complaint and . . . constru[ing] the complaint in favor of the complaining party." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (internal quotation marks omitted). The Court may dismiss for lack of standing only if "it is beyond doubt that [no] plaintiff can[] prove a plausible set of facts that establish" their standing. *Lane*, 529 F.3d at 557.

### A.    TDP, DSCC, and DCCC have Article III standing.

Plaintiffs TDP, DSCC, and DCCC (the "Organizational Plaintiffs") present classic examples of both organizational and associational standing. HB 25 will directly harm the Organizational Plaintiffs by frustrating their missions of turning out voters and electing Democrats. That harm will force these plaintiffs to divert resources away from existing projects and towards efforts to ensure voters are not disenfranchised by the long lines HB 25 creates as well as communicating with and educating voters about HB 25 to ensure they fully complete their ballots. HB 25 will also directly injure the Organizational Plaintiffs by harming their candidates' electoral prospects. The Organizational Plaintiffs also have standing to sue on behalf of their members, whose rights HB 25 will directly violate. Tellingly, the Secretary fails to identify a single case where such allegations by a political party or committee were insufficient in a challenge to a voting restriction to confer standing.

### 1.    Direct Organizational Standing

The Organizational Plaintiffs have sufficiently pled multiple forms of direct organizational injury. First, they have pled (1) a diversion of organizational resources to identify and counteract HB 25's unlawful action, and (2) frustration of their missions. *Havens Realty Corp. v. Coleman*,

455 U.S. 363, 379 (1982). This injury need not be "large" or "substantial," and "it need not measure more than an identifiable trifle." *OCA*, 867 F.3d at 612 (quoting *Ass'n of Comm. Orgs. For Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)). And they need only show their interests will be "perceptibly impaired." *Id.* at 612 n.29.

HB 25 will impose severe burdens on Texas voters, especially Democrats, by subjecting them to unreasonably long polling-place lines and causing them to submit incomplete ballots. AC ¶¶ 55-65. This in turn will harm the Organizational Plaintiffs' basic mission, which is to turn out voters supportive of Democratic candidates and electing such candidates to office in Texas. *Id.* ¶¶ 21-23. HB 25 will force the Organizational Plaintiffs to divert resources away from their normal get-out-the-vote efforts, supporting individual campaigns, and developing programs benefiting Democratic Party candidates. *Id.* Those resources instead will be used to educate voters about HB 25's change in the law and provide assistance to voters who otherwise would be unable to withstand, or discouraged by, the unreasonably long polling-place lines HB 25 creates. *Id.*

The Secretary's assertion that these allegations are insufficient again ignores controlling case law. Mot. at 17. At the pleadings stage, Plaintiffs need not provide detailed descriptions of the activities from which its funds will be diverted to combat the effects of HB 25. In *Havens Realty*, the Court held that plaintiffs' allegations, which stated only that defendants' "racial steering practices" frustrated their "efforts to assist equal access to housing through counseling and other referral service" by forcing them "to devote significant resources to identify and counteract the defendant[s'] racially discriminatory steering practices," were sufficient to withstand a motion to dismiss. 455 U.S. at 379; *see also Democratic Nat'l Comm. v. Bostelmann*, --- F. Supp. 3d ---, No. 20-cv-240-WMC, 2020 WL 1320819, at *3 (W.D. Wis. Mar. 20, 2020) (finding complaint sufficiently pled organizational standing by alleging "the challenged provisions

will require [the state party] to expend additional resources to assist their members and constituents to overcome [alleged] burdens to exercise their right to vote").[4]

In any event, even cases from beyond the pleading stage demonstrate Plaintiffs' allegations are sufficient. In *OCA*, plaintiff's mission was "to promote civic participation and provide civic education, which it carrie[d] out through a 'Get Out the Vote' initiative." 867 F.3d at 609. Because the challenged law impeded "some" of the plaintiff's members from voting, plaintiff "redirected some of its efforts toward educating its members and other members of the public about" the challenged law. *Id.* at 609-10. The Fifth Circuit held this was clearly sufficient for purposes of organizational standing because these voter education efforts "consumed [plaintiff's] time and resources in a way they would not have been spent." *Id.* at 612.  And the court rejected the exact argument the Secretary offers here, Mot. at 15, *i.e.*, that this reaction to the challenged law was merely a continuation of the plaintiff's normal operations. Thus, because HB 25 will cause the Organizational Plaintiffs to divert resources away from their normal programs to combat HB 25's effects, they have standing to challenge HB 25. *See also Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (state party had standing because ID law caused it to "devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586-87 (5th Cir. 2006) ("*TDP*") (holding TDP had standing to challenge state action based on identical diversion of resources theory).

Second, HB 25 will independently injure the Organizational Plaintiffs by directly harming

---

[4] Even the Eleventh Circuit's decision this week in *Jacobson v. Fla. Sec'y of State*, No. 19-14552, 2020 WL 2049076 (11th Cir. Apr. 29, 2020), which invents a far too heavy evidentiary burden for diversion of resources *at trial*, recognizes that the requirements on this issue are lower at the pleadings stage. *Id.* at *8 (explaining the *Havens Realty* Court found plaintiffs' allegations "sufficient to establish standing at the pleading stage").

their candidates' electoral prospects. The "threatened loss of power" flowing from an electoral defeat is "a concrete and particularized injury sufficient for standing purposes." *TDP*, 459 F.3d at 587. A "political party's interest in a candidate's success is not merely an ideological interest," but instead a threat to the party's ability to "direct the machinery of government toward the party's interests." *Id.* Here, Plaintiffs allege HB 25 will have a disproportionate effect on African American and Hispanic Texans, who overwhelmingly support the Democratic Party. AC ¶¶ 55-65. Indeed, this was exactly HB 25's purpose. *Infra* Sections VI-VII. This specifically alleged disproportionate effect will harm the electoral prospects of the Organizational Plaintiffs' candidates, causing them injury "sufficient for standing purposes." *TDP*, 459 F.3d at 587.

### 2.    Associational Standing

The Organizational Plaintiffs also possess associational standing to challenge HB 25 on behalf of their members and constituents, who include Democratic candidates and the voters that support them. AC ¶¶ 21-23. Each plaintiff easily satisfies the doctrine's three elements: (1) their "members would independently meet the Article III standing requirements"; (2) the voting rights interests at stake are "germane" to each organization's purpose; and (3) "neither the claim[s] asserted nor the relief requested requires participation of individual members." *TDP*, 459 F.3d at 587 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). First, there can be no question that the Organizational Plaintiffs' members and constituents—Democratic candidates and voters throughout Texas, a substantial proportion of whom are African American and Hispanic—can challenge HB 25 based on the voting-rights injuries alleged in the Amended Complaint. *See id.* at 587-88. Second, "the goal of a political party is to gain control of government by getting its candidates elected." *Id.* at 588. That mission is germane to this suit, which challenges a law that will impede Democrats' ability to cast votes. And third, "nothing requires the participation" of Democratic candidates or the voters that support them, whose interests "are fully

represented by the TDP," *id.*, as well as DSCC and DCCC.

The Secretary's assertion that the Amended Complaint must "identif[y] [] specific members," Mot. at 16, has no legal basis. "[N]o precedent hold[s] that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on lack of associational standing." *Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012). This is particularly so in the voting rights context. "[P]olitical parties have standing to assert, at least, the rights of its members who will vote in an upcoming election," even when they "c[an] not identify *specific* voters that would be affected; it is sufficient that some inevitably would." *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016); *see also Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (holding it was unnecessary for state party to "identify specific voters" impacted by challenged law); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) (state party had standing to sue on behalf of its "tens of thousands" of unidentified voter members because it was "extremely unlikely" the challenged provisions would "not affect a single Democratic Party member"); *Lee v. Va. State Bd. of Elections*, 155 F. Supp. 3d 572, 578 (E.D. Va. 2015) (finding *Summers* did not require state party to identify harmed members in its complaint). For the same reason, the Secretary is wrong to suggest Plaintiffs must also allege their membership structure at the pleadings stage. *Bostelmann*, 2020 WL 1320819, at *3 (finding state party had associational standing based only on allegation that it was a "membership organization" and the challenged laws "place[d] undue burdens on [its] members' right to vote").

The error in the Secretary's argument is demonstrated by her citations, without explanation, to *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009), and *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010). Mot. at 16. Neither case involved the sufficiency of pleadings;

rather, they discussed what must be proven at *trial*. Moreover, the Secretary's broad interpretation of *Summers* is incorrect: "[w]here it is relatively clear," like here, "that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular members to understand and respond to an organization's claim of injury, [] no purpose [is] to be served by requiring an organization to identify by name the member of members injured." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). Here, the Organizational Plaintiffs have millions of members and constituents throughout the State of Texas. To agree with the Secretary that *none* of those individuals will be injured by HB 25's broad statewide impact would require the Court to dispense with "common sense," which it cannot do. *Cherry Knoll, LLC v. Jones*, 922 F.3d 309, 316 (5th Cir. 2019).

In any event, Plaintiffs have identified three such members. *See* ECF No. 19-6 at Pages 7-14 of 14. These voters have already been forced to wait in long lines at the polls, even with the availability of STV. *Id.* HB 25 will exponentially and unjustifiably increase that burden, violating their fundamental rights.

### 3. The Secretary's "statutory standing" argument is baseless.

The Secretary's position that organizations are barred from suing under Section 1983, Mot. at 17-19, contradicts settled and controlling law. The Fifth Circuit has long held that organizations may assert Section 1983 claims under an associational-standing theory. *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 551 (group had standing to assert § 1983 claims on behalf of members); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981); *see also Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974); *Jornaleros de Las Palmas v. City of League City*, 945

F. Supp. 2d 779, 800 (S.D. Tex. 2013).[5]

### B. Individual Plaintiffs

HB 25 will also directly injury Plaintiffs Sylvia Bruni and Jessica Tiedt. The injury-in-fact requirement is meant "to distinguish a person with a direct stake in the outcome of a litigation— even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n.14 (1973). This element "is 'very generous' to claimants, demanding only that the claimant 'allege[] some specific, identifiable trifle of injury.'" *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) (quoting *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)) (citations omitted). Ms. Bruni and Ms. Tiedt each allege direct injury caused by HB 25 by way of their current positions.

Ms. Bruni is the chair of the Democratic Party of Webb County, and Ms. Tiedt is a candidate for Texas State House of Representatives District 20. AC ¶¶ 20, 24. HB 25 will directly harm both because it will lead to increased polling place lines and decreased turnout among voters who would otherwise vote for Ms. Tiedt and other candidates for whom Ms. Tiedt and Ms. Bruni campaign and fundraise. *Id.* Because of HB 25, many voters will fail to make a selection in every race on the ballot, especially for candidates in races that appear further down the ballot. *Id.* Ms. Tiedt, who is a down-ballot candidate herself, will be directly injured by decreased turnout among her likely voters and by voters who fail to vote in her race due to HB 25. HB 25 will thus directly harm Ms. Tiedt's ability to win her race and require her to divert resources to counteract its impact.

---

[5] The Secretary's argument confuses associational standing with third-party standing, a completely different doctrine. Mot. at 17. Her reliance on *Danos v. Jones*, 652 F.3d 577 (5th Cir. 2011), demonstrates this mistake. *Danos* involved a case considering the standing of an *individual* seeking to assert a claim on behalf another individual. That attempt invoked the "third-party standing" doctrine, which in certain circumstances allows an individual to assert a claim on behalf of another individual when the two share a close relationship and the second is hindered from asserting the suit on her own behalf. *Powers v. Ohio*, 499 U.S. 400, 410-11 (5th Cir. 1991). That doctrine has no application here.

*See Buchanan v. Fed. Election Comm'n*, 112 F. Supp. 2d 58, 63 (D.D.C. 2000) ("[P]olitical actors may bring suit when they are competitively disadvantaged by government action."); *TDP*, 459 F.3d at 587 (holding a threat to electoral prospects and resulting campaign expenditures are "sufficient to give a candidate standing to protest the action causing the harm").

Both Ms. Bruni and Ms. Tiedt will also have to divert their time and resources to educate voters about HB 25's alteration of a longstanding voting procedure, as well as assist and encourage voters who otherwise would be discouraged from the polling-places lines that HB 25 will produce. AC ¶¶ 20, 24. This alleged diversion of resources is a separate injury that confers standing. In fact, these Plaintiffs' allegations are indistinguishable from those in *Lee*, in which the court found two individuals active in "voter registration, voter education, and Get-Out-The-Vote efforts" had standing by alleging Virginia's voter ID law would require them "to expend additional resources and effort," including "an educational component as well as the need to encourage voters to remain in line to cast[] their votes despite the time required." 155 F. Supp. 3d at 578-79.

### C.      Plaintiffs' allegations are not speculative.

The Amended Complaint sets forth detailed allegations describing how HB 25 will injure Plaintiffs and their members and constituents. As explained in greater detail in the Sections that follow, Plaintiffs allege HB 25 will significantly increase the amount of time more than two-thirds of Texas voters will take to complete their ballots, which, in turn will cause a drastic increase in the amount of time Texans will have to wait in line to cast their votes and cause voter confusion. AC ¶¶ 55-58, 62-63. Indeed, Plaintiffs have already offered significant evidence of these effects. *See* ECF Nos. 19-5, 19-7. These effect will be most severe among African American and Hispanic voters, who use STV at a significantly higher rate, disproportionately live in higher-density areas with longer lines and longer ballots, and, on average, are less able to withstand the burdens of long lines. AC ¶¶ 59-62. Forcing Texas voters, particularly African American and Hispanic voters, to

make individual selections in each race on the ballot will also increase the amount of incomplete ballots submitted. *Id.* The Secretary's assertion that none of this will happen, Mot. at 14, simply raises a factual dispute that the parties must adjudicate. But, at bottom, these effects are far from speculative; they are the natural result of eliminating STV in Texas.

**IV.    Plaintiffs plausibly allege that HB 25 will unduly burden Texans' right to vote.**

To challenge Plaintiffs' *Anderson-Burdick* claim, the Secretary offers her own version of the facts. But in resolving this Rule 12(b)(6) motion, the Court must accept the Amended Complaint's factual allegations "as true . . . and the inferences to be drawn therefrom, in the light most favorable to [Plaintiffs]." *Leal*, 731 F.3d at 413; *see also id.* (Rule 12(b)(6) motions are "viewed with disfavor and [] rarely granted"). The Amended Complaint's allegations, taken as true, demonstrate that HB 25 will impose severe burdens on Texas voters—particularly African American and Hispanic voters—through drastically longer polling-place lines and increased roll-off. And because HB 25 does not serve any of the interests identified by the Secretary, those interests do not justify the burdens that HB 25 imposes. As a result, HB 25 violates the First and Fourteenth Amendments. *See also* Pls.' PI Mot. at 3-16.

The Secretary's insistence that HB 25 is lawful because some other States do not have STV is a red herring that violates *Anderson-Burdick*'s basic inquiry. *Anderson-Burdick*'s balancing test "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions"; the "results of [the] evaluation will not be automatic" because "there is 'no substitute for the hard judgments that must be made.'" *Anderson v. Celebrezze*, 460 U.S. 780, 789-90 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1983)). It is therefore "not enough for [Texas] to simply rely on the lack of straight-party voting in other states; the necessary question is how [HB 25] interacts with other voting practices in [Texas], and the burdens this law places on voters who vote within [Texas's] electoral framework." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656,

665 (6th Cir. 2016). That is particularly so here, where Texas's abnormally long ballots will exponentially amplify the burdens that eliminating STV will have in *this* State.

> **A.      HB 25 will impose severe burdens on Texans' right to vote.**

HB 25's elimination of STV will cause unreasonably long lines at Texas's polls, which will impose a severe burden on Texans' right to vote. Removing STV in Texas will cause more than 5.6 million voters to switch from previously using STV to making individual selections on each ballot item, significantly increasing the amount of time each voter spends completing their ballot. AC ¶¶ 3, 27.[6] "By increasing the amount of time it takes for an individual voter to complete his or her ballot, [HB 25] will accordingly cause longer lines at polling places and increase the wait time to cast a vote." *Mich. State*, 833 F.3d at 663. And the sudden transition of *two-thirds* of Texas voters from efficiently casting ballots through STV to making individual choices in every single ballot item will drastically increase the amount of time voters wait in line, severely burdening their fundamental right to vote. *NAACP State Conf. of Pa. v. Cortés*, 591 F. Supp. 2d 757, 765 (E.D. Pa. 2008) ("[U]nacceptably long lines . . . unduly burden and thus deprive many citizens of their right to vote."). This burden will be all the worse given that Texans already encounter long lines at the polls. AC ¶¶ 5, 32-34.

Contrary to the Secretary's suggestion, Mot. 20-21, other aspects of Texas's Election Code will not mitigate the long lines produced by HB 25. The fact that Texas already offers early voting does not resolve this issue: as the Amended Complaint explains, eliminating STV will exacerbate the long lines that Texans already encounter on Election Day *and* during early voting. AC ¶¶ 5, 32-33. Nor will Texas's vote-by-mail option mitigate the long lines HB 25 will produce, because

---

[6] The Secretary asks the Court to infer that eliminating STV will have *no effect* on the amount of time voters spend in the voting booth. Mot. at 21. Aside from being illogical, such an inference against Plaintiffs' allegations violates Rule 12(b)(6)'s standard. *Leal*, 731 F.3d at 413.

Texas law allows only to a tiny fraction of Texans to vote by mail. *Id.* ¶ 35.

HB 25 will also cause more Texans to submit incomplete ballots. AC ¶¶ 4, 29, 62. Eliminating STV will increase voter fatigue, particularly given Texas's lengthy ballots. *Id.* "Without the STV option, voters must take significantly more time to complete their ballots, which increases the risk of voter fatigue and roll-off." *Id.* ¶ 29. While the Secretary insists the opposite will occur, Mot. at 2, 4, 22-23, the Court must credit Plaintiffs' version of this factual dispute.

The long lines and increased roll-off produced by HB 25 will most severely burden African American and Hispanic voters. Because African American and Hispanic Texans use STV at a significantly higher rate than white Texans, AC ¶¶ 9, 40, 59, HB 25 will force a disproportionate number of minority voters to switch away from STV. And as has been the experience of other States, these minority communities that disproportionately rely on STV will see the greatest increase in line lengths. *Id.* ¶ 60. Moreover, because African American and Hispanic voters disproportionately live in the most densely populated areas of the State where ballots are the longest and polling-place lines are already unreasonably long, *id.* ¶¶ 9, 44, 59, 89, HB 25 will have its most devastating effect in areas where minority voters disproportionately live. *Id.* ¶ 44, 59. Making matters worse, African American and Hispanic voters' lower average socioeconomic status, caused by the State's discrimination, will amplify the burdens that long lines impose on them compared to white voters. *Id.* ¶¶ 30, 61.

With respect to the disproportionate roll-off that HB 25 will cause among minority voters, the Secretary covers her ears and claims "insult" at the inverse relationship between educational achievement and ballot roll-off, Mot. at 21, which political scientists have long documented, AC ¶¶ 29, 42, 62; Pls.' PI Mot. at 13-14. Because of this State's long and continuing history of discrimination, African American and Hispanic voters, on average, have lower educational

achievement than white Texans. AC ¶ 62. Removing STV will therefore cause a disproportionately high amount of roll-off among those voters, particularly given that they use STV at a significantly higher rate. To the extent the Secretary insists on ignoring this fact, that behavior simply resembles HB 25's legislative proponents' refusal to acknowledge the law's disparate impacts, even when directly confronted with them. *See infra* Section VII; Pls.' PI Mot. at 28-31.[7]

Finally, the Court should reject *amicus*' promotion of Justice Scalia's restrictive theory of *Anderson-Burdick*. *See* ECF No. 42-2 at 5-8. Tellingly, *amicus* fails to cite a single case adopting this theory in the twelve years since publication of Justice Scalia's concurrence in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). As already explained in Plaintiffs' Motion for Preliminary Injunction, a majority of the Supreme Court in *Crawford* rejected Justice Scalia's theory, as have numerous lower courts, including one in this District. Pls.' PI Mot. at 11-12. And because Justice Stevens's plurality opinion in *Crawford*—which examined the challenged law's impact on those it burdened the most—is narrower, it is controlling under the rule set forth in *Marks v. United States*, 430 U.S. 188, 193 (1977). *See* Pls.' PI Mot. at 12 n.9.

### B.     The interests identified by the Secretary do not justify HB 25's burdens.

Regardless of the severity of HB 25's burdens, the interests identified by the Secretary do not justify them. Plaintiffs do not dispute that the State benefits when its voters are informed or when its elections involve high-quality, competitive campaigns. But eliminating STV does not serve those interests at all, let alone in a manner that "make[s] it necessary" to cause voters to wait in hours-long lines and submit incomplete ballots. *Anderson*, 460 U.S. at 789. To the extent the Secretary seeks to prove otherwise, she offers only unadorned factual assertions that cannot be

---

[7] Plaintiffs independently claim that HB 25's disproportionate burdens on African Americans and Hispanics will unjustifiably burden the associational rights of Democrats, given that African American and Hispanic Texans' overwhelmingly support the Democratic party. AC ¶¶ 34-35, 63-65. The Secretary offers no argument as to this claim.

credited at the motion to dismiss stage.

HB 25 does not serve any of the interests that the Secretary identifies. First, there is no reason to believe that forcing a voter to make individual selections on a ballot will make her more "informed." Mot. at 22. "[I]t is far from evident that" requiring each voter "to look, at least briefly, at each section of the partisan ballot in order to identify and fill in the desired bubble" will "foster[] an engaged electorate," particularly when the "party affiliation of each partisan candidate will still appear beside the candidate's name." *Mich. State*, 833 F.3d at 665-66. The Secretary's argument assumes that, if STV is not available on ballots, voters will better research candidates *before* coming to the polling place. But there is no reason to believe that will occur.[8]

Second, the claim that, without STV, voters will choose candidates based on qualification, Mot. at 22, is similarly unintuitive. Texas's ballots do not describe candidates' qualifications; they include only each candidate's name and party affiliation. And the existence of STV in no way impedes voters from taking qualifications into account: after selecting the STV option, voters may change their selections in any given race. AC ¶ 2. Thus, if a voter selects the Republican Party using STV but feels particular Republican candidates are unqualified, nothing about the voter's use of STV stops her from choosing the more qualified candidate in those races.

Third, the Secretary's assertion that eliminating STV will *reduce* roll-off simply raises a factual dispute. The Amended Complaint specifically alleges that eliminating STV will increase roll-off among Texas voters, particularly in areas in which ballots are excessively long. AC ¶¶ 4, 29, 62. Rule 12(b)(6) requires the Court to accept Plaintiffs' side of this factual dispute.

Last, by asserting that eliminating STV will make Texas's elections more "competitive"

---

[8] The Secretary's repeated citations to HB 25's "bill analyses," *e.g.*, Mot. at 22-23 & nn.23-24, does not support her assertion that HB 25 *actually* serves any of these interests. Such documents simply describe arguments that have been made for and against a given bill.

because it "makes incumbents more susceptible to third-party challenges," Mot. at 23, the Secretary is again merely raising a factual dispute. Indeed, Plaintiffs have already offered the Court evidence that eliminating STV has the opposite effect. *See* Pls.' PI Mot. at 16 (explaining and citing evidence that HB 25 "benefits incumbents and well-funded candidates").

Put simply, the Secretary cannot obtain dismissal of Plaintiffs' *Anderson-Burdick* claims by asserting her own version of disputed facts. *Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) ("[W]ithout any factual record at [the pleadings] stage, we cannot say that the Secretary's justifications outweigh the constitutional burdens on [plaintiff] as a matter of law.").

Finally, the Secretary's citations to other challenges to other States' elimination of STV, Mot. 24-26, are both misleading and inapplicable to this Motion. After a trial, the district court in *Mich. State A. Philp Randolph Inst. v. Johnson* concluded that Michigan's elimination of STV was intentionally discriminatory, failed *Anderson-Burdick*, and imposed a disparate impact in violation of Section 2 of the VRA. 326 F. Supp. 3d 532 (E.D. Mich. 2018). The Secretary suggests the Sixth Circuit "quickly vacated" that decision out of disagreement with its reasoning. Mot. 26. But that is false. The district court's judgment was vacated as moot because Michigan voters, unhappy with the State's elimination of STV, *re-instated* STV via initiative. *See Mich. State A. Philip Randolph Inst. v. Johnson*, No. 18-1910 (6th Cir. 2018), ECF No. 30-1. As for the remaining cases cited by the Secretary, just one included a claim that eliminating STV would increase polling-place lines, ballot roll-off, or voter confusion. There, the court found *after holding a trial* that plaintiffs' evidence was insufficient. *One Wis. Inst., Inc. v. Nichol*, 198 F. Supp. 3d 896, 945-46 (W.D. Wis. 2016). That decision has no utility here, where the Court must accept Plaintiffs' detailed

allegations that HB 25 will have such effects. *Leal*, 731 F.3d at 413.[9]

In sum, Plaintiffs' allegations are more than sufficient to state a claim that HB 25 will unduly burden the right to vote in violation of the First and Fourteenth Amendments.

## V.     Plaintiffs plausibly allege that HB 25 will violate Section 2 of the VRA.

### A.     Plaintiffs' allegations easily satisfy the elements of a Section 2 claim.

The Secretary's argument that Plaintiffs have not stated a Section 2 claim simply gets the law wrong. The Fifth Circuit, sitting en banc, recently announced a two-step test that governs Plaintiffs' Section 2 claim. Plaintiffs must prove: (1) HB 25 "impose[s] a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," and (2) that burden is "in part [] caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Veasey*, 830 F.3d at 244. And once again, the Secretary is wrong to suggest that other State's laws are in any way relevant to this analysis. Mot. at 29. Section 2 claims are "'peculiarly dependent upon the facts of each case' and require[] 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (quoting *Rogers v. Lodge*, 458 U.S. 613, 621-22 (1982)).

The Amended Complaint easily establishes a plausible claim under *Veasey*'s two-step test. *See* Pls.' PI Mot. at 17-24. First, as explained, HB 25 will impose disparate burdens on African American and Hispanic voters in the form of unreasonably long polling-place lines and increased roll-off. *Supra* Section IV.A. That effect leaves African American and Hispanic voters with an

---

[9] The same distinction applies to the Secretary's heavy reliance on the Sixth Circuit's unpublished order staying the district court's permanent injunction pending appeal in *Mich. State A. Philip Randolph Inst.*, which focused on plaintiffs' evidence *at trial*. *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342 (6th Cir. Sept. 5, 2018).

unequal opportunity to participate in Texas's political process.

In evaluating the second step, *Veasey* instructs courts to utilize the various "*Gingles* factors," also referred to as the "Senate Factors." 830 F.3d at 245-46. The Amended Complaint includes detailed allegations weighing each of the relevant Senate Factors in favor of finding a Section 2 violation. *See* AC ¶¶ 70-84. The Secretary does not contest that Texas has a continuing history of discrimination, including in the area of voting (Factor One), *id.* ¶¶ 70-77, that voting in Texas is severely racially and ethnically polarized (Factor Two), *id.* ¶ 82, or that discrimination in Texas has produced significant socioeconomic disparities that impair minority voters' ability to participate in the political process (Factor Five), *id.* ¶¶ 78-80. As for Texas's use of at-large statewide judicial elections (Factor Three), AC ¶ 84, the fact that those practices may not violate Section 2, Mot. at 29-30, does not change the fact that they "may enhance the *opportunity* for discrimination." *Westwego Citizens for Better Govt. v. City of Westwego*, 946 F.2d 1109, 1120 n.16 (5th Cir. 1991) (emphasis added). With respect to the racial appeals prevalent in Texas's politics (Factor Six), the Secretary's claim that the Complaint identifies only "isolated incidents," Mot. at 29, is belied by the fact that the illustrative incidents described in the Complaint came from just *the most recent election cycle*. AC ¶ 81; *see also* Pls.' PI Mot. at 22-23. The Secretary also wrongly suggests that a member of a minority group is incapable of capitalizing on racial and ethnic stereotypes for political gain, *see* Mot. at 29—neither case law nor logic supports that position. Next, that Texas elected a Hispanic Senator, Mot. at 29, does not change the indisputable fact that African Americans and Hispanics are woefully underrepresented in Texas public office (Factor Seven). AC ¶ 83.[10] As for Texas's responsiveness to minority communities (Factor Eight),

---

[10] The Secretary again gets the law wrong by arguing that minority underrepresentation should be measured against the pool of candidates, as opposed to the total percentage of the population. *See*

HB 25 proponents' complete failure to discuss the law with minority leaders, AC ¶ 41, and refusal to consider amendments that would have mitigated the law's impact on minorities, *id.* ¶¶ 40, 45, indicate a clear lack of responsiveness. *Veasey*, 830 F.3d at 261-62 (holding the same). Finally, HB 25 is tenuously related to its goals (Factor Nine) because it does not further any of the interests discussed above. *Supra* Section IV.B.

Nothing in *Veasey* or any applicable case law supports the Secretary's claim that Plaintiffs must show HB 25 will actually prevent minority voters from electing candidates of their choice. Mot. at 28. The Secretary draws this groundless theory from vote-dilution case law, *id.* (quoting *Gingles*, 478 U.S. 47), which governs claims challenging laws that, while not impeding voters' ability to cast votes, "operate to minimize or cancel out the voting strength of racial minorities." *Westwego Citizens*, 946 F.2d at 1120 (quoting *Gingles*, 478 U.S. at 47)). Here, Plaintiffs do not assert a vote-dilution claim; they allege that HB 25 will *abridge and deny* minority voters' ability to cast votes. As *Veasey* explains, such claims entail a different test than that governing vote-dilution claims, and do not require any showing of prior or hypothetical electoral success. 830 F.3d at 243-44. Moreover, the Secretary's theory is preposterous: if it were correct, Section 2 would allow Texas to completely prohibit minorities from voting so long as those voters were previously unable to elect their candidates of choice.

Finally, the Secretary's and *amicus*' argument that *Veasey*'s two-step test endangers Section 2's constitutionality, Mot. at 30; ECF No. 42-2 at 2-5, is foreclosed by *Veasey* itself. There, the court rejected the argument that its two-step test would "make Section 2 'invalid as no longer

---

*Veasey*, 830 F.3d at 261 (agreeing minorities are underrepresented in Texas offices because "African Americans comprise 13.3% of *the population* in Texas, but only 1.7% of all Texas elected officials are African American," and "Hispanics comprise 30.3% of *the population* but hold only 7.1% of all elected positions" (emphases added)).

congruent and proportional to the Fifteenth Amendment.'" *Veasey*, 830 F.3d at 253. Calling this argument "short sighted," the court explained that the "history and text of the Fifteenth Amendment" make clear that Congress can prohibit laws that disproportionately abridge minority voters' franchise rights, regardless of intent. *Id.* In particular, "[a]pplication of the" Senate Factors "determines whether any such abridgement is linked to social and historical conditions of discrimination such that the abridgement has occurred 'on account of race.'" *Id.* (quoting U.S. Const. amend. XV and 52 U.S.C. § 10301(a)). Thus, *Veasey*'s two-step test ensures "that Section 2's protections remain closely tied to the power granted Congress by the Fifteenth Amendment." *Id.*; *see also id.* at 253 n.47 (collecting decisions in which the Fifth Circuit "and many others have upheld the constitutionality of the Section 2 results test").

### B.     Plaintiffs can challenge HB 25 under Section 2.

#### 1.     HB 25 falls squarely within Section 2's protections.

The VRA's plain language makes clear that a voting "procedure" like STV—*i.e.*, how a voter choose candidates on their ballot—is subject to Section 2's protections. 52 U.S.C. § 10301(a). Under the VRA, "voting" is defined in part as "casting a ballot." *Id.* § 10310(c)(1). And the federal regulations accompanying Section 5 of the Voting Rights Act, which Defendant selectively cites, make clear that "a voting standard, practice, or procedure" is one that affects "balloting." 28 C.F.R. § 51.13(b). STV is clearly a method of casting a ballot and balloting. Whether Texas voters have the option to use STV when casting their ballots thus implicates Section 2.

In the only other case where a Section 2 challenge was raised in relation to a state's repeal of STV, the Sixth Circuit consistently referred to STV as a "voting practice." *Mich. State*, 833 F.3d at 665. Courts have also applied Section 2 to other balloting methods similar to STV. For example, in *Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003), the

Ninth Circuit evaluated whether California's use of punch-card ballots violated Section 2. This voting method, much like the option to vote straight ticket, was a procedure by which voters would cast their ballots and was thus appropriately the subject of a Section 2 challenge. *See also Stewart v. Blackwell*, 444 F.3d 843, 851 (6th Cir. 2006).

The Secretary's appeal to *Lucas v. Townsend*, 698 F. Supp. 909 (M.D. Ga. 1988), which was not a Section 2 case, is misplaced. In *Lucas*, the challenged act was not a voting procedure, but rather a substantive decision on whether to submit a bond measure for approval to the electorate and the content of that bond measure—choices Georgia law explicitly left to the discretion of school boards. *Id.* at 912. The court held that a decision to exercise that preexisting discretion and combine into a single bond measure funding that would be allocated to three different purposes does not implicate a "procedure" by which voters cast their ballots. *Id.* That substantive decision was appropriately left to the school board because Georgia law authorized the school board to make that decision. In contrast, the way by which Texans actually cast their ballots is a voting procedure appropriately the subject of a Section 2 challenge.

### 2.      Section 2 provides Plaintiffs a right of action.

There is no question that there is a private right of action to enforce Section 2, and that right extends to organizations like Plaintiffs TDP, DSCC, and DCCC. Suggesting otherwise, the Secretary ignores the VRA's plain text, Congress's clear intent, binding Supreme Court precedent, and every single Section 2 case brought by private individual and organizational plaintiffs. The Department of Justice has filed only four of the 61 actions under § 2 since 2013. *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 649 n.2 (11th Cir. 2020) (citing U.S. Civil Rights Commission, An Assessment of Minority Voting Rights Access in the United States 10 (2018)). Each of the other *57 actions* were initiated through a private right of action, even more than a decade after *Alexander v. Sandoval*, 532 U.S. 275 (2001), which the Secretary claims marked a

change in the Supreme Court's approach to evaluating whether a statute provides a private right of action. Ignoring all of this, the Secretary puts forth a theory that has never been accepted by any court in the country.

At the outset, the Secretary mischaracterizes *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996). There, a majority of the Court (not a "minority," as the Secretary claims) agreed Section 2 may be enforced by private plaintiffs. Though *Morse* was not a Section 2 case, it considered the issue of whether there is a private right of action under a sister provision in the VRA. In discussing that question, a majority of the Court concluded Section 2 may be enforced by private plaintiffs. *Id.* at 232 (plurality opinion) (Stevens, J., joined by Ginsburg, J.) ("[T]he existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965. We, in turn, have entertained cases brought by private litigants to enforce §2." (internal quotation marks omitted)); *id.* at 240 (Breyer, J., concurring, joined by O'Connor and Souter, J.J.) (agreeing with plurality's statement regarding private enforcement of Section 2). And as *Morse* recognized, when Congress amended the VRA in 1975, its accompanying Senate Report explained "the purpose of [one of] the change[s] made was to provide the same remedies *to private parties* as had formerly been available to the Attorney General alone." *Morse*, 517 U.S. at 233 (emphasis added); *see* 52 U.S.C. § 10302 (providing remedies under the VRA where "the Attorney General *or an aggrieved person* institutes a proceeding" (emphasis added)).

It is also unquestionable that this private right of action extends to organizations. Section 2 allows suits to be instituted by "aggrieved person[s]," which includes organizations. As the Senate Report accompanying the 1975 amendments to the VRA explained:

> [a]n 'aggrieved person' is any person injured by an act of discrimination. *It may be an individual or an organization* representing the interests of injured persons. In enacting remedial legislation, Congress has regularly established a dual enforcement mechanism. It has, on the one hand, given enforcement responsibility

> to a governmental agency, and on the other, has also provided remedies to private
> persons acting as a class or on their own behalf.

S. Rep. 94-295, 9-10, 1975 U.S.C.C.A.N. 774, 775 (emphasis added); *see also Lopez v. Merced Cty., Cal.*, No. 06-1526, 2008 WL 170696, at \*10-11 (E.D. Cal. Jan. 16, 2008) ("History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested. The 1975 Amendment's use of the term 'aggrieved person' [] cited by the Senate Report, support[s] an expansive interpretation." (citations omitted)).

For exactly these reasons, all other courts that have considered whether organizations may bring Section 2 claims have found that they can. In rejecting the Secretary's argument here, one court explained that "[t]he word 'person' in an act of Congress is presumed to include organizations," that nothing in the VRA "suggest[s] that a cause of action under Section 2 is limited to individuals," and that the legislative history "confirms that Congress intended to confer a right to sue on organizations seeking to protect the voting rights of their members and others." *Frank v. Walker*, 17 F. Supp. 3d 837, 867 (E.D. Wis.), *rev'd on other grounds,* 768 F.3d 744 (7th Cir. 2014). The court in *One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 968 (W.D. Wis. 2016), reached the same conclusion, finding organizations "qualify as 'aggrieved persons'" under Section 2 and thus "can therefore assert claims." *See also Democratic Nat'l Comm. v. Az. Sec'y of State's Office*, No. CV-16-01065-PHX-DLR, 2017 WL 3149914, at \*4 (D. Ariz. July 25, 2017) ("Political parties and other civic organizations often are plaintiffs in constitutional and [VRA] litigation challenging state election laws and procedures."). The Supreme Court has also consistently and repeatedly heard Section 2 suits filed by private organizations. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399 (2006); *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015).

In addition to ignoring the *One Wisconsin* and *Frank* decisions, the Secretary fails to

mention that another court in this District rejected this exact theory. *Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014). There, the court found that "[o]rganizations and private parties have been permitted to enforce Section 2 of the VRA, both before and after the 2001 *Alexander* case on which Defendants rely," *id.*, and on which the Secretary again relies here, Mot. at 30-31. As is the case here, the court observed that "[d]efendants have failed to supply any case in which organizations . . . were denied standing to bring a Section 2 challenge," and catalogued a list of federal decisions in which organizations "ha[d] been permitted to enforce Section 2 of the VRA." *Veasey*, 29 F. Supp. 3d at 906-07. This Court should not be the first in history to accept the Secretary's unfounded theory.[11]

## VI.   Plaintiffs plausibly allege that HB 25 was intended to impede minority political participation.

The circumstances surrounding HB 25's enactment demonstrate that its purpose was to combat increasing African American and Hispanic electoral strength. In seeking to dismiss this claim, the Secretary offers an incorrect legal standard. Mot. at 33. It is Plaintiffs' burden to demonstrate only that limiting minority electoral strength was a "substantial" or "motivating" factor behind HB 25. *Veasey*, 830 F.3d at 231. This intent "need only be one purpose" behind HB 25, "and not even a primary purpose." *Id.* at 230. Once Plaintiffs make that showing, the evidentiary burden "shifts to the [Secretary] to demonstrate that the law would have been enacted without this factor." *Id.* at 231 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

The Complaint offers detailed allegations supporting each of the factors relevant to determining whether discriminatory intent motivated HB 25. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977); Pls.' PI Mot. at 24-33. First, as already

---

[11] In any case, Plaintiff Ms. Bruni is a resident of Laredo Texas, and a Hispanic voter who in the past has relied on straight ticket voting. Thus, even under the State's consistently rejected theory, she may bring this claim.

explained, HB 25's burdens will "bear[] more heavily on one race [and ethnicity] than another." *Arlington Heights*, 429 U.S. at 266; *see supra* Section IV.A. Next, the "sequence of events" leading to HB 25's passage, *Arlington Heights*, 429 U.S. at 267, demonstrates that eliminating STV became a priority for the Legislature only when it was clear that doing so would impose politically expedient burdens on African Americans and Hispanic voters. As the Secretary herself admits, the Texas Legislature consistently rejected efforts to eliminate STV prior to 2017. Mot. at 3. But in 2017, the Legislature decided instead that eliminating STV was appropriate. What changed? In those intervening years, minority voters, who overwhelmingly skew Democrat, increased in electoral strength and began using STV more often than white voters, who overwhelmingly skew Republican. AC ¶ 49; *see also* Pls.' PI Mot. at 26-28. HB 25's proponents, who "faced a declining voter base[,] stood to gain partisan advantage by suppressing the . . . votes of African-Americans and Latinos" by eliminating STV. *Veasey*, 830 F.3d at 241 n.30.[12]

This strategy aligns with HB 25's "historical background," *Arlington Heights*, 429 U.S. at 267, which consists of Texas's repeated attempts to handicap "increased voting power by emerging demographic groups." *Perez v. Abbott*, 253 F. Supp. 3d 864, 959 (W.D. Tex. 2017); *Veasey*, 830 F.3d at 241 n.30; *LULAC*, 548 U.S. at 439-40. Indeed, during HB 25's debate, the bill's author stated he was too "busy" to familiarize himself with decisions issued in the prior three months finding Texas had intentionally discriminated against minority voters on three separate occasions. AC ¶ 40.

---

[12] That partisanship played a role in these considerations does not mitigate their racially and ethnically discriminatory nature: "[i]ntentions to achieve partisan gain and to racially discriminate are not mutually exclusive." *Id.* While "[u]sing race as a proxy for party may be an effective way to win an election," "intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 222 (4th Cir. 2016).

HB 25's proponents' steadfast refusal to examine the law's disparate effect, as well as their blanket rejection of any amendment that would have ameliorated its disparate burdens—even in the face of repeated warnings of the law's racial and ethnic effects—also indicate those burdens were the reason the law was passed. *Veasey*, 830 F.3d at 263-37 (explaining that strikingly similar behavior during Texas's enactment of its voter ID law supported a conclusion of discriminatory intent). Time and again, HB 25's proponents were told that the law would have disparate effects on minority voters. AC ¶¶ 39-47. HB 25's proponents flatly denied this fact, but at the same time admitted they were unaware of anything actually disputing these concerns. *Id.* ¶ 40.

HB 25's passage also involved significant procedural and substantive deviations. *Veasey*, 830 F.3d at 231; *see also* Pls.' PI Mot. at 31-32. The bill received just two public hearings. AC ¶ 38. In the House, the bill's author deviated from the normal approach of taking positions on proposed amendments. *Id.* ¶ 39. In the Senate, HB 25 was considered in a committee unaccustomed to reviewing election-law bills. *Id.* ¶ 38. While the Secretary suggests that these deviations were justified given that HB 25 was a "high-priority bill" that was expected to be "challenge[d] . . . in court," Mot. at 35-36, one would expect the exact opposite: if legislators were concerned about the law's ability to withstand judicial review, they should have fully vetted the law, rather than pushing it through to avoid rigorous consideration. And by eliminating a practice that has been a part of Texas's elections for a century, HB 25 is a significant substantive deviation. AC ¶ 26.

The Secretary is wrong to suggest that because eliminating STV will also harm a substantial yet significantly smaller portion of white voters, it cannot have a disproportionate impact on minority voters. Mot. at 34. As explained, HB 25 will disproportionately harm minority voters not only because they utilize STV at a significantly higher rate, but also because they

disproportionately live in more densely populated areas where the increase in lines will be greatest and their lower average socioeconomic status amplifies the burdens that long lines otherwise normally impose on voters. Minority voters will also experience greater roll-off as a result of HB 25. The Secretary's citations thus have no application here, where the burdens that minority voters will face as a result of HB 25 will be more *severe* than the burdens faced by white voters.[13]

Because Plaintiffs plausibly allege that a substantial and motivating factor behind HB 25's enactment was an attempt to limit minority political participation, the burden shifts to the Secretary to prove the law would have been passed absent this purpose. Aside from the fact that the Secretary cannot attempt to resolve this issue on a motion to dismiss, Plaintiffs have already explained that the justifications the Secretary offers for HB 25 were clear pretext. *Supra* Section IV.B. As a result, Plaintiffs plausibly allege that HB 25 violates the Fourteenth and Fifteenth Amendments.

## VII.    Plaintiffs plausibly allege that HB 25 is the product of unconstitutional viewpoint discrimination.

As just explained, HB 25's proponents wished to impose burdens on minority voters. They did so because, in Texas, African American and Hispanic voters overwhelmingly support the Democratic party. AC ¶¶ 64, 117-18. In addition to constituting unlawful race discrimination, this conduct also squarely violates the First Amendment. A State may not impede the franchise rights of "a sector of the population because of the way they may vote." *Carrington v. Rash*, 380 U.S. 89, 94 (1965).

The analysis governing this claim follows the *Arlington Heights* invidious-motive

---

[13] The Secretary's reliance on a sentence in a nearly 30-year-old dissent opining on the effect of straight-ticket voting in that specific case, Mot. at 35 (citing *LULAC Council No. 4434 v. Clements*, 999 F.2d 831, 912 (5th Cir. 1993) (King, J., dissenting)), has no relevance to Plaintiffs' allegations here. But if anything, Judge King's point supports Plaintiffs' position in that the Legislature was unconcerned about STV's effects so long as it "reinforce[d] minority voters' unequal access to the political process," *LULAC*, 999 F.2d at 912 (King J., dissenting), and waited to eliminate STV only when doing so would limit minority electoral power.

framework just discussed, not *Anderson-Burdick*. Burdening individuals because of their political views is an invidious form of discrimination that strikes at the heart of the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995). Such discrimination is inconsistent with the *Anderson-Burdick* balancing test, which is reserved for "reasonable, *nondiscriminatory* restrictions upon the First and Fourteenth Amendment rights of voters." *TDP*, 84 F.3d at 182 (emphasis added). "When there is a proof that a discriminatory purpose has been a motivating factor in the [State's] decision," the "judicial deference" that *Anderson-Burdick* is meant to provide States "is no longer justified." *Arlington Heights*, 429 U.S. at 265-66. As a result, *Arlington Heights*' analysis, which guides the determination of "whether invidious discriminatory purpose was a motivating factor," applies to this claim. *Id.* at 266. [14]

As just explained, *supra* Section VI, the *Arlington Heights* analysis makes clear that HB 25's substantial and motivating purpose was to limit the electoral participation of minority voters because of their political views. Without this invidious purpose, there was no reason to eliminate STV because doing so would not have furthered any of the government interests the Secretary identifies. *Supra* Section IV.B. As a result, HB separately violates the First Amendment.

The Court should reject the Secretary's attempt to expand the Supreme Court's decision in *Rucho* beyond its logical bounds. Mot. at 37 (citing *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)). A federal court recently rejected this exact argument—*i.e.*, that *Rucho* renders challenges to ballot-design choices political questions—calling it "[h]ogwash." *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1257 (N.D. Fla. 2019), *vacated on other grounds*, 2020 WL 2049076 (11th Cir. Apr. 29, 2020). *Rucho* held that partisan gerrymandering claims present political questions; it did not hold that federal courts lack jurisdiction to hear election-related claims relating to politics. Partisan

---

[14] But even if *Anderson-Burdick* governs this claim, HB 25 is unconstitutional. *Supra* Section IV.

gerrymandering claims are unlike those that can "be decided under basic equal protection principles," such as the *Arlington Heights* standard. *Id.* at 2496. The Court explained that "[p]artisan gerrymandering claims have proved far more difficult to adjudicate" because "a jurisdiction may engage in constitutional partisan gerrymandering." *Id.* at 2497. But in no instance is it constitutionally permissible for a State to punish voters because of their political views: "partisan gain can never justify a legislative enactment that burdens the right to vote." *One Wis. Inst.*, 198 F. Supp. 3d at 929. Thus, the mere fact that "political entities" may choose a State's ballot design, Mot. at 37, does not preclude federal courts from enjoining the abuse of such power to violate constitutional rights. "The legislative power is not a Midas touch that gilds a matter on contact and insulates it from judicial review, and a decision does not become a political question merely because it is made by a political branch of government." *Jacobson*, 411 F. Supp. 3d at 1257-58.

## VIII. The Secretary's equitable defenses fail.

As a matter of law, laches cannot be applied in this case, which seeks prospective relief against future constitutional and statutory violations. "[L]aches may not be used as a shield for future, independent violations of the law" because "[t]he concept of undue prejudice, an essential element in a defense of laches, is normally inapplicable when the relief is prospective." *Env't'l Def. Fund v. Marsh*, 651 F.2d 983, 1005 n.32 (5th Cir. 1981); *see also Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1321 (11th Cir. 2008) (laches "bar[s] only . . . retrospective damages, not [] prospective relief"). The Secretary cites no authority to the contrary.

Even ignoring this controlling law, the Secretary has not satisfied her burden of proving any element required for a laches defense: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted. *Law*, 578 F.2d at 101. Because the only prejudice relevant to this inquiry is that

occurring to the *Secretary*, *id.*, her references to potential prejudice to *other* actors in Texas politics, Mot. at 38, offers her laches argument no support. And to the extent the Secretary vaguely complains that defending multiple voting rights lawsuits "taxes public resources and creates inefficiencies," Mot. at 38, that is simply not enough to prove laches. *Matter of Bohart*, 743 F.2d 313, 327 (5th Cir. 1984) (requiring defendant to show prejudice "causes a disadvantage in asserting and establishing a claimed right or defense"). The costs of defending a lawsuit is not prejudice for purposes of laches. *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 808 (8th Cir. 1979) ("[W]e reject the contention that the cost of litigation . . . by itself could constitute prejudice within the contemplation of a laches defense."). The Secretary also fails to explain either why these "inefficiencies" are so severe that this case should be dismissed outright, or how they would have been different had this suit been brought at a different time. That the Secretary must defend multiple voting rights suits is an unfortunate product of the number of laws Texas has promulgated violating its citizens' voting rights.

Nor has the Secretary demonstrated any alleged delay was unjustified. While HB 25 was passed in 2017, it is not set to take effect until the November 2020 election. AC ¶ 7. After HB 25 was passed, it was unclear whether the Secretary would provide counties funding to mitigate the law's expected harms. Plaintiffs filed this suit soon after the Secretary made clear that she would provide nothing to protect voters from HB 25's burdens. *Id.* ¶ 46. Furthermore, Plaintiffs filed as soon as the Democratic candidates were selected on March 3, 2020, which confirmed the identities of Organizational Plaintiffs' candidates on the ballot in November.

At the very least, this issue is inappropriate for a motion to dismiss. Because laches "is fact-dependent[,] . . . courts generally do not prevent a plaintiff from proceeding with his claims when very little factual information is available." *Crittendon*, 347 F. Supp. 3d at 1339. The Court

should not dismiss Plaintiffs' claims simply because of bald assertions made by the Secretary.

The Secretary's second affirmative defense, that the unclean hands doctrine bars TDP's claims, has no basis in law or fact. Mot. at 39-40. The unclean hands doctrine cannot apply in a case, such as this, that seeks the vindication of fundamental rights. Even the cases on which the Secretary relies, which involve inapposite areas of law, recognize that the "public interest" determines whether application of the unclean-hands doctrine is appropriate. *Id.* at 39 (quoting *United States v. Perez-Torres*, 15 F.3d 403, 407 (5th Cir. 1994)). The vindication of constitutional rights is "always in the public interest." *O'Donnell v. Harris Cty.*, 260 F. Supp. 3d 810, 821 (S.D. Tex. 2017). This is particularly so when, as here, a case seeks to protect the "fundamental right to vote," which "is one of the cornerstones of our democratic society," and the "threatened deprivation of which . . . can never be tolerated." *Murphree v. Winter*, 589 F. Supp. 374, 382 (S.D. Miss. 1984). Indeed, the Supreme Court has "often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 654 n.21 (1985). Because this suit serves the public interest, the unclean-hands doctrine is clearly inapplicable.

Even if this doctrine could apply, the Secretary cannot meet her burden. To assert this defense, the Secretary must prove at least (1) "a direct relationship" between the "inequitable conduct" and "the proceeding in which the doctrine is invoked," and (2) that the Secretary "has personally been injured by the plaintiff's conduct." *BP*, 941 F.3d at 812; *see also Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 451 (11th Cir. 1993). Other than pointing to TDP's role in Texas' white primary system prior to 1944, Mot. at 39, the Secretary offers nothing suggesting there is a "direct relationship" between any conduct by TDP and Plaintiffs' challenge to HB 25 today. And the Secretary does not, and cannot, argue she "has personally been injured"

by TDP.

As a final matter, the Secretary's argument simply makes no sense. Those who control political parties change over time. This is particularly so in Texas, where the Democratic Party's embrace of civil rights protections for racial and ethnic minorities transformed the State's partisan alignment and caused white Democrats who opposed such protections to abandon the party. After this shift, Texas continued to engage in racial and ethnic discrimination. *Veasey*, 830 F.3d at 239-40. Even in the last decade, multiple federal courts have found Texas's Republican-controlled government intentionally discriminated against minorities on multiple occasions. *Id.* Today, African American and Hispanic voters overwhelmingly support the Democratic Party. AC ¶¶ 11, 64. It would be absurd to deny those voters injunctive relief against unlawful and unconstitutional State action today because of prior actions of individuals with ideologically opposite views about civil rights. Although the Democratic Party has in recent decades championed civil rights, given the sordid racial history of the major political parties in this State, the Secretary's argument would prevent both from vindicating the rights of their members and constituents—irrespective of state action violating their fundamental right to vote. Indeed, most of the arguments advanced in the Secretary's Motion would render the judiciary powerless to enforce voting rights, which are "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). It is for good reason that, time and again, courts around the country have rejected these arguments.

## CONCLUSION

The Court should deny Defendant's motions to dismiss and transfer venue.

May 1, 2020

Respectfully submitted,

/s/ *Skyler M. Howton*

Chad W. Dunn, TX# 24036507
Brazil & Dunn, LLP
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

Skyler M. Howton
Attorney-in-Charge
TX# 24077907
SDTX#2395101
PERKINS COIE LLP
500 North Akard St., Suite 3300
Dallas, TX 75201-3347
Telephone: (214) 965-7700
Facsimile: (214) 965-7799
SHowton@perkinscoie.com

*Counsel for Plaintiff Texas Democratic Party*

Marc E. Elias*
Bruce V. Spiva*
Lalitha D. Madduri*
Daniel C. Osher*
Emily R. Brailey*
Stephanie I. Command*
MElias@perkinscoie.com
BSpiva@perkinscoie.com
LMadduri@perkinscoie.com
DOsher@perkinscoie.com
EBrailey@perkinscoie.com
SCommand@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

*Counsel for All Plaintiffs*

*Admitted Pro Hac Vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 1, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Skyler M. Howton* _____
Skyler M. Howton