United States District Court
Southern District of Texas
**ENTERED**
June 24, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| SYLVIA BRUNI, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 5:20-CV-35 |
| | § | |
| RUTH HUGHS, *in her official* | § | |
| *capacity as the Texas Secretary* | § | |
| *of State*, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Plaintiffs filed this lawsuit premised on their predicted effects of a forthcoming Texas elections law, which they claim will cause a series of events at polling-places, ultimately resulting in their injuries. Namely, Plaintiffs challenge House Bill 25 (HB 25), which the Texas Legislature passed in 2017 and which will take effect in September 2020. The Bill will remove from the Texas Elections Code the option for Texans to cast their ballots in partisan races using a "straight-ticket vote." According to Plaintiffs, the enforcement of HB 25 will cause longer lines at polling-places, increased roll-off at polling-places, voter confusion at polling-places, and less turnout from Democratic-party voters at polling-places. Plaintiffs claim that the combination of these predicted effects will cause them to suffer several injuries.

Defendant, Texas Secretary of State Ruth Hughes, has filed a Motion to Dismiss (Dkt. No. 32) which argues, among other things, that Plaintiffs lack standing. "Standing" is a requirement to sue rooted in Article III of the United States Constitution, which ensures that federal courts confine themselves to their "constitutionality limited role of adjudicating actual and concrete disputes" *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018). Federal courts enforce Article III standing by requiring that a plaintiff satisfy a three-part

O

test, including that she suffered an injury-in-fact. *Gil v. Whitford*, 138 S.Ct. 1916, 1929 (2018). A threat of future injury may satisfy Article III provided the injury is "certainly impending." *Clapper v. Amnesty Intern USA*, 568 U.S. 398, 409 (2013). This action calls the Court to decide whether Plaintiffs' injuries satisfy that constitutionally mandated standard.

The Court has carefully reviewed the parties' arguments, the record, and the applicable law. Having found that Plaintiffs' injuries rest on numerous suppositions that are uncertain to occur and that the occurrence of Plaintiffs' injuries depends on decisions of third parties who are not before the Court, the Court finds that Plaintiffs' injuries are not certainly impending and fail to satisfy Article III. Thus, the Secretary's Motion to Dismiss (Dkt. No. 32) is hereby **GRANTED**, and this action is **DISISSED WITHOUT PREJUDUICE**.

## I.    Background

As it stands, the Texas Election Code allows Texans to cast their ballots in statewide elections by "casting a straight-party vote," a practice known as "straight-ticket voting." TEX. ELEC. CODE. § 62.011. Straight-ticket voting "allows a voter to vote for all candidates of their desired political party by making a single mark designating the selection of that political party, rather than voting for each partisan candidate individually." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 660 (6th Cir. 2016). In 2017, the Texas Legislature passed HB 25, which will eliminate from the Texas Elections Code the option for Texans to cast a straight-ticket vote in partisan races. *See* 2017 Tex. Sess. Law Serv. Ch. 404.[1] Although the Legislature passed HB 25 in 2017, the Bill takes effect in September 2020. *Id.*

There are five Plaintiffs in this case: (1) Sylvia Bruni, an elected official for the Webb County Democratic Party, (2) the Democratic Senatorial Campaign Committee, (3) the Democratic Congressional Campaign Committee, (4) the Texas Democratic Party, and (5)

---

[1] HB 25 is codified in TEX. ELEC. CODE § 31.012.

O

Jessica Tiedt, a candidate for District 20 of the Texas House of Representatives (Dkt. No. 16). Plaintiffs allege that the enforcement of HB 25 will violate the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act (*id.*). They filed this lawsuit under 42 U.S.C. §§ 1983 and 1988 against the sole Defendant, Texas Secretary of State Ruth Hughes, who is tasked with adopting rules for the elimination of straight-ticket voting. *See* 2017 Tex. Sess. Law Serv. Ch. 404. Ultimately, Plaintiffs seek an injunction to stop HB 25 from taking effect and a declaration that the Bill violates the above-named provisions of the Constitution and Voting Rights Act (Dkt. No. 16).

Plaintiffs make nine discrete factual allegations in their complaint, which, at this stage of the litigation, the Court must presume are true. *Stratta v. Roe*, No. 18-50994, 2020 WL 2781642, at *3 (5th Cir. May 29, 2020). Plaintiffs reason that, when read together, these allegations compel an inference that they have sustained an injury in fact. First, they allege that Texans currently endure long lines when casting votes at polling-place locations (Dkt. No. 16 at 12). They have detailed several studies and articles to support this allegation (*id.*).

Second, Plaintiffs allege that long lines disparately impact minorities who "overwhelmingly" support the Democratic Party (*id.* at 4, 24). They reason that minorities are more likely to "(1) live in poverty, (2) have less flexible job schedules, (3) lack access to transportation, and (4) lack access to child care assistance," which causes them to "leave polling-place lines" and avoid "attempting to vote" altogether (*id.* at 15). In short, Plaintiffs allege that minorities "have less ability to withstand long-polling place lines" (*id.* at 24).

Third, Plaintiffs allege that ballots in Texas elections are generally lengthy, labeling them as "some of the longest ballots in the country" (*id.* at 11). And they specifically allege that in Texas's "most populous counties, voters are sometimes faced with the task of making decisions in over 80 races or referendum questions" all on a single ballot (*id.*).

O

Fourth, Plaintiffs allege that long lines and ballots increase voter fatigue and roll-off (*id.* at 12). Roll off occurs "when a voter casts a ballot but fails to make a selection in all entries on that ballot" (*id.*). Plaintiffs contend that many voters engage in roll-off due to the lengthy ballots in Texas races and the lengthy waits that voters are subject to when casting their ballots. They add that roll-off "occurs most commonly" amongst minorities given they have, "on average, lower educational attainment [as] compared to white Texans" (*id.* at 25).

Fifth, Plaintiffs allege that straight-ticket voting combats long lines and roll-off (*id.* at 12). They reason that straight-ticket voting "reduces voting time and minimizes wait times at polling places," and reduces roll-off by "reducing the number of separate races in which a voter must select a candidate" (*id.* at 2, 12). Stated differently, Plaintiffs reason that straight-ticket voting helps prevent long lines and increase the speed at which citizens cast their votes by permitting them to do so for all races on a given ballot with a single punch.

Sixth, Plaintiffs allege that the elimination of straight-ticket voting will significantly increase the length of lines at polling places and increase roll-off at polling-places. Plaintiffs cite a state legislator who summarizes their position on this point:

> [L]ong waits at polling places already are huge problems in some parts of Texas, especially in urban areas where many voters line-up to vote for many races on the ballot. On the first day of early voting for the November 2016 election, for example, long waits—sometimes hours—were reported in Bexar, Harris, Nueces, and Denton counties. Lines and ballot fatigue can exhaust voters' patience, and eliminating the straight-party option would only make things worse and cause many either to skip down-ballot races altogether or not go to the polls at all. The effect would be to suppress voting and voter turnout.

(Dkt, No. 16 at 18) (citing Tex. S.J., 85th Leg., Reg. Sess., Sen. Zaffirini (May 18, 2017)).

Seventh, Plaintiffs allege that the elimination of straight-ticket voting will cause voter confusion (Dkt. No. 16 at 25).  Plaintiffs reason that voters "who have relied on [the straight-ticket voting practice] for decades will now be forced to navigate a system with which they are unfamiliar," which "will disparately impact minority voters" who "on average have lower

O

educational attainments as a result of historical discrimination" (*id.*).

Seventh, Plaintiffs allege that their predicted "effects" of HB 25—longer lines at polling-places, increased roll-off at polling-places, and voter confusion at polling-places—will significantly burden Texans' right to vote (*id.* at 23, 26). Specifically, Plaintiffs reason that, given Texas's "existing problem of long polling-place lines," the elimination of straight-ticket voting will "exponentially increase" the time that Texans will wait to cast their ballots at polling-places, which will cause "a substantial amount of additional voters [to] leave polling-place lines without voting" (*id.*). For the same reason, Plaintiffs allege that the predicted effects of HB 25 will disproportionately burden voters who support the Democratic Party, including minorities, which will "in turn" cause Democratic candidates, including Tiedt and others, to lose votes at polling-places that would have otherwise been cast for them (*id.*).

Finally, Plaintiffs allege that they will be injured by the predicted effects of HB 25 because they will need to "divert and expend additional time and resources in voter education and turnout" (*id.* at 7–10). Plaintiffs further allege that the predicted effects will decrease the electoral prospects of Tiedt and other candidates whom they support and represent, and that HB 25 will prevent members, volunteers, and constituents of the organization-Plaintiffs from exercising their "associational rights to band together and elect candidates of their choice" (*id.*). Tiedt, a "down-ballot candidate," also alleges that increased roll-off will deprive her of votes given her position at the bottom of Texas ballots (*id.* at 11).

Secretary Hughes moves to dismiss this case under Federal Rules of Civil Procedure 12(b)(1) and (6) or, in the alternative, to transfer the case to the Western District of Texas under Federal Rule of Civil Procedure 12(b)(3) (Dkt. No. 32).[2] Amongst other arguments, the

---

[2] Plaintiffs have filed three similar cases in the Western District of Texas, although none of those cases are predicated on the effects of a forthcoming Bill. *See Tex. Democratic Party, et al. v. Hughes*, No. 1:19-cv-1071-LY, Dkt. No. 1 (W.D. Tex. 2019) (Plaintiffs challenging the "systemic advantage of the Ballot Order Statute" which is currently codified in the Texas Elections Code and

O

Secretary argues that Plaintiffs lack Article III standing (*id.* at 43). Plaintiffs filed a Response (Dkt. No. 47), and Defendant filed a Reply (Dkt. No. 52). With the Court's leave, the Honest Elections Project filed an Amicus Brief in Support of Defendant's Motion (Dkt. No. 42).

## II.   Applicable Law

A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject-matter jurisdiction. Where, as here, a defendant lodges a "facial attack" under Rule 12(b)(1), the Court only examines the "sufficiency of the allegations in the complaint because they are presumed to be true." *Houston Home Dialysis v. Blue Cross and Blue Shield of Tex.*, No. H-17-2095, 2018 WL 5249996, at *4 (S.D. Tex. Oct. 22, 2018) (citation omitted); *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018). "This analysis is generally confined to review of the complaint and its proper attachments," *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008), and the complaint will stand "if the jurisdictional allegations are sufficient." *Houston Home Dialysis*, 2018 WL 5249996, at *4.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. ART. III, § 2. One element of the case-or-controversy requirement "is that plaintiffs must establish that they have standing to sue." *Peters v. St. Joseph Servs. Corp.,* 74 F. Supp. 3d 847, 854 (S.D. Tex. 2015). Standing is a question of subject-matter jurisdiction. *Norris v. Causey*, 869 F.3d 360, 366 (5th Cir. 2017). The party invoking jurisdiction bears the burden to establish Article III standing. *Rancho Viejo Waste Mgmt. LLC v. City of Laredo*, 364 F. Supp. 3d 698, 701 (S.D. Tex. 2019) (Marmolejo, J.).

---

which was enacted in 1963); *Tex. Democratic Party, et al. v. Hughes*, No. 1:19-CV-1063-LY, Dkt. No. 1 (W.D. Tex. 2019) (Plaintiffs challenging House Bill 1888 after the Bill went into effect); *Tex. Democratic Party v. Hughes*, No. 5:20-CV-8-OLG, Dkt. No. 12 (W.D. Tex. 2020) (Plaintiffs challenging the Texas Secretary of State's rejection of voter registration applications because they lacked an "original, wet signature"). In any event, the Court must address Defendant's standing argument in this case before it addresses any other challenge, including a 12(b)(3) motion to transfer venue. *Founders Ins. v. Chmielewski*, No. H-15-2866, 2016 WL 10731712, at *2 (S.D. Tex. May 4, 2016) (citation omitted)).

O

To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1640, 1547 (2016).[3] General factual allegations of an injury caused by the defendant may be sufficient, for on a motion to dismiss "[the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). However, "it is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. Dallas*, U.S. 215, 231 (1990). Instead, a plaintiff must allege facts that are "essential to show jurisdiction." *Id.*[4]

## III.   Analysis

All of Plaintiffs' alleged injuries hinge on the occurrence of their five predicted "effects" of HB 25: (1) increased lines at polling places, (2) increased roll-off at polling places, (3) increased voter confusion at polling places, (4) reduced Democratic-party turnout at polling places, either because Democratic-party voters will leave polling-place lines or fail to show up all together, and (5) due to these predicted effects, fewer votes at polling-places for Democratic-party candidates, including for Tiedt and other candidates whom Plaintiffs support. Plaintiffs allege that these predictions will cause them to sustain their injuries.

To satisfy Article III standing, a plaintiff's injury must be "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 398 (2013). A threat of future injury "must be certainly impending to constitute injury in fact, and allegations of possible future injury are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149,

---

[3] Organizational plaintiffs must also satisfy these elements. *Greater New Orleans Fair Housing Action Ctr. v. Kelly*, 364 F. Supp. 3d 635, 646 (E.D. La. 2019) (citation omitted)

[4] A plaintiff seeking injunctive or declaratory relief must also satisfy this standard. *Waller v. Hanlon*, 922 F.3d 590, 603 (5th Cir. 2019); *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019).

O

158 (1990)). The Supreme Court has made clear that while this imminence requirement is "a somewhat elastic concept," it "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly impending.*'" *Lujan*, 504 U.S. at 564 n.2 (emphasis in original). This requirement is "stretched beyond breaking point" where a plaintiff alleges "an injury at some indefinite future time, and the acts necessary to make the injury happen are" partly in the plaintiff's control. *Id.*

A plaintiff's injury "that would result from a chain of events does not always preclude standing," but "at times, a chain of events can be too remote to support a claim of standing." *Abulawa v. U.S. Dep't of Treas.*, No. 15-2186 (RDM), 2017 WL 2465045, at *2 (D.D.C. June 7, 2017); *see Trinity Indus. v. Martin*, 963 F.2d 795, 799 (5th Cir. 1992) ("The possibility, that maybe, in the future, if a series of events occur, [plaintiff] might suffer some injury, is clearly too impalpable to satisfy the requirements of Article III." (citation omitted)). To that end, an injury based on a "likely and credible chain of events" must still be "certainly impending." *Prestage Farms. v. Board of Sup'rs of Noxubee Cty., Miss.*, 205 F.3d 265, 268 (5th Cir. 2000). And although a change in a plaintiff's "campaign plans or strategies in response to an allegedly injurious law" can itself confer an injury-in-fact, "the change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir. 2018). At the pleading stage, when considering "any chain of allegations for standing purposes," the Court may "reject as overly speculative those links which are predictions of future events." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015); *see Ineos USA v. Fed. Energy Reg. Comm.*, 940 F.3d 1326, 1329 (D.C. Cir. 2019). "Federal courts consistently deny standing when claimed anticipated injury has not been shown to be more than uncertain potentiality." *Prestage Farms.*, 205 F.3d at 268.

In this case, all of Plaintiffs' alleged injuries fail to satisfy the imminence requirement

O

of Article III because they are premised on numerous predicted "effects" of HB 25 which are uncertain to occur. *Texas v. United States*, 523 U.S. 296, 296 (1998). Namely, Plaintiffs' injuries only *might* occur: *if* the Bill causes longer lines at polling-places; *if* the Bill causes increased roll-off at polling-places; *if* the Bill causes voter confusion at polling-places; *if* these predicted effects cause Democratic-party voters—and not voters of other political affiliations—to leave lines at polling-places or fail to show up at polling-places altogether; *if* these predicted effects cause voters who would have voted for Tiedt or other Democratic-party candidates to engage in roll-off at polling places; and *if* all of these predicted effects—in a compounding fashion—cause Democratic-party candidates, including Tiedt and other candidates whom Plaintiffs support, to lose votes at polling-places that would have otherwise been cast for them. Given the numerous suppositions that must occur before Plaintiffs might suffer any harm, the Court finds that Plaintiffs' injuries are not certainly impending and fail to satisfy Article III. *Texas*, 523 U.S. at 296; *Prestage Farms*, 205 F.3d at 268; *see also Bryant v. Holder*, No. 2:10-CV-76-KS-MTP, 2011 WL 710693, at *11 (S.D. Tex. Feb. 3, 2011).[5]

Furthermore, the cases that Plaintiffs rely on are unconvincing because they do not address the salient issue, the imminence—or lack thereof—of a plaintiff's injury. Although the plaintiff in *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) alleged that its injury was the "additional time and effort spent explaining" the effects of a challenged election statute to those whom the statute affected, the plaintiff had—at the start of the

---

[5] Plaintiffs' allegations about the *current* length of lines at polling-places, length of ballots at polling-places, and frequent roll-off at polling-places are factual allegations which the Court presumes are true, given they are "historical or otherwise demonstrable." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015). But their allegations about the "effects" that HB 25 *will have* at polling places are not demonstrable facts but are instead predictions of future events, which do not enjoy a presumption of truth. *Id*. Nor can the Court *infer* that those predictions will occur based on the factual allegations in Plaintiffs' complaint. *FW/PBS,* U.S. at 231; *see also Freedom Watch, Inc. v. McAleenan*, No. 19-CV-1374, 2020 WL 922909, at *6 (D.C.C. Feb. 26, 2020) ("The deciding court must distinguish allegations of facts, either historical or otherwise demonstrable, from allegations that are really predictions."). Instead, Plaintiffs must allege facts essential to satisfy Article III, which in this case they have not.

O

lawsuit—already expended those efforts, and the state had already enforced the statute. *Id.*

at 609. This case is different: HB 25 has not taken effect, and Plaintiffs' injuries only might

occur if several contingencies come to fruition. *OCA-Greater Houston* is therefore inapposite.

Similarly, *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) is

unpersuasive. There, acting under a provision of the Texas Elections Code, the chairwoman

of the Republican Party declared that another elected official, Tom Delay, was ineligible for

reelection. *Id.* at 585. The Texas Democratic Party (TDP) sued the chairwoman for injunctive

relief, arguing the provision she acted under was unconstitutional. *Id.* On appeal, the Fifth

Circuit found that TDP had sustained two injuries from the chairwoman's actions: (1) the

"additional funds and resources" that it would need to expend to "prepare a new and different

campaign in a short time frame," and (2) the harm to its election prospects that would result

if the Republican Party "were permitted to replace DeLay with a more viable candidate." *Id*.

Yet, the injuries in *Benkiser* were imminent and not premised on numerous

hypothetical scenarios that might occur due to the enforcement of a forthcoming law. The

plaintiff in *Benkiser* challenged an already-enforced statute, and its injuries were the direct

result of the statute's application. In other words, the plaintiff's injuries flowed directly from

the defendant's use of the statute without intermediate events. By contrast, the injuries here

are hypothetical and are not couched as the direct result of HB 25. Rather, Plaintiffs' injuries

hinge on multiple uncertain intermediate predictions. While the injury in *Benkiser* is similar

in form to injuries here—the expenditure of resources and the harm to a plaintiff's electoral

prospects—it is the *imminence* of Plaintiffs' injuries that are at issue in this case, not their

form. And, notably, in response to the Secretary's argument that Plaintiffs' injuries are not

certainly impending (Dkt. No. 32 at 20), Plaintiffs fail to cite *any* caselaw, let alone caselaw

that supports the proposition that an injury may be "certainly impending" for Article III

O

purposes where it hinges on several predicted effects of a forthcoming law (Dkt. No. 47 at 27).

The Court also agrees with the Secretary's argument that Plaintiffs assume "local officials will not use their state-law authority to ameliorate the situation" at polling-places (Dkt. No. 32 at 14). Indeed, as Texas's chief election officer, the Secretary holds "the power to take appropriate action to protect Texans' voting rights from abuse," *Tex. Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *6 (5th Cir. 2020), which includes the ability to "assign to the elections divisions staff any function relating to the administration of elections that is under [the Secretary's] jurisdiction." TEX. ELEC. CODE. 31.001. Thus, the Secretary's ability to direct local officials to alleviate the length of lines at polling-places cuts against the certainty of Plaintiffs' predicted effects of HB 25. And beyond that, HB 25 tasks the Secretary with providing notice on her website that straight ticket voting has been eliminated, including the precise wording of the notice. *See* 2017 Tex. Sess. Law Serv. Ch. 404. The Secretary's ability to provide such notice to all Texans further weakens the chance that HB 25 will cause voters to be confused, ill-equipped, or uneducated about the Bill.

Moreover, significantly amplifying the uncertainty over Plaintiffs' allegations is the nation's current public-health crisis. The United States is experiencing a global pandemic involving the spread of the highly contagious COVID-19 virus which can cause serious illness and sometimes death. As one district court put it, "there is no doubt that the rapidly approaching election date[s] in the midst of the COVID-19 pandemic means that citizens will face serious, and arguably unprecedented, burdens in exercising their right to vote in-person." *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-cv-249-wmc, 278-wmc, 284-wmc, 2020 WL 1638374, at *13 (W.D. Wis. Apr. 2, 2020).[6] As the virus continues to spread, the

---

[6] Some state officials have already taken steps to modify in-person voting at polling-places. For instance, Texas Governor Greg Abbott postponed the May 2020 primary runoff election, doubled the "period for early voting by personal appearance," and directed officials to issue guidance on social distancing and other precautionary measures. *Tex. Democratic Party*, 2020 WL 2982937, at *1 (5th

pandemic is projected to transform in-person voting at polling-places *regardless* of HB 25's enforcement. Considering the pandemic has already caused long lines at polling-places,[7] many Texans will endure longer lines at polling-places indefinitely, irrespective of any order issued by this Court. And other Texans will experience *shorter* lines given that voters have been encouraged to steer clear from in-person voting where possible.[8] All things considered,

---

Cir. 2020) (noting that, in response to the pandemic, "[l]ocal officials are working tirelessly to shape their responses to changing facts on the ground" (cleaned up)). And before that, New Yok *cancelled* its 2020 Democratic presidential primary. *Yang v. Kosinski*, 960 F.3d 119, 119 (2d. Cir. 2020); *see* Corasaniti and Saul, *16 States Have Postponed Primaries During the Pandemic. Here's a List*, THE NEW YORK TIMES, available at, https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html (May. 27, 2020).

[7] *See* Tal Axelrod, *Fauci Expects Real Degree of Normality by Novembner Election*, THE HILL, 2020 WL 1817826 (Apr. 10, 2020) (noting that "videos [have] emerged of long lines and understaffed polling locations, raising concerns over the effect COVID-19 had on the safety of voters who went to cast ballots in person"); Everett Catts, *Election Day Arrives; Long Lines are Expected due to COVID-19,* THE NEIGHBOR, available at https://www.mdjonline.com/neighbor_newspapers/election-day-arrives-long-lines-are-expected-due-to-covid-19/article_3c38ac1a-aa4c-11ea-a6d4-431c24a3d0f4.html (June 9, 2020); Sam Levine, *Georgia Primary Blighted by Long Lines and Broken Voting Machines*, THE GUARDIAN, available at https://www.theguardian.com/us-news/2020/jun/09/georgia-election-primary-long-lines-broken-voting-machines (June 9, 2020); Tessa Weinberg, *COVID May Mean Longer Lines at the Polls in July. Officials Recommend Voting Early,* FORT WORTH STAR-TELEGRAM, available at https://www.star-telegram.com/news/politics-government/election/article243370571.html (June 11, 2020); Greg Adaline, *Long Lines, Incorrect Ballots in Richland Co. add to Voter Frustration in SC Primary*, WIS NEWS, available at https://www.wistv.com/2020/06/09/long-lines-incorrect-ballots-richland-co-add-voter-frustration-sc-primary/ (June 9, 2020); Whitesides and Renshaw, *Confusion, Long Lines at Some Poll Sites as Eight U.S. States Vote During Coronavirus Pandemic*, THOMPSON REUTERS, available at https://www.reuters.com/article/us-usa-election/confusion-missing-ballots-as-eight-us-states-vote-during-coronavirus-pandemic-idUSKBN2391B5 (June 2, 2020).

[8] Indeed, "[c]rowded in-person voting is a potential health threat amidst [the] highly contagious pandemic with no known vaccine or treatment." Dunn, et. al, *Legal Theories to Compel Vote By-Mail in Federal Court*, 11 CAL. L. REV. ONLINE 166, 167 (2020); *see, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-cv-249-wmc, 278-wmc, 284-wmc, 2020 WL 1638374, at *1 (W.D. Wis. Apr. 2, 2020) (opining that two consequences of an election where citizens vote in-person during the pandemic are "a dramatic shortfall in the number of voters on election day as compared to recent primaries, even after accounting for the impressive increase in absentee voters" and "a failure to achieve sufficient in-person voting to have a meaningful election and an increase in the spread of COVID-19"); Dunn, et. al, *Legal Theories to Compel Vote By-Mail in Federal Court*, 11 CAL. L. REV. ONLINE 166, 167 (2020) ("Regulations imposed to mitigate the worst effects of the virus could keep thousands of voters from the polls in the November 2020 presidential election. Vote-by-mail has emerged as the top policy solution to guarantee that voters can still cast their ballots, provided proper safeguards are in place to maximize voting security and prevent discarding of valid ballots.");Myanna Dellinger, *Airline Bailouts and Climate Change Re-Regulation*, 47 N. KY. L. REV. 95, 112 (2020) ("[T]e fear of another COVID-19 peak in the fall of 2020 (and beyond) could also lead to more voters simply staying at home instead of voting, at least in states where voting by mail is not possible."); *Responding to the*

O

in-person voting at polling-places is wrought with uncertainty, which means that Plaintiffs' injuries—predicated on their predicted "effects" of HB 25 *at polling-places*—are far from certainly impending.

The uncertainty of Plaintiffs' allegations notwithstanding, the occurrence of their injuries remains in the hands of Texas voters. Even after HB 25 takes effect, Texans may choose to wait in line at polling places or not, to engage in roll-off or not, or to manually vote for all members of their desired political party or not. And Texans will be presented with an additional decision this year as they consider voting in-person during the pandemic. These impending decisions provide an additional reason that Plaintiffs lack standing: their injuries hinge on decisions of third parties who are not before the Court. *See High v. Karbhari*, 774 F. App'x 180, 183 (5th Cir. 2019) (noting that, at the pleading stage, "if [an] injury's existence depends on the decisions of third parties not before the court, it is conjectural or hypothetical and does not establish standing"); *Sierra Club v. Environ. Protec. Agency*, 925 F.3d 490, 495 (D.C. Cir. 2019) ("[F]ederal courts are generally hesitant to base standing on a chain of events that depends on unfettered choices made by independent actors not before the courts.").

## IV.    Conclusion

For these reasons, the Court finds that Plaintiffs have failed to meet their burden of establishing Article III standing. Having found that Plaintiffs lack Article III standing, the Court lacks subject-matter jurisdiction to adjudicate this case. Thus, the Secretary's Motion to Dismiss (Dkt. No. 32) is **GRANTED**, and this case is **DISMISSED WITHOUT PREJUDICE**. The Clerk is **DIRECTED** to **CLOSE** this case.

---

*Coronavirus Crisis*, BRENNAN CTR. FOR JUSTICE, https://www.brennancenter.org/our-work/responding-coronavirus-crisis (Last visited June 19, 2020) (advocating for, in light of the COVID-19 pandemic, "wider online voter registration and election tools, extended deadlines, and a move to make vote-by-mail universally available while retaining safe options for in-person voting").

O

It is so **ORDERED**.

**SIGNED** June 24, 2020.

_____
Marina Garcia Marmolejo
United States District Judge

!
!